## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No: |
| | : | |
| WEALTH MANAGEMENT LLC; | : | |
| JAMES PUTMAN; and SIMONE FEVOLA, | : | |
| | : | |
| Defendants, and | : | |
| | : | |
| WML GRYPHON FUND LLC; | : | |
| WML WATCH STONE PARTNERS, L.P.; WML | : | |
| PANTERA PARTNERS, L.P.; WML PALISADE | : | |
| PARTNERS, L.P.; WML L3, LLC; and WML | : | |
| QUETZAL PARTNERS, L.P., | : | |
| | : | |
| | : | |
| Relief Defendants. | : | |

## COMPLAINT

1.     Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Commission"), brings this emergency enforcement action against defendants Wealth Management LLC ("WM"), a registered investment adviser located in Appleton, Wisconsin; James Putman ("Putman"), WM's founder, majority owner, and Chief Executive Officer; and Simone Fevola ("Fevola"), WM's former President and Chief Investment Officer (collectively, "Defendants"), and alleges for its complaint against them as follows:

## SUMMARY OF ALLEGATIONS

2.    This case involves securities fraud violations by WM, Putman and Fevola, and the continuing harm being suffered by their advisory clients as a result.

3.    WM is a financial planning firm for families and individuals and also serves as General Partner or Managing Member for six unregistered investment pools, collectively referred to herein as the "WM Funds." WM is a medium-sized firm, claiming currently to have 447 advisory clients and approximately $131 million under management, with approximately $102 million of its clients' funds invested in the WM Funds.

4.    In 2006 and 2007, Putman and Fevola engaged in a kickback scheme through which each accepted at least $1.24 million in undisclosed payments derived from certain investments made by the WM Funds, while continuing to cause clients to invest in the WM Funds.

5.    WM, Putman and Fevola have also breached their fiduciary duties and engaged in fraud by misrepresenting the safety and stability of the two largest WM Funds, and by placing their clients into these investments even though they were unsuitable for some of their clients.

6.    Through the activities alleged in this Complaint, the Defendants, directly or indirectly, have engaged in transactions, acts, practices or courses of business which constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. 9 78j(b)] and Rule 10b-5 [17 C.F.R. § 9240.10b-5] promulgated

thereunder, and Putman and Fevola also aided and abetted WM's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

7.      Additionally, WM and Putman , directly or indirectly, have engaged in transactions, acts, practices, and courses of business which constitute violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1), 80b-6(2) and 80b-6(4)], and Rule 206(4)-8 promulgated thereunder [17 C.F.R. 275.206(4)-8], and Putman and Fevola aided and abetted WM's violations of these provisions.

8.      WM has also engaged in transactions, acts, practices, and courses of business which constitute violations of Section 207 of the Advisers Act [15 U.S.C. § 80b-7], and Fevola aided and abetted WM's violations of this provision.

9.      Additionally, the WM Funds, who are named herein as Relief Defendants, have received ill-gotten gains as a result of the Defendants' violations of the federal securities laws.

10.     The SEC brings this action to restrain and enjoin such transactions, acts, practices and courses of business pursuant to Sections 21(d) and 20(e) of the Exchange Act [15 U.S.C. § 78u(d) and § 78aa], Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

11.     The SEC seeks permanent injunctive relief against the Defendants to enjoin them from future violations of the federal securities laws, disgorgement of ill-gotten gains plus prejudgment interest thereon against WM, Putman and Fevola, and the WM Funds, and the imposition of civil penalties against Defendants Putman and Fevola.

12.     The SEC brings this action on an emergency basis to protect and preserve whatever assets remain in the WM Funds, and to ensure the accurate valuation of these assets, their orderly liquidation, and the equitable distribution of the WM Funds' assets to investors.

13.     The WM Funds appear to have limited remaining assets. It also appears likely that the reported values of the Funds are substantially overstated. WM and Putman have received and continue to receive management fees on the basis of these likely overvalued assets. WM and Putman have been providing redemptions to WM Fund investors based on likely overstated valuations, and have indicated to the SEC that they intend to continue to honor the redemption requests of certain investors as a priority over other investors in the context of an announced liquidation of the WM Funds. WM and Putman are doing this even as they have acknowledged to certain investors that they have no idea about the real value of the WM Funds' principal assets. Putman recently admitted to two investors that their accounts, both with reported values exceeding $600,000, may be worthless.

14.     Notwithstanding his blatant violations of the federal securities laws, Putman, the majority owner of WM, remains at the helm, while most of WM's staff and members of its Board of Managers have departed in recent months.

15.     The emergency relief sought includes: (a) temporary and preliminary injunctive relief; (b) the appointment of a receiver over WM and the WM Funds, who will oversee an immediate and expedited accounting, the orderly liquidation of the WM Funds' holdings, and the equitable distribution of assets to WM Fund clients, while overseeing the operations of WM throughout; and (c) the entry of an asset freeze to

remain in place until such receiver is appointed and gains control over the assets of WM and the WM Funds.

## JURISDICTION

16.     The Commission brings this action pursuant to the authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking to restrain and enjoin permanently the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein, and for such other equitable relief as may be appropriate or necessary for the benefit of investors.

17.     The Commission also seeks a final judgment ordering certain of the Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon, and ordering certain of the Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

18.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§78u(d) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. The Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. Some of these transactions, acts, practices and courses of business occurred in the Eastern District of Wisconsin, where each of the

Defendants transacted business during the relevant period. Defendants Putman and Fevola are both residents of this district, and WM's and the WM Funds' offices are also located within this district.

19.     Defendants have, directly and indirectly, made, and are making, use of the mails, and of the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

20.     There is a reasonable likelihood that Defendants will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this Complaint, and transactions, acts, practices and courses of business of similar purport and object.

## THE DEFENDANTS

21.     **Wealth Management LLC** is a Wisconsin limited liability company located in Appleton, Wisconsin. It has been registered with the Commission as an investment adviser since August 1997. WM was founded by Putman in 1985, and Putman currently owns 60% of the firm. WM is the investment adviser to six unregistered investment pools and serves as the General Partner or Managing Member of these private funds. The WM Funds are named as relief defendants in this action. As of April 14, 2009, WM claims to have discretionary management authority over 447 accounts and to have over $131 million in assets under management. Of this amount, WM claims that approximately $102 million of those assets under management are invested in the WM Funds, with the remaining assets invested in stocks, bonds, and other common instruments.

22.     **James Putman**, age 57, resides in Menasha, Wisconsin. Putman is the

founder, Chief Executive Officer, and Chairman of the Board of Managers of WM.

23.     **Simone Fevola**, age 49, resides in Appleton, Wisconsin. Fevola served as WM's President and Chief Investment Officer from September 2002 through October 2008, when he resigned.

### THE RELIEF DEFENDANTS

24.     **WML Gryphon Fund LLC** is a Wisconsin limited liability company based in Appleton, Wisconsin. Gryphon operates as an unregistered investment pool, and is not registered with the SEC in any capacity. At all times relevant to the allegations herein, WM has been the fund's managing member and investment adviser.

25.     **WML Watch Stone Partners, L.P.** is a Delaware limited partnership based in Appleton, Wisconsin. Watch Stone operates as an unregistered investment pool, and is not registered with the SEC in any capacity. At all times relevant to the allegations herein, WM has been the fund's general partner and investment adviser.

26.     **WML Pantera Partners, L.P** is a Delaware limited partnership based in Appleton, Wisconsin. Pantera operates as an unregistered investment pool, and is not registered with the SEC in any capacity. At all times relevant to the allegations herein, WM has been the fund's general partner and investment adviser.

27.     **WML Palisade Partners, L.P.** is a Delaware limited partnership based in Appleton, Wisconsin. Palisade operates as an unregistered investment pool, and is not registered with the SEC in any capacity. At all times relevant to the allegations herein, WM has been the fund's general partner and investment adviser.

28.     **WML Quetzal Partners, L.P.** is a Delaware limited partnership based in Appleton, Wisconsin. Quetzal operates as an unregistered investment pool, and is not

registered with the SEC in any capacity. At all times relevant to the allegations herein, WM has been the fund's general partner and investment adviser.

29.     **WML L3, LLC** is a Delaware limited liability company based in Appleton, Wisconsin. L3 operates as an unregistered investment pool, and is not registered with the SEC in any capacity. At all times relevant to the allegations herein, WM has been the fund's managing member and investment adviser.

## FACTS

### A.     WM and the WM Funds

30.     WM is a registered investment adviser serving families and individuals.

31.     Putman founded WM in 1985, has been its majority owner at all relevant times, and currently owns approximately 60% of WM.

32.     At all times relevant to the allegations herein, Putman exercised general control over the operations of WM and the WM Funds.

33.     At all times relevant to these violations, Putman possessed the power or ability to control the specific transaction or activities of WM and the WM Funds.

34.     Prior to 2003, WM's clients' assets were held in segregated accounts, were separately managed and were typically invested in common instruments such as stocks, bonds, and highly liquid stock and bond funds.

35.     Beginning in 2003, the Defendants established the WM Funds. The WM funds are unregistered investment pools, akin to the widely used term "hedge funds."

36.     Pursuant to the operating agreements for these pooled funds, the WM Funds have been managed at all times by WM.

37.     After establishing the WM Funds, WM, Putman, and Fevola caused many of WM's advisory clients to invest substantially all of their assets under WM's management – and, in some cases, substantially all of their total investment assets – in the WM Funds. WM, Putman, and Fevola caused clients to invest in the Funds throughout the period of May 2003 through August 2008.

38.     In regular reports to investors, WM has reported generally positive returns for the WM Funds, in some cases remarkably consistent returns, but these purported returns have been based almost entirely on the values reported by third-party managers of the WM Funds' investments in risky, illiquid ventures, as discussed below. WM has not performed any independent due diligence on, or verification of, these values.

39.     As of April 14, 2009, WM claimed to have discretionary management authority over 447 accounts and to have over $131 million in assets under management. Approximately $102 million of those assets under management are invested in the WM Funds, with the remainder held in segregated, individual client accounts.

40.     According to WM, of the $102 million invested in the WM Funds as of April 14, 2009, Gryphon has approximately $38 million in assets, with approximately 40% of WM's advisory clients invested in that fund; and Watch Stone has approximately $50 million in assets, with 47% of WM's advisory clients invested in that fund. (Ex. 5, pp. 8, 23-25) Gryphon and Watch Stone thus comprise approximately $88 million of the $102 million that WM claims to have invested in the WM Funds at present. Palisade has approximately $7 million in assets and 21% of WM clients invested; Quetzal has approximately $4 million in assets and 19% of WM clients invested; Pantera has approximately $2 million in assets and 3% of WM clients invested; and L3 has

approximately $670,000 in assets and 5% of WM clients invested.

41. WM executes a Discretionary Investment Management Agreement ("Investment Management Agreement") with each client, under which the client gives WM full discretion to make investment decisions. WM charges a fee for its investment management services, which is usually 1.00% to 1.25% of the investment assets that WM manages for the clients, with a sliding scale for larger investments. For clients with investments in the WM Funds, WM bases its management fee on the total managed assets for the client. For example, where WM charges a 1.00% management fee to a client who has an investment value of $400,000 in the WM Funds and $100,000 outside of the Funds, WM charges a management fee of 1.00% of the $500,000 in total assets that WM manages.

42. All of the WM Funds' offering documents state that WM is compensated for managing the WM Funds through the management fee and identify Putman and Fevola as the key individuals involved in managing the WM Funds' investments. Where the WM Funds invest in private funds managed by third parties, those third parties typically charge the WM Funds a management fee in addition to the fee charged by the WM. In addition to management fees based on assets under management, WM is also entitled to an annual "Incentive Allocation" of 5% or 10% (depending on the fund) of the annual profits of four of the WM Funds. None of the WM Funds' offering documents provides for any source of compensation, other than this management fee and the Incentive Allocation, to WM, Putman and Fevola in connection with their management of the WM Funds' assets.

**B.      Defendants Misrepresented the Safety and Stability of Gryphon and Watch Stone, Which Were Unsuitable Investments for Some of WM's Clients**

43.      WM, Putman and Fevola have misrepresented the safety and stability of Gryphon and Watch Stone as being comparable to conservative fixed-income investments.

44.      The offering documents for Gryphon and Watch Stone are substantially similar and represent that their investment objectives are "to achieve a high level of income consistent with the preservation of capital." Their offering documents represent that while WM has wide latitude to make investment decisions, the WM Funds "will invest primarily in 'investment grade' debt securities." The offering documents also represent that the WM Funds may invest in other funds which share Gryphon's and Watch Stone's investment objectives. WM provided these offering documents to investors at the time of their investment.

45.      Contrary to the representations in Gryphon's and Watch Stone's offering documents and in written reports to investors, for many years the Funds have invested in neither debt securities nor funds which invest in debt securities. Instead, WM, Putman and Fevola have caused Gryphon and Watch Stone to make a wide variety of risky, illiquid, "alternative" investments, including: life insurance premium financing funds; a water park; an oil drilling and production company; and real estate funds which provide financing for single family home developers in the southwest U.S. Most of these investments are in other funds which are managed by third-party managers, as Gryphon and Watch Stone have generally been operating as "funds of funds." The offering documents for some of these alternative investments characterize the investments as

speculative. These characterizations are wholly inconsistent with the conservative stated investment objectives and investment strategy of Gryphon and Watch Stone.

46.     WM, Putman and Fevola did not disclose to Gryphon's and Watch Stone's investors and prospective investors that these investments were risky and illiquid, and instead misleadingly suggested that they were as safe and stable as conservative fixed-income investments.

47.     In addition to representations in offering documents, Gryphon and Watch Stone provided monthly reports to investors, prepared and/or reviewed by WM and Fevola, in which the Funds used as performance benchmarks the Merrill Lynch Domestic Master Bond Index, which was an index of U.S. Treasury, agency, corporate, and other bonds; as well as the 3-Month U.S. Treasury Bill. In these monthly reports, Gryphon and Watch Stone represented that since inception, they had significantly outperformed these fixed-income benchmarks while exhibiting relatively low volatility. Several investors in the Funds made additional investments after receiving these reports.

48.     The monthly reports depicting the WM Funds' investments as higher performing, and in some cases less volatile, than performance benchmarks such as the Merrill Lynch Domestic Master Bond Index were similarly false and misleading, since there has been no established trading market for any of these alternative investments, and all representations about price and volatility were based exclusively on the representations made by third-party fund managers. Thus, to suggest that any such comparison was appropriate was itself materially misleading.

49.     In addition to these written representations, Putman orally misled at least one investor about the risks of investing in Gryphon, telling the investor at the time of his

initial investment that Gryphon provided stable returns unavailable in the stock market and would yield 7%-8% annual returns with virtually no risk.

50.     In addition to the fraudulent conduct alleged above, WM, Putman and Fevola breached their fiduciary duty to certain of their clients and further violated the antifraud provisions of the federal securities laws because the WM Funds' investments were unsuitable for some clients, even absent the kickback scheme or the fraudulent misrepresentations and omissions concerning safety and risk. Several of WM's clients are elderly retirees who sought safe, low-risk investments and relied on their investments in the WM Funds as their primary source of retirement income. The WM Funds' illiquid and risky investments were plainly unsuitable for these clients.

51.     Nevertheless, WM, Putman, and Fevola caused at least some of these clients to be invested in WM Funds, knowing that the WM Funds' assets would be invested in these unsuitable "alternative" investments.

52.     For example, when WM and Putman initially invested the retirement assets of a 70-year old retiree with Alzheimer's disease in Watch Stone, Putman and the client signed an investment policy statement which contained a selection of the most conservative of five different investment strategies, providing for a target asset allocation of 95% fixed income securities and 5% money market funds. Putman wrote: "We will utilize Watch Stone Partners for investing this account" And he subsequently invested substantially all of his assets under WM's management in Watch Stone.

53.     Likewise, WM has invested substantially all of the retirement savings of a 77-year old retiree in Gryphon. This investor now depends on income from Gryphon to pay for monthly living expenses.

54.     Clients such as these entrusted WM, Putman, and Fevola with nearly all of their liquid assets, and WM, Putman and Fevola betrayed that trust by investing them in Gryphon, Watch Stone and other illiquid and risky investments.

55.     At all times in connection with their representations to prospective and actual investors in Gryphon and Watch Stone, WM, Putman and Fevola knew or were reckless in not knowing that their above statements concerning the safety, stability, liquidity and suitability of Gryphon and Watch Stone were false and misleading.

**C.     Putman and Fevola Caused The WM Funds to Invest In Risky Life Insurance Premium Financing Funds, and Then Putman and Fevola Took Undisclosed Kickbacks Derived From These Investments**

56.     The largest of the WM Funds' "alternative investments" are two funds which provide life insurance premium financing, The Brown Investment Fund, L.P. ("Brown") and The Baetis Fund, L.P. ("Baetis"). From 2003 through 2007, the WM Funds invested a total of approximately $48 million in Brown and Baetis.

57.     At all relevant times, the WM Funds have either been the sole investors or the majority investors in Brown and Baetis. These funds have comprised a significant part of the reported investment value of Gryphon and Watch Stone at all relevant times. Palisade, Pantera and Quetzal also invested a portion of their assets in Brown or Baetis, directly or indirectly.

58.     WM, Putman and Fevola understood, during the majority of the time that the WM Funds have been investing in Brown and Baetis, that Brown's and Baetis' primary business involved making loans to elderly individuals who used the proceeds to pay life insurance premiums for the first two years of their insurance policies. In

connection with each loan, an "ILIT" – irrevocable life insurance trust – was created. The ILIT's asset consisted of the life insurance policy, and the beneficiaries of the ILIT include the insured, the insurance agent, and the lender, which was either Brown or Baetis.

59.     WM, Putman and Fevola, at the time of investing the WM Funds' assets in Brown and Baetis, understood that the financing of these policies was supposed to generate a return in one of three ways: (1) the insured buys the policy from the ILIT after two years, assumes the premium payments, and repays the loan to Brown or Baetis with interest ranging from 8% to 15%; (2) the ILIT sells the policies in the life settlement market after two years and the ILIT's beneficiaries share in the profits; or (3) the beneficiaries of the ILIT receive death benefits if the insured passes away during the two-year period.

60.     WM, Putman and Fevola also understood, at the time of investing the WM Funds' assets in Brown and Baetis, that this investment strategy of financing individual life insurance policies carried with it a number of significant risks, such as the possibility that there would be no market for the policies when ILIT tried to sell them, or that the policyholder and/or Brown or Baetis would fail to pay the policy's required premiums during the first two year policy, which could cause the insurance company to cancel the policy and cause a total loss of principal.

61.     WM, Putman and Fevola also knew or were reckless in not knowing that, in connection with their investment in Brown and Baetis, these funds' investment strategy to finance individual loans resulted in greatly illiquid investments and much greater volatility as compared to investment grade debt securities.

62.     At times relevant to the allegations in this complaint, Brown and Baetis have been, and continue to be, managed by an unregistered investment adviser, Wood, Hat, & Silver ("WHS").

63.     WHS' principal, Joseph Aaron ("Aaron"), was sued by the Commission in 1996 in an enforcement action alleging that Aaron committed fraud in selling promissory notes to investors. As part of the consent judgment in that lawsuit, Aaron was enjoined from violations of the anti-fraud provisions of the federal securities laws, ordered to pay a $20,000 civil penalty, and suspended for twelve months from association with any broker, dealer, municipal securities dealer, investment company or investment adviser. The permanent injunction against Aaron automatically resulted in a permanent investment company bar under Section 9(a) of the Investment Company Act of 1940.

64.     Putman and Fevola knew about Aaron's disciplinary history as early as 2003 and 2004. Despite the obvious concerns raised by Aaron's disciplinary history, WM, Putman, and Fevola nonetheless invested substantial portions of WM Fund assets in Brown and Baetis, allowed Aaron to value the WM Funds' investments in Brown and Baetis, and did not perform any independent verification of these valuations. WM, Putman and Fevola did not disclose Aaron's disciplinary history to WM's advisory clients or the WM Funds' investors and prospective investors.

65.     In 2006 and 2007, Putman and Fevola each took $1.24 million in undisclosed kickbacks derived from the WM Funds' investments in Brown and Baetis. During the period in which Putman and Fevola were receiving their undisclosed kickbacks, and thereafter, WM, Putman and Fevola continued to recommend WM Funds to WM's advisory clients, continued to place WM advisory client funds into the WM

Funds, and continued to cause additional investment by the WM Funds into Brown and Baetis, through which they derived their kickback payments.

66. Putman and Fevola did not disclose the receipt of these commissions or the inherent conflict of interest to WM's clients during their perpetration of the kickback scheme. They also misrepresented in Part II of WM's Forms ADV, which are deemed to be filed with the Commission for purposes of the Advisers Act, that WM and related persons to WM, such as Putman and Fevola, did not receive any economic benefits from non-clients in connection with giving investment advice to clients.

E. **The Funds Appear to Have Limited Remaining Assets**

67. The WM Funds appear to have limited remaining assets, as the Funds' largest investments appear to have limited or questionable value. Three of the Funds' largest investments are now in bankruptcy. The first two bankrupt investments are in two real estate funds managed by MKA Advisors ("MKA"), a California investment manager. These real estate funds were forced into bankruptcy in April 2009. WM has written off the value of the WM Funds' investment in one of these two funds significantly. WM continues to reflect that the Funds' investment in the other MKA fund has retained most of its value, but this valuation was performed prior to this fund's bankruptcy.

68. The other bankrupt investment is in Sagecrest II, LLC ("Sagecrest II"), a Connecticut short-term asset-backed lending fund. Sagecrest II filed for bankruptcy in the summer of 2008. In December 2008, WM wrote down the value of the Funds' investments in Sagecrest II by approximately 50%.

69.     Most of the Funds' current purported value resides in investments in Brown and Baetis, but the value of these investments is questionable. For example, notes to Gryphon's audited 2006 financial statements – which were recently completed in January 2009 -- disclose that amounts owed on promissory notes comprise most of the purported value of Baetis. However, according to these financial statements, many of the promissory notes have matured and have not been repaid or sold as of November 2008. Similarly, Brown's 2008 audited financial statements – which were completed in March 2009 – disclose that from December 2008 through March 2009, several of the life insurance policies that secure the promissory notes invested in by Brown lapsed. These lapses, resulting from policyholders' failure to pay premiums, caused Brown to completely write off the value of those promissory notes. The financial statements also state that if this trend of lapses continues, Brown "will recognize significant bad debt expense on worthless promissory notes receivables in 2009."

70.     Further, in May 2008, WHS and Aaron told WM that Brown and Baetis could not satisfy redemption requests by WM because of the downturn in the real estate market.

71.     As noted above, Aaron, who runs Brown and Baetis, has previously been sued by the Commission for fraud, which casts doubt on the integrity of the valuations he has been providing to WM.

72.     Starting in December 2008, the value of Brown and Baetis reported by WHS and Aaron has declined, but not significantly, and WM and Putman have continued to rely exclusively on periodic, one-page account statements received from Brown and Baetis, despite the evidence that those investments' values have greatly deteriorated.

18

73.     Even Putman questions whether the Funds have any value. In WM's most recent monthly reports for the Funds, WM and Putman represented that as of December 31, 2008, Gryphon and Watch Stone had approximately $47 million and $52 million in assets, respectively. But as recorded in notes prepared by WM, Putman recently admitted to one investor that the realizable value of Gryphon's investment in Baetis – which comprised 70% of Gryphon's assets as of December 31, 2008 -- "could be as high as 80% and as low as 0% depending on the markets." According to this investor, Putman has told him that his entire investment in Gryphon -- which according to WM's and Gryphon's account statements to the investor is over $1 million -- could be worthless. Similarly, another investor in Watch Stone told us that Putman recently told him, in the presence of four others, that the supposed $687,000 value of his investment in Watch Stone could actually be zero.

74.     All of these facts suggest that WM and Putman have overstated and are continuing to overstate the values of the WM Funds. As a result of these likely overvaluations, WM has taken and is continuing to take fees, which apparently are based on these likely inflated valuations. In addition, investors in the WM Funds may be making investment decisions that adversely affect their interests on the basis of such information. Still others may have refrained from seeking redemptions because of these likely inflated valuations. Moreover, WM Fund investors have received inconsistent reports from WM concerning the redemption and liquidation.

**F.    WM and Putman Have Suspended Redemptions and Announced the Liquidation of the WM Funds**

75.    Notwithstanding WM's and Putman's fraudulent conduct and fundamental breach of their fiduciary duties to their clients, Putman remains firmly in control of WM (based on his controlling interest in the firm), and WM remains in control of the WM Funds.

76.    Putman's continued control over WM and the WM Funds has led to the resignations or termination in the last 10 months of the majority WM's staff and the resignations of at least two members of WM's Advisory Board. According to WM's website, as of May 17, 2009, there are currently only two members of the Advisory Board: one of whom is an associate professor at a dentistry school in Louisiana.

77.    In February 2008, WM provided written notification to investors in the WM Funds that, pursuant to the WM Funds' governing documents, WM was temporarily limiting redemptions in the WM Funds to 2% per quarter of the value of each individual's investment, purportedly due to liquidity issues. Notwithstanding WM's limitation of redemptions to 2% per quarter, some investors requested full redemptions from the fourth quarter of 2007 through the third quarter of 2008. WM accepted these full redemption requests and promised to satisfy them as money became available.

78.    In December 2008, WM provided written notification of its decision to liquidate the WM Funds and completely suspend redemptions. WM stated that for investors who had not yet submitted redemption requests, future distributions would be made on a pro rata basis based on WM's December 31, 2008 valuation of the WM Funds. However, WM stated that investors whose withdrawal requests were accepted before

September 30, 2008 would be treated as unsecured creditors who would be paid in full before other investors would be paid at all.

79. Absent immediate relief, it is likely that WM and Putman will distribute the limited remaining assets of the WM Funds to a few investors who submitted redemption requests prior to September 30, 2008 and leave the remaining investors with little or no recovery.

80. WM's and Putman's fraudulent conduct warrants their removal as investment managers and the insertion instead of a court-appointed receiver who can properly value the WM Funds' assets, protect the assets against dissipation by WM and Putman through the continued receipt of management fees, engage in an orderly liquidation of WM's holdings, and provide for the equitable distribution of funds to the WM Fund investors.

## COUNT I

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder

### (WM, Putman, and Fevola)

81. The SEC realleges and incorporates by reference each and every allegation set forth above.

82. By virtue of the conduct alleged herein, WM, Putman, and Fevola, directly or indirectly, singly or in concert with others, by use of the means or instrumentality of interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements

of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

83.     WM, Putman, and Fevola knew or were reckless in not knowing of the activities described herein.

84.     By reason of the foregoing, WM, Putman, and Fevola each violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder

### (Putman and Fevola)

85.     The SEC realleges and incorporates by reference each and every allegation set forth above.

86.     As alleged above, WM committed primary violations of the Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with the offer and sale of investments in the WM Funds.

87.     By reason of the foregoing and pursuant to Section 20 of the Exchange Act [15 U.S.C. § 78t], Putman and Fevola, each aided and abetted, and is therefore liable for, the primary violations committed by WM of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], because Putman and Fevola each knowingly or recklessly provided substantial assistance to such entities'

violations of these provisions. Unless enjoined, Putman and Fevola will likely again aid and abet violations of these provisions.

## COUNT III

### Violations of Section 17(a)(1), (2) and (3) of the Securities Act
### [15 U.S.C. § 77q(a)(1), (2) and (3)]

### (WM. Putman, and Fevola)

88.     The SEC realleges and incorporates by reference each and every allegation set forth above.

89.     WM, Putman, and Fevola, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, knowingly or recklessly, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

90.     WM, Putman, and Fevola knew or were reckless in not knowing of the activities described herein.

91.     By reason of the foregoing, WM, Putman, and Fevola have each violated, and unless enjoined will likely again violate, Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), § 77q(a)(2) and § 77q(a)(3)].

# COUNT IV

## Violations of Sections 206(1) and 206(2) of the Advisers Act
## [15 U.S.C. §§ 80b-6(l) and 80b-6(2)]

### (WM and Putman)

92. The SEC realleges and incorporates by reference each and every allegation set forth above.

93. WM and Putman, directly or indirectly, knowingly or recklessly, by use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], have: (a) employed devices, schemes, and artifices to defraud a client or prospective client; and/or (b) engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

94. WM and Putman knew or were reckless in not knowing of the activities described herein constituting violations of Sections 206(1) and 206(2) of the Advisers Act.

95. By reason of the foregoing, WM and Putman have each violated, and unless enjoined will likely again violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## COUNT V

### Aiding and Abetting Violations of Section 206(1) and 206(2) of the Advisers Act
### [15 U.S.C. §§ 80b-6(l) and 80b-6(2)]

#### (Putman and Fevola)

96. The SEC realleges and incorporates by reference each and every allegation set forth above.

97. By reason of the foregoing and pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Putman and Fevola aided and abetted, and are therefore liable for, the primary violations committed by WM of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], because Putman and Fevola knowingly or recklessly provided substantial assistance to such entity's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]. Unless enjoined, Putman and Fevola will likely again aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## COUNT VI

### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder
### [15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-8]

#### (WM and Putman)

98. The SEC realleges and incorporates by reference each and every allegation set forth above.

99. WM and Putman, singly or in concert with others, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, while acting as investment advisers to pooled investment vehicles within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], made untrue statements of material fact or

omitted to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to an investor or prospective investor in a pooled investment vehicle or otherwise engaged in acts, practices, or courses of business that are fraudulent, deceptive or manipulative with respect to an investor or prospective investor in a pooled investment vehicle.

100. By reason of the foregoing, WM and Putman have directly or indirectly violated, and unless enjoined will likely again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### COUNT VII

### Aiding and Abetting of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder
### [15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-8]

### (Putman and Fevola)

101. The SEC realleges and incorporates by reference each and every allegation set forth above.

102. By reason of the foregoing and pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Putman and Fevola aided and abetted, and are therefore liable for, the primary violations committed by WM of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], because Putman and Fevola knowingly or recklessly provided substantial assistance to such entity's violations of Section 206(4) Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]. Unless enjoined, Putman and Fevola will likely again aid and abet violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## COUNT VIII

### Violations of Section 207 of the Advisers Act
### [15 U.S.C. § 80b-7]

### (WM)

103.    The SEC realleges and incorporates by reference each and every allegation set forth above.

104.    WM, singly or in concert with others, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, willfully made untrue statements of material fact in, and omitted to state material facts required to be stated in, reports filed with the Commission, namely, Part II of WM's Form ADV.

105.    By reason of the foregoing, WM has violated, and unless enjoined will likely again violate, Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

### COUNT IX

### Aiding and Abetting of Section 207 of the Advisers Act
### [15 U.S.C. § 80b-7]

### (Fevola)

106.    The SEC realleges and incorporates by reference each and every allegation set forth above.

107.    By reason of the foregoing and pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Fevola aided and abetted, and is therefore liable for, the primary violations committed by WM of Section 207 of the Advisers Act [15 U.S.C. § 80b-7], because Fevola knowingly or recklessly provided substantial assistance to such entity's violations of Section 207 of the Advisers Act [15 U.S.C. § 80b-7]. Unless

enjoined, Fevola will likely again aid and abet violations of Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

## I.
### (Declaratory Judgment)

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein and enter judgment against each of them.

## II.
### (Injunctive Relief)

Grant an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants WM, Putman and Fevola, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77o(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

As to Defendants WM and Fevola only, grant an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants WM and Fevola, their officers, agents, servants,

employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 207 of the Advisers Act [15 U.S.C. §§ 80b-7]

## III.
### [Interim Relief]

Grant appropriate additional emergency interim relief, consistent, with Rule 65(d) of the Federal Rules of Civil Procedures, to protect WM's advisory clients and the WM Funds' investors, including: (i) a Temporary Restraining Order and Order of Preliminary Injunction against Defendants WM and Putman restraining and enjoining them as set forth above in Section II of the Relief Requested; (ii) an Order freezing the assets of WM and the WM Funds; (iii) an Order appointing a receiver over WM and the WM Funds; (iv) an Order requiring the Defendants WM and Putman to provide expedited accountings and discovery; and (v) other ancillary emergency interim relief as is set forth in the SEC's Emergency Motion for a Temporary Restraining Order, Asset Freeze, Appointment of a Receiver, and Other Ancillary Relief filed contemporaneously with this complaint.

## IV.
### [Disgorgement of Ill-Gotten Gains]

Issue an Order requiring all Defendants to disgorge the ill-gotten gains that they received as a result of their wrongful conduct (including any losses they avoided by virtue of their unlawful conduct), including prejudgment interest.

# V.
## [Civil Penalties]

Issue an Order imposing appropriate civil penalties upon Defendants WM, Putman and Fevola pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

# VI.
## [Retention of Equitable Jurisdiction]

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

# VII.
## [Other Relief]

Grant such orders for further relief the Court deems appropriate.

Respectfully submitted,

_____

Steven J. Levine (IL Bar No. 6226921)
Eric M. Phillips (IL Bar No. 6237871)
Tracy W. Lo (IL Bar No. 6270173)
Jeffrey A. Shank (IL Bar No. 6283981)
Attorneys for Plaintiff
Securities and Exchange Commission
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated: May 20, 2009