**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

_____
                                                            :
**SECURITIES AND EXCHANGE COMMISSION,**       :
                                                            :
                                                            :
        **Plaintiff,**                                      :
                                                            :
    **v.**                                                  :        **Civil Action No:**
                                                            :
**WEALTH MANAGEMENT LLC;**                       :
**JAMES PUTMAN; SIMONE FEVOLA;**                :
                                                            :
        **Defendants,**                                     :
**and**                                                     :
                                                            :
**WML GRYPHON FUND LLC;**                         :
**WML WATCH STONE PARTNERS, L.P.; WML**          :
**PANTERA PARTNERS, L.P.; WML PALISADE**         :
**PARTNERS, L.P.; WML QUETZAL**                   :
**PARTNERS, L.P.: and WML L3 LLC;**               :
                                                            :
                                                            :
                                                            :
        **Relief Defendants.**                             :
_____:


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION**
**FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER, ORDER**
**<u>APPOINTING RECEIVER, AND OTHER ANCILLARY RELIEF</u>**

Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Commission"), respectfully submits this memorandum in support of its Motion for a Temporary Restraining Order, Asset Freeze Order, Order Appointing Receiver, and Other Ancillary Relief ("Motion").

## INTRODUCTION

This action involves fraudulent offerings and a kick-back scheme involving Defendants Wealth Management LLC ("WM"), its majority owner James Putman ("Putman"), and its former President Simone Fevola ("Fevola"). WM is a well-established, medium-sized, registered Investment Adviser in Appleton, Wisconsin that provides financial planning services and investment advisory services for individuals and families, with approximately half of WM's clients being high net worth individuals. Prior to 2003, WM managed its clients' accounts in segregated accounts, investing primarily in stocks, bonds, and mutual funds. Beginning in 2003, Defendants WM, Putman and Fevola created a number of unregistered pooled investment funds (the "WM Funds") that WM also managed, and caused many of WM's advisory clients to invest in them. WM, Putman and Fevola misrepresented the safety, stability and, in for some clients, the suitability of the two largest WM Funds. WM misled these investors into believing that these WM Funds would invest primarily in conservative fixed-income investments, when in fact WM caused the WM Funds to make investments in risky, illiquid securities which now appear to have little value. For some of their clients, WM, Putman, and Fevola invested nearly all of the assets under their management in these risky, illiquid WM Funds.

In 2006 and 2007, Putman and Fevola engaged in an old-fashioned kickback scheme, whereby Putman and Fevola each accepted $1.24 million in undisclosed payments, derived from substantial investments by the WM Funds into two investment funds managed by a third party.

Even as they were pocketing these kickback payments, WM, Putman and Fevola continued recommending these investments in the WM Funds to their advisory client, and caused them to place additional funds into these investments.

WM claims currently to have approximately $131 million under management, with approximately $102 million invested in the WM Funds. The valuation of the WM Funds appears to be substantially overstated, however, as the financial condition of many of the WM Funds' underlying investments is poor. Indeed, three sizable investments by the WM Funds are now bankrupt. WM and Putman continue to represent that the WM Funds' other investments have significant value, but Putman recently admitted to at least two investors that investments in the two largest WM Funds could actually be worthless.

WM, which is majority-owned and controlled by Putman, began limiting redemptions from the Funds in February 2008 and suspended new redemption requests beginning in December 2008, at which time it purportedly began winding down the WM Funds and liquidating their assets. However, in the last 18 months WM has paid out millions of dollars from the WM Funds in an effort to satisfy in full the redemption requests of a small group of investors who made full redemption requests from the fourth quarter of 2007 through September 30, 2008. WM also recently advised the SEC that in the coming days it intends to pay out over $500,000 from the WM Funds to continue to try to satisfy the redemption requests of this small group of investors and to pay itself fees in connection with the WM Funds' liquidation.

WM's efforts to fully satisfy redemption requests submitted prior to September 30, 2008 underscores the need for emergency action. It appears likely that by paying investors who made redemption requests before September 30, 2008 in full before paying other investors at all, WM arguably has been giving, and plans to continue to give, preferences to a small group of investors by fully satisfying their redemption requests based on likely inflated investment values. (Ex. 72,

4/22/09 WM Responses to 2 SEC Questions)  Meanwhile, the majority of investors in the WM Funds, who did not submit redemption requests prior to September 30, 2008, appear likely to be left with large losses because of the limited remaining value of the WM Funds' investments.

In May 2008, Putman and Fevola finally disclosed their kickback scheme to WM's Advisory Board and outside counsel.  Ordinarily, one would expect the disclosure of such a scheme to prompt the immediate termination of those employees who participated in it. However, because Putman is the majority owner of WM and effectively controls it, he remains firmly entrenched at the helm of this sinking ship.  In recent months, there has been substantial attrition among WM's staff (including WM's President, Chief Investment Officer and Chief Compliance Officer), and two of WM's four Advisory Board members have resigned, in protest over Putman's continued control over WM.

The foregoing facts make clear that a judicially supervised equitable receivership over WM and the WM Funds is now required to adequately protect WM's advisory clients and the WM Funds' investors.  A receiver, untainted by fraud, can step in and oversee the operations of WM while determining the best way to liquidate the WM Funds to maximize their value, and devise and implement, under principles of equity, a plan of distribution concerning the WM Funds' limited remaining assets to injured investors.

For these reasons, and others discussed herein, the SEC respectfully requests the following relief from this Court:

(1) a temporary restraining order, restraining and enjoining Defendants WM and Putman against future violations of the federal securities laws, pursuant to a proposed Temporary Restraining Order and Order for Other Emergency Relief ("TRO Order") submitted in connection with this motion;

(2) an order immediately appointing Faye B. Feinstein, Esq., a partner at the law firm of Quarles & Brady, LLP as receiver over WM and the WM Funds, pursuant to a proposed Order Appointing Receiver ("Receiver Order") submitted in connection with this motion;

(3) an immediate freeze of all corporate assets of WM and the WM Funds, including all brokerage and bank accounts held in the name of WM and the WM Funds, until such time as the Receiver has had the opportunity to obtain control over all of WM's and the WM Funds' assets and accounts, pursuant to a separate "Asset Freeze Order" submitted in connection with this motion;

(4) an order requiring WM, Putman and the WM Funds to provide an expedited accounting and response to certain limited written discovery as specified in the proposed TRO order;

(5) an order requiring WM, Putman and the WM Funds and their employees and agents and others with whom they conduct business to cooperate fully with the court-appointed receiver, as specified in the proposed TRO Order;

(6) an order prohibiting the destruction of any records, as specified in the proposed TRO Order; and

(7) such further relief as the Court may deem appropriate.

**STATEMENT OF FACTS**[1]

**A.      The Defendants**

WM is an investment adviser located in Appleton, Wisconsin, serving families and

individuals.  (Ex. 5, 4/14/09 Form ADV Part 1, p.1)  WM has been registered with the

Commission as an investment adviser since August 1997. (Ex. 7)  WM was founded by Putman

in 1985, and Putman currently owns approximately 60% of WM.  (Ex. 8, Putman Tr., pp. 1, 9,

119)  WM is the investment adviser to six unregistered investment pools and serves as the

General Partner or Managing Member of these private WM Funds.  (Exs. 14, 16, pp. 9-10

Confidential Offering Memoranda for the WM Funds)[2]  In its April 14, 2009 Form ADV Part I

filed with the SEC, WM claims to have discretionary management authority over 447 accounts

and to have over $131 million in assets under management.  (Ex. 5, p.8)  Approximately $102

million of those assets under management are invested in the WM Funds, with the remaining

assets invested in stocks, bonds, and other common instruments. (Ex. 1, Davis Decl., ¶¶ 37-38;

Ex. 6, 4/14/09 Form ADV, Part II, p. 3)

James Putman, age 57, resides in Menasha, Wisconsin.  (Ex. 9, p.2)  Putman is the

founder, Chief Executive Officer, and Chairman of the Board of Managers of WM. (*Id.* at 8; Ex.

9, 12)  Simone Fevola, age 49, resides in Appleton, Wisconsin.  (Ex. 12, pp.1, 2) Fevola served

---

[1]   The facts set forth in this memorandum are supported by a two-volume Compendium of Exhibits which includes, among other documents, the declarations of SEC examiner Willie R. Davis (Ex. 1) and SEC staff accountant Jean Javorski (Ex. 2), and the sworn testimonies of Defendants Putman (Ex. 8) and Fevola (Ex. 13).  Citations in this memorandum begin with a reference to a particular exhibit, followed by an abbreviated description, and then a page or paragraph reference.  Where the evidence involves merely background information or is likely not to be disputed, the citation omits an abbreviated description.

[2]   The SEC has only appended the offering materials for the two largest of the WM Funds -- "Gryphon" and "Watch Stone" -- but will make offering materials for the other funds available promptly upon request by the parties or the Court.

as WM's President and Chief Investment Officer from September 2002 through October 2008, when he resigned. (Exs. 10, 12) Fevola currently works as a consultant to Winch Advisory Services, a registered investment adviser located in Appleton, Wisconsin. (Ex. 13, Fevola Tr., p. 8)

The WM Funds comprise six limited liability companies or limited partnerships. They include WML Gryphon Fund LLC ("Gryphon"), Watch Stone Partners, L.P. ("Watch Stone"), WML Pantera Partners, L.P. ("Pantera"), WML Palisade Partners, L.P. ("Palisade"), WML Quetzal Partners, L.P. ("Quetzal"), and WML L3 LLC ("L3"). (Ex. 3, Sch. D) The WM Funds operate as private investment pools, and none of them have ever registered an offering of securities under the Securities Act of 1933 ("Securities Act") or a class of securities under the Securities Exchange Act of 1934 ("Exchange Act"). (Ex. 1, Davis Decl., ¶ 39).

WM executes a Discretionary Investment Management Agreement ("Investment Management Agreement") with each client, under which the client gives WM full discretion to make investment decisions. (Exs. 5, p. 8; Ex. 24, Discretionary Investment Management Agreement for Investor D) WM charges a fee for its investment management services, which is usually 1.00% to 1.25% of the investment assets that WM manages for the clients, with a sliding scale for larger investments. (Ex. 4, 3/31/08 Form ADV, Part II, Sched. F., pp. 1-2). For clients with investments in the WM Funds, WM bases its management fee on the total managed assets for the client. (*Id.*; Ex. 8, Putman Tr., p. 140) For example, where WM charges a 1.00% management fee to a client who has an investment value of $400,000 in the WM Funds and $100,000 outside of the Funds, WM charges a management fee of 1.00% of the $500,000 in total assets that WM manages. All of the WM Funds' offering documents state that WM is compensated for managing the Funds through the management fee and identify Putman and Fevola as the key individuals involved in managing the Funds' investments. (Exs. 14, 16, COMs

of the WM Funds, pps. 3-4 and 9-10).  Where the WM Funds invest in private funds managed by third

parties, those third parties typically charge the WM Funds a management fee in addition to the fee

charged by the WM. (Ex. 1, Davis Decl., ¶ 40) In addition to management fees based on assets under

management, WM also receives an annual "Incentive Allocation" of 5% or 10% (depending on

the fund) of the annual profits of four of the WM Funds.  (Ex. 4, Part II, Sched. F)  None of the

WM Funds' offering documents provides for any source of compensation, other than this

management fee and the Incentive Allocation, to WM, Putman and Fevola in connection with

their management of the WM Funds' assets.  *Id.*

**B.    <u>The WM Funds</u>**

WM launched the WM Funds with the establishment of Gryphon in 2003 and, over the

next couple of years, established the additional five WM Funds.  (Ex. 13, Fevola Tr., pp. 13-15).

Prior to launching the WM Funds, WM client assets were held in segregated accounts, were

separately managed, and were typically invested in mostly mutual funds, with some investments

in stocks and bonds traded on national exchanges.  (Ex. 1, Davis Decl., ¶ 37)

After establishing the WM Funds, WM, Putman, and Fevola caused most of WM's

advisory clients to invest substantially all of their assets under WM's in the WM Funds.   (Ex. 3,

3/31/08 Form ADV, Part I, p. 8, 26-28; Ex. 5, 4/14/09 Form ADV, Part I, p.8, 23-26, Ex. 74, Ex.

74, Investment Policy Statements)  These advisory clients include a 70-year old retiree with

Alzheimer's disease, who has nearly all of his and his wife's retirement savings invested in

Watch Stone despite telling WM that they wanted to make conservative fixed income

investments (Ex. 1, Davis Decl., ¶¶ 29-30; Ex. 25, Investor B's Investment Policy Statement

dated Oct. 11, 2004); and a 77-year old retiree who has most of his retirement savings invested

in Gryphon and depends on income from Gryphon to pay for monthly living expenses. (Ex. 2,

Javorski Decl., ¶¶ 8, 11-12, 14)

The bulk of WM client assets were placed in two of the WM Funds -- Gryphon and Watch Stone. According WM's Form ADV filed with the SEC on April 14, 2009: Gryphon has approximately $38 million in assets, with approximately 40% of WM's advisory clients invested in that fund; and Watch Stone has approximately $50 million in assets, with 47% of WM's advisory clients invested in that fund. (Ex. 5, pp. 8, 23-25) Gryphon and Watch Stone thus comprise approximately $88 million of the $102 million that WM claims to have invested in the WM Funds at present.[3] (Ex. 5, pp. 23-25, Davis Decl., ¶ 38)

In regular reports to investors, WM has reported generally positive returns for the WM Funds, in some cases remarkably consistent returns, but these purported returns have been based almost entirely on the values reported by third-party managers of the Funds' investments in risky, illiquid ventures, as discussed below. (Ex. 27, November 2008 Monthly WM Investor Newsletters; Ex. 1, Davis Decl., ¶ 43) WM has not performed any independent due diligence on, or verification of, these values. (Ex. 1, Davis Decl., ¶ 43; Ex. 13, Fevola Tr. p. 32).

**C.** **Defendants Misrepresented the Safety, Stability and Suitability of Gryphon and Watch Stone**

In connection with their causing WM's advisory clients to invest in Gryphon and Watch Stone, WM, Putman and Fevola misrepresented to their advisory clients the safety and stability of Gryphon and Watch Stone as being comparable to the safety and stability of conservative fixed-income investments. (Exs. 14, 16, WM Offering Materials p. 1; Exs. 30 and 31, Monthly WM Investor Newsletters for Gryphon and Watch Stone; Exs. 32-35, Subscription Agreements; Ex. 1, Davis Decl., ¶¶ 24, 44) Gryphon's and Watch Stone's offering documents state that their investment objectives are "to achieve a high level of income consistent with the preservation of

---

[3]    According to WM's Form ADV dated April 14, 2009, Palisade has approximately $7 million in assets and 21% of WM clients invested; Quetzal has approximately $4 million in assets and 19% of WM clients invested; Pantera has approximately $2 million in assets and 3% of WM clients invested; and L3 has approximately $670,000 in assets and 5% of WM clients invested. (Ex. 5, pp. 24-26)

capital." (Exs. 14, 16, p. 1, 7)  Their offering documents represent that while WM has wide latitude to make investment decisions, the Funds "will invest primarily in 'investment grade' debt securities."  (*Id.*)

Contrary to the representations in Gryphon's and Watch Stone's offering documents for many years the Funds have invested in neither debt securities nor funds which invest in debt securities.  Instead, WM, Putman and Fevola have caused Gryphon and Watch Stone to make a wide variety of risky, illiquid, "alternative" investments, including: life insurance premium financing funds; a water park; an oil drilling and production company; and real estate funds which provide financing for single family home developers in the southwest U.S.   (Ex. 41, 7/1/07 Investment Manager Summary for each WM Fund, pp. 1-3, 9-10)  Most of these investments are in other funds which are managed by third-party managers, as Gryphon and Watch Stone have generally been operating as "funds of funds."  *Id*.  The offering documents for several of these other alternative investments characterize the investments as speculative.  (Exs. 42 and 43, Brown and Baetis Offering Memorandum, pp. 2, 3; Exs. 44 and 70, MKA Real Estate Opportunity and Qualified Offering Memorandum, p. ii)  Moreover, Putman and Fevola were expressly told by a representative of one of the funds, which engaged in life insurance premium financing, that investments in this business were high risk.  (Ex. 71, Riek Tr., pp. 48-49)  These characterizations are completely inconsistent with the conservative stated investment objectives and investment strategy of Gryphon and Watch Stone, which is to preserve capital and invest primarily in "'investment grade' debt securities."  (Exs. 14, 16, pp. 1, 7)   WM, Putman and Fevola did not disclose to Gryphon's and Watch Stone's investors and prospective investors that these investments were risky and illiquid, and instead misleadingly suggested that they were as safe and stable as conservative fixed-income investments.

In addition to representations in offering documents, WM, Putman and Fevola provided monthly reports to investors for the Gryphon and Watch Stone Funds in which they misleadingly used as performance benchmarks the Merrill Lynch Domestic Master Bond Index, which was an index of U.S. Treasury, agency, corporate, and other bonds, and the 3-Month U.S. Treasury Bill. (Exs. 30 and 31, Monthly WM Investor Newsletters for Gryphon and Watch Stone) In these monthly reports to investors, Gryphon and Watch Stone represented that since inception, they had significantly outperformed these fixed-income benchmarks while exhibiting relatively low volatility. *Id.* Several investors in the Funds made additional investments after receiving these reports. (Exs. 36 and 37, Summary of Purchases in Gryphon and Watch Stone)

These comparisons to performance benchmarks such as the Merrill Lynch Domestic Master Bond Index were also false and misleading, since there have been no established trading markets for any of these "alternative" investments in which Gryphon and Watch Stone were invested, and all representations about price and volatility were based exclusively on the representations made by third-party fund mangers. (Ex. 71, Riek Tr., pp. 46-47; Ex. 1, Davis Decl., ¶43) Thus, to suggest that any such comparison was appropriate was itself materially misleading.

In addition to these written representations, Putman made a false oral communication to at least one investor that Gryphon provided stable returns unavailable in the stock market and would yield 7%-8% annual returns with virtually no risk. (Ex. 1, Davis Decl., ¶ 24)

In recommending Gryphon and Watch Stone to their clients, WM, Putman, and Fevola equated investments in Gryphon and Watch Stone with safe, stable fixed-income investments. For example, when WM and Putman initially invested the retirement assets of a 70-year old retiree with Alzheimer's disease in Watch Stone, Putman signed an investment policy statement along with the client. (Ex. 25, Investor B's Investment Policy Statement) In the investment

policy statement, Putman and the client chose the most conservative of five different investment strategies, which provided for a target asset allocation of 95% fixed income securities and 5% money market funds. *Id.* Putman wrote: "We will utilize Watch Stone Partners for investing this account." *Id.* In reality, these alternative investments, which were nothing like fixed-income, were entirely unsuitable for WM's advisory clients such as these two investors. *Id.*

**D. Putman and Fevola Caused The Funds to Invest In Risky Life Insurance Premium Financing Funds, and Then Putman and Fevola Took Undisclosed Kickbacks Derived From These Investments**

### 1. The Funds Invested in Life Insurance Premium Financing Funds

The WM Funds' largest "alternative investments" are two funds which provide life insurance premium financing: The Brown Investment Fund, L.P. ("Brown") and The Baetis Fund, L.P. ("Baetis"). From 2003 through 2007, the WM Funds invested a total of approximately $48 million in Brown or Baetis. (Ex. 1, Davis Decl., ¶ 46) Since the WM Funds began investing in Brown and Baetis, the WM Funds have either been the sole investor or the majority investor in these funds. (Ex. 8, Putman Tr., p. 33; Ex. 13, Fevola Tr, p. 30-31; Ex. 73, Brown & Baetis Investor Reports) These funds have comprised a significant part of the reported investment value of the WM Funds.[4] (Ex. 1, Davis Decl., ¶ 47; Exs. 30-31, Monthly WM Investor Newsletters for Gryphon and Watch Stone) The offering documents for Brown and Baetis emphasize that an investment in those funds "may be deemed to be speculative" and "is designed for sophisticated investors who are able to bear a substantial loss of their investment." (Ex. 42, Baetis POM, p.2; Ex. 43, Brown POM, p. 3)

In the last few years, Brown's and Baetis' primary business has been to make loans to elderly individuals who used the proceeds to pay life insurance premiums for the first two years.

---

[4] According to WM, as of December 31, 2008, investments in Baetis comprised 69.7% of Gryphon's assets and 60.1% of Pantera's assets; and investments in Brown comprised 52.1% of Watch Stone's assets and 24.4% of Palisade's assets. Additionally, 19.8% of Quetzal's assets were invested in Gryphon, whose assets were largely invested in Baetis, as noted above. (Ex. 64, December 2008 Monthly WM Investor Newsletters for each WM Fund)

(Ex. 8, Putman Tr., pp. 22, 35, 46, 121; Fevola Tr., pp. 58-59)  In connection with each loan, an "ILIT" – irrevocable life insurance trust -- was created.  (Ex. 8, Putman Testimony, p. 46)  The ILIT's asset consists of the life insurance policy, and the beneficiaries of the ILIT include the insured, the insurance agent, and the lender, which is either Brown or Baetis.  *Id*.  Thus, these funds secured their loans by obtaining an interest in the underlying insurance policies.  (Ex. 1, Davis Decl., ¶ 49)  According to Putman and Fevola, the financing of these policies is supposed to generate a return in one of three ways: (1) the insured buys the policy from the ILIT after two years, assumes the premium payments, and repays the loan to Brown or Baetis with interest ranging from 8% to 15%; (2) the ILIT sells the policies in the life settlement market after two years and the ILIT's beneficiaries share in the profits; or (3) the beneficiaries of the ILIT receive death benefits if the insured passes away during the two-year period.  (Ex. 8, Putman Tr., pp. 44-45, 49; Ex. 13, Fevola Tr., p. 24; Ex. 1**,** Davis Decl., ¶ 48)

Putman admitted in testimony that he understood that there was a real risk of loss of principal in connection with investments in Brown and Baetis.  (Ex. 8, Putman Tr., p. 51).  One such risk, as Putman put it, was that "there would be no buyers" for the policies when the ILIT tried to sell the policies.  *Id*.  He testified that an additional risk was that if the policyholder failed to pay the policy's required premiums during the first two years of the policy, then "[t]here would be a loss of principal" on the investment.  *Id*.

Brown and Baetis are managed by an unregistered investment adviser, Wood, Hat, & Silver ("WHS"), whose principal, Joseph Aaron ("Aaron"), had been sued by the Commission in 1996 in an enforcement action alleging that Aaron committed fraud in selling promissory notes to investors.  As part of the consent judgment in that lawsuit, Aaron was enjoined from violations of the anti-fraud provisions of the federal securities laws, ordered to pay a $20,000 civil penalty, and suspended for twelve months from association with any broker, dealer,

municipal securities dealer, investment company or investment adviser. The permanent

injunction against Aaron automatically resulted in a permanent investment company bar under

Section 9(a) of the Investment Company Act of 1940. (Ex. 42, Baetis POM, p. 3; Ex. 43, Brown

POM, p. 4; Ex. 49, Form ADV-W dated December 11, 2006 for Wood, Hat & Silver, L.L.C.; Ex.

50, AP Order against Joseph Aaron dated January 25, 1996; Ex. 48, 2004 WHS Form ADV, Part

I, pp. 42-43)

Putman and Fevola have admitted that early in WM's relationship with Brown and

Baetis, in 2003 or 2004, they learned about Aaron's disciplinary history, and Putman has

admitted that this concerned him. (Ex. 8, Putman Tr., pp. 97-98, 100; Ex. 13, Fevola Tr., pp. 61-

62) Nevertheless, Putman and Fevola, continued to put WM advisory client funds into Baetis

and Brown, and blindly accepted Aaron's representations as to the value of WM Funds'

investments in Brown and Baetis on one-page statements containing no support for the reported

value, and never performed any independent verification of these valuations. (Ex. 8, Putman Tr.,

p. 52; Ex. 13, Fevola Tr., pp. 31, 33,, Ex. 73, Brown & Baetis investor reports).

### 2. Putman and Fevola Took Undisclosed Kickbacks

In mid-2006, Thomas Riek ("Riek"), a former investment adviser representative for WHS

and a employee at WM, offered Putman the opportunity to share in the insurance agents'

commissions generated by the life insurance policies financed directly by Brown and Baetis, and

indirectly by the WM Funds that comprised more than 85 percent of Brown's and 100 percent of

Baetis' assets. (Ex. 8, Putman Tr., p. 58; Ex. 51, Background Questionnaire of Tom Riek, p. 12)

 Putman, in turn, told Fevola about this opportunity. (Ex. 8, Putman Tr., p. 62; Ex. 13, Fevola

Tr. p. 34) Riek told Putman that they could receive between ten to thirty percent of the insurance

agents' commissions. (Ex. 8, Putman Tr., pp. 59-60)

Putman, Fevola, and Riek formed an entity called Quadrimus, LLC ("Quadrimus") in August 2006 to receive and distribute a portion of the commission payments generated by the life insurance premium financing. (Ex. 8, Putman Tr., p. 70; Ex. 13, Fevola Tr., pp. 37-38; Ex. 52, Operating Agreement for Quadrimus, LLC) According to Putman and Fevola, the three members of Quadrimus shared the commissions equally - each receiving approximately $1.24 million from October 2006 through the end of 2007. (Ex. 8, Putman Tr., pp. 59, 75-77; Ex. 13, Fevola Tr., pp. 38, 40-41; Ex. 53, 2006 and 2007 Schedule K-1s Issued by Quadrimus, L.L.C ) Many investors continued to make investments in the WM Funds even while Putman and Fevola were taking these undisclosed kickbacks. (Ex. 1, Davis Decl., ¶ 50) Indeed, between October 2006 and December 2007, WM, Putman and Fevola convinced more than 100 investors to invest an additional $20 million in Gryphon, Watch Stone and the other WM Funds, almost half of which was then plowed into Baetis and Brown, providing additional capital from which more kickback payments were derived. *Id*. at ¶¶ 50-51. The kickbacks the Putman and Fevola received were only made possible by virtue of money raised from WM's advisory clients for the WM Funds, which Putman and Fevola then used to invest in Baetis and Brown and finance the insurance policies from which the kickbacks were derived.

Putman and Fevola have admitted that they did not disclose the receipt of these commissions to WM's clients. (Ex. 8, Putman Tr., pp. 142, 144; Ex. 13, Fevola Tr., p. 73) WM and Fevola also misrepresented in Part II of WM's Form ADV that WM did not receive any economic benefits from non-clients in connection with giving investment advice to clients. (Ex. 8, Putman Tr., p. 137; Ex. 13, Fevola Tr., p. 67) It was not until May 2008 that Putman finally disclosed the receipt of these payments to WM's outside counsel and Board of Advisors. (Ex. 8, Putman Tr., p. 109). Putman and Fevola have both signed promissory notes to WM and informed the SEC that they are willing pay back to WM the $1.24 million in kickback payments

that each received in connection with the WM Funds' investments in Baetis and Brown, less taxes paid. (Ex. 8, Putman Tr., pp. 131-34; Ex. 13, Fevola Tr., pp. 78-79) But these promises do not make Defendants' violations of the federal securities laws and their breach of their duty to their investors any less egregious.

Shortly before the SEC commenced this action, the staff took Riek's investigative testimony. He testified that despite Putman's and Fevola's assertions to the contrary, Riek had discussions with Putman prior to the formation of Quadrimus that the commission payments be affirmatively disclosed to the investors of the WM Funds. (Ex. 71, Riek Tr., pp. 97, 100-03) Riek testified that he was told by Putman that disclosures were made to the WM investors. (Ex. 71, Riek Tr., p. 101) Riek stated that he was shocked later to learn from Putman that Putman and Fevola had never made any disclosures to the investors of the WM Funds about the receipt of these commission payments. (Ex. 71, Riek Tr., p. 103) According to Riek, when he asked Putman why no disclosures were ever made, Putman's response was that he had delegated the responsibility to Fevola, that he was told that the disclosures had been made, that he did not follow up on the disclosures properly, and that his failure to verify was a mistake. (Ex. 71, Riek Tr., p. 103) Putman's self-serving statements to Riek show only Putman's willingness to throw Fevola under the bus and his corresponding failure to accept responsibility for his conduct; it in no way exonerates his own conduct, or explains his complete and utter failure for two years to communicate the kickbacks to the Advisory Board, to WM's counsel, to any of WM's clients, or in their required Form ADV filings, nor does it justify the kickbacks in the first instance.

**E.    WM Suspended Redemptions From the WM Funds and Announced the Liquidation of the Funds**

The WM Funds' governing documents generally allow investors to redeem their investments as of the last day of each calendar quarter upon thirty, forty-five, or sixty days notice, depending on the particular Fund. (Exs. 14, 16, WM Funds' COM, p. 3) In February

2008, WM provided written notification to investors in the WM Funds that WM was temporarily limiting redemptions in the Funds to 2% per quarter of the value of each individual's investment, purportedly due to liquidity issues. (Ex. 54, 2/15/08 letter from WM regarding 2% liquidation) Notwithstanding WM's limitation of redemptions to 2% per quarter, some investors requested full redemptions from the fourth quarter of 2007 through the third quarter of 2008. (Ex. 55, Redemption Schedules for WM Funds; Ex. 26, 12/11/08 letter from WM regarding liquidation) WM accepted these full redemption requests and promised to satisfy them as money became available. (Ex. 26, 12/11/08 letter from WM to investors regarding liquidation)

In December 2008, WM provided written notification of its decision to liquidate the Funds and completely suspend redemptions. *Id.* WM stated that for investors who had not yet submitted redemption requests, future distributions would be made on a pro rata basis based on WM's December 31, 2008 valuation of the Funds. *Id.* However, WM stated that investors whose withdrawal requests were accepted before September 30, 2008 would be treated as former investors and unsecured creditors who would be paid in full before other investors would be paid at all.[5] *Id.*

## F. The Funds Appear to Have Limited Remaining Assets

The Funds appear to have limited remaining assets, as the Funds' largest investments appear to have limited or questionable value. Three of the Funds' investments are now in bankruptcy. The first two bankrupt investments are in two real estate funds managed by MKA Advisors ("MKA"). (Exs. 56 and 57, Chapter 11 Involuntary Bankruptcy Petitions for MKA Real Estate Opportunity Fund and MKA Qualified Fund) These real estate funds were forced into bankruptcy in April 2009. *Id.* WM has written off the value of the WM Funds' equity position in one of these two funds significantly. (Ex. 58, 5/11/09 Liquidation Bulletin for

Gryphon)  WM continues to reflect that the WM Funds' investment in the other MKA fund has

retained 85% of its value, but this valuation was performed prior to this fund's bankruptcy.  *Id*.

Further, in May 2008, WHS and Aaron told WM that Brown and Baetis could not satisfy

redemption requests by WM because of the downturn in the real estate market, and that thus,

Brown and Baetis lacked liquidity**.**  (Ex. 1, Davis Decl., ¶ 45)

The other bankrupt investment is in Sagecrest II, L.L.C. ("Sagecrest II"), a short-term

asset-backed lending fund.  Sagecrest II filed for bankruptcy in the summer of 2008.  (Ex. 60,

12/30/08 Correspondence to WM Investors about Restatement).  In December 2008, WM wrote

down the value of the WM Funds' investments in Sagecrest II by approximately 50% (Ex. 64,

December 2008 WM Investor Newsletters for Each WM Fund)  However, even this valuation is

dubious in light of the bankruptcy filing.

Most of the WM Funds' current purported value resides in investments in Brown and

Baetis, but the value of these investments is highly questionable.   (Ex. 61, WM Funds Portfolio

Allocation as % Based on 12/30/08 Unaudited Values)  For example, notes to Gryphon's audited

2006 financial statements – which were recently completed in January 2009 -- disclose that

amounts owed on promissory notes comprise most of the purported value of Baetis.  (Ex. 28,

Gryphon 2006 Audited Financials, p. 3)  However, according to these financial statements, many

of the promissory notes have matured and have not been repaid or sold as of November 2008.

*Id*. Similarly, Brown's 2008 audited financial statements – which were completed in March 2009

– disclose that from December 2008 through March 2009, several of the life insurance policies

that secure the promissory notes invested in by Brown lapsed.  (Ex. 63, Brown 2008 Audited

Financials, p. 7)  These lapses, resulting from policyholders' failure to pay premiums, caused

Brown to completely write off the value of those promissory notes.  (*Id*.) The financial

```
(..continued)
```
[5] WM has taken the position that the Funds' governing documents require WM to treat those investors that made

statements also state that if this trend of lapses continues, Brown "will recognize significant bad debt expense on worthless promissory notes receivables in 2009." (*Id*. at 9) As noted above, Aaron, who runs Brown and Baetis, has previously been sued by the Commission for fraud, casting doubt on the integrity of the valuations he has been providing to WM. In December 2008, WM and Putman reduced their valuations of the WM Funds' investments in Brown and Baetis, but not significantly, and have continued to rely exclusively on periodic, one-page account statements received from Brown and Baetis, despite the evidence that those investments' values have greatly deteriorated. (Ex. 1, Davis Decl., ¶ 43; Exs. 45 and 46, Baetis and Brown Account Statements to WM Funds; Ex. 60 12/30/08 Letter to WM Investors About Restatement)

Even Putman questions whether the Funds have any value. In WM's most recent monthly reports for the Funds, WM and Putman represented that as of December 31, 2008, Gryphon and Watch Stone had approximately $47 million and $52 million in assets, respectively. (Ex. 64, December 2008 WM Investor Newsletters for Each WM Fund) But as recorded in notes prepared by WM, Putman recently admitted to one investor that the realizable value of Gryphon's investment in Baetis – which comprised 70% of Gryphon's assets as of December 31, 2008 – "could be as high as 80% and as low as 0% depending on the markets." (Ex. 65, Investor A Meeting Notes dated March 31, 2009) According to this investor, Putman has told him that his entire investment in Gryphon -- which according to Gryphon's account statements to the investor is just under $1 million -- could be worthless. (Ex. 1, Davis Decl., ¶ 26; Ex. 66, 1/30/09 Letter to Investor A Confirming Account Balance) Similarly, another investor in Watch Stone told the SEC that Putman recently told him, in the presence of four others, that the supposed $687,000 value of his investment in Watch Stone could actually be

```
(..continued)
```
redemption requests prior to September 30, 2008 as unsecured creditors with priority rights to remaining assets.

zero.  (Ex. 1, Davis Decl., ¶ 34; Ex. 67, 3/30/09 Letter to Investor B Confirming Account

Balance)

All of these facts suggest that WM and Putman have overstated and are continuing to

greatly overstate the values of the WM Funds.  As a result of these overvaluations, WM has

taken and is continuing to take fees, which apparently are based on these inflated valuations.

(Ex. 68, April 2008 WM Responses to SEC Questions)  In addition, investors in the WM Funds

may be making investment decisions that adversely affect their interests on the basis of such

information.  Still others may have refrained from seeking redemptions because of these inflated

valuations.  Moreover, WM Fund investors have received inconsistent reports from WM

concerning the redemption and liquidation.  (Ex. 1, Davis Decl., ¶¶ 31, 33, 35)

### G.     <u>Putman's Continued Control Over WM and the WM Funds</u>

After an internal investigation by WM in June 2008 relating to the kickbacks, Putman

ceased being involved in the management or operations of WM, and was temporarily denied

access to WM.  (Ex. 69, 8/26/08 Letter from Putman's Counsel to WM's Counsel**;** Ex., 1, Davis

Decl., ¶ 53) Putman, however, returned as CEO in October 2008.  (Ex. 8, Putman Tr., p. 130; Ex.

1, Davis Decl., ¶ 54)  Because Putman was the controlling shareholder, WM's Board of

Managers did not believe it had the legal power to permanently keep him out of the position.

(Ex.1, Davis Decl., ¶ 52)  Since Putman's return, there has been significant attrition in WM's

staff (including its President, Chief Investment Officer and Chief Compliance Officer), and two

members of WM's Management Board have resigned in protest over Putman's reassertion of

control over WM and certain decisions he has made since returning.  (Ex. 1, Davis Decl., ¶¶  52,

55-56; Exs. 10, 11, WM Resignation Letters).  According to one of the outgoing independent

board members, the board's role was merely advisory, and Putman ultimately controlled all

decision-making.

Putman's continued dominance over WM is having profoundly negative effects on WM's ability to continue operating and stands to injure WM's clients.

**ARGUMENT**

## I.   Defendants WM and Putman Should be Temporarily Restrained from Further Violation of the Securities Laws

Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)(1)] allow the SEC, "upon a proper showing," to seek a "permanent or temporary injunction."  A "proper showing" of violative activity necessary to obtain a temporary restraining order from further violations of the securities laws consists of a substantial showing of likelihood of success as to (i) a current violation and (ii) the risk of repetition.  <u>SEC v. Hollnagel</u>, 503 F. Supp.2d 1054, 1058 (N.D. Ill. 2007), <u>SEC v. Cavanagh</u>, 155 F.3d 129, 132 (2d Cir. 1998).[6]  The SEC easily meets this standard.  As discussed below, there is persuasive evidence that the Defendants WM and Putman have violated numerous antifraud provisions under the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940, and that, unless enjoined, they may do so in the future.

## A.   Violations of the Advisers Act

As detailed below, the SEC is substantially likely to succeed in establishing that Defendants WM and Putman violated numerous provisions of the Advisers Act.

### 1.   <u>Violations of Sections 206(1) and (2) of the Advisers Act</u>

Section 206(1) of the Investment Advisers Act of 1940 ("Advisers Act") prohibits an investment adviser from, directly or indirectly, employing any device, scheme or artifice to

---

[6]   Because the SEC is a government agency seeking an injunction in the public interest, it is not required to prove irreparable injury, a balance of the equities in its favor or the unavailability of remedies at law.  <u>SEC v. Unifund Sal</u>, 910 F.2d 1028, 1035-36 (2d Cir. 1990).  <u>See also</u> <u>SEC v. Randy</u>, 38 F.Supp.2d

defraud any client or prospective client. Section 206(2) of the Advisers Act prohibits any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client. Scienter is required for a violation of Section 206(1), but not for Section 206(2). See Steadman v. SEC, 603 F.2d 1126, 1134 (5th Cir. 1979), aff'd on other grounds, 450 U.S. 91 (1981).

The Supreme Court has held that Section 206 establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients. Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 17 (1979). An adviser's fiduciary duties include "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. at 191-94. Further, an investment adviser has breached its fiduciary duty if it recommends or employs an investment strategy that is not suitable to its clients. See In the Matter of Brian D. Schrauger and Questor Group, Inc., SEC Release No. 33-7496, 1998 WL 17899 (January 20, 1998); In the Matter of George Sein Lin, SEC Release No. 1174, 1984 WL 491864 (June 19, 1989).

Because WM and Putman have had an investment advisory relationship with investors in the WM Funds that includes investments in the Funds but also extends beyond the Funds, the WM Funds and the clients that invested in these Funds may be considered WM's and Putman's clients for purposes of certain violations of Sections 206(1) and (2). U.S. v. Lay, 566 F. Supp. 652 (N.D. Ohio 2008).[7]

```
(..continued)
```
657, 672 (N.D. Ill. 1999) (actions for statutory injunction need not meet the requirements for an injunction imposed by traditional equity jurisdiction).

[7] Further, Putman may be charged with direct violations of Sections 206(1) and (2) because his conduct coupled with his ownership and control of WM satisfy the broad definition of "investment adviser." See, e.g., In the Matter of John J. Kenny and Nicholson/Kenny Capital Management, Inc., SEC Rel. No. 33-8234, 2003 WL 23353325 (May 14, 2003) (stating that an associated person of an investment adviser may be charged as a primary violator under Section 206 where the activities of the associated person cause him or her to meet the broad definition of "investment adviser"). Putman is 60% owner and CEO of WM. He provided investment advice to WM's individual advisory clients and to the WM Funds for

### a.     Undisclosed Kickbacks

WM and Putman plainly violated Sections 206(1) and (2) of the Advisers Act by defrauding the WM Funds and WM's advisory clients in connection with Putman's and Fevola's acceptance of $1.24 million each in kickbacks derived from the WM Funds' investments in Brown and Baetis.  Accepting kickbacks derived from clients' investments plainly constitutes a violation of Sections 206(1) and (2) of the Advisers Act, among other provisions.  See SEC v. Tandem Management, 2001 WL 1488218 (S.D.N.Y., Nov. 21, 2001) (President and Chief Investment Officer of investment advisory firm violated Section 206 of the Advisers Act by accepting kickbacks in the form of rebates of soft dollar credits derived from brokerage commissions paid in connection with trades made on behalf of clients).

### b.     Misrepresentations About Gryphon's and Watch Stone's Safety and Stability

WM and Putman further violated Sections 206(1) and (2) of the Advisers Act by misrepresenting the safety and stability of Gryphon and Watch Stone to WM's investment advisory clients and by using these misrepresentations to make unsuitable investments for the clients.  As discussed above, WM and Putman caused Gryphon and Watch Stone to invest in risky, illiquid "alternative" investments that bore little resemblance to fixed income instruments. Although WM and Putman told investors in Gryphon and Watch Stone about these alternative investments, WM and Putman deceived investors by mischaracterizing the safety and stability of those investments as comparable to conservative fixed-income investments. In doing so, WM and Putman violated Sections 206(1) and 206(2) of the Advisers Act.  See SEC v. Fife, 311 F.3d 1 (1st Cir. 2002) (investment adviser violated Section 206 of the Advisers Act by making misrepresentations about risk of investments); In re David A. King and King Capital Corp.,

```
(..continued)
```
compensation.  Therefore, Putman was acting as an "investment adviser" to WM's advisory clients and to the WM Funds.

Advisers Act Release No. 1391 (Nov. 9, 1993) (on consent) (investment advisers'

misrepresentation of material facts concerning investments, including statements that investment

was "risk free," violated Section 206 of the Advisers Act). The WM Funds' risky alternative

investments were unsuitable for many of WM's elderly clients, who sought conservative fixed-

income investments.

**c.     Violations Based on Making Unsuitable Investments**

WM and Putman further violated Section 206(1) and 206(2) of the Adviser's Act

by placing some of their clients in unsuitable investments. For example, when WM and Putman

initially invested the retirement assets of a 70-year old retiree with Alzheimer's disease in Watch

Stone, Putman signed an investment policy statement along with the client. In the investment

policy statement, Putman and the client chose the most conservative of five different investment

strategies, which provided for a target asset allocation of 95% fixed income securities and 5%

money market funds. Putman wrote: "We will utilize Watch Stone Partners for investing this

account." In reality, these alternative investments, which were nothing like fixed-income, were

entirely unsuitable for WM's advisory clients such as these two investors. See In the Matter of

Brian D. Schrauger and Questor Group, Inc., SEC Release No. 33-7496, 1998 WL 17899

(January 20, 1998); In the Matter of George Sein Lin, SEC Release No. 1174, 1984 WL 491864

(June 19, 1989).

**B.     Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8
          Thereunder**

Section 206(4) of the Advisers Act specifically prohibits an investment adviser from,

directly or indirectly, engaging in any act, practice, or course of business which is fraudulent,

deceptive, or manipulative. Rule 206(4)-8 defines such prohibited conduct. Rule 206(4)-8

makes it a fraudulent, deceptive or manipulative act, practice or course of business to make false

or misleading statements to investors in those pools or otherwise defraud investors or

prospective investors.  17 C.F.R. § 275.206(4)-8; Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, SEC Release No. IA-2628 (Aug. 9, 2007); <u>SEC v. Rabinovich & Associates, LP</u>, 2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008) (finding defendants who operated unregistered investment company liable under Section 206(4) for overstating firm's performance)  Scienter is not required for a violation of Section 206(4).  <u>SEC v. Steadman</u>, 967 F.2d 636, 647 (D.C. Cir. 1992).

WM and Putman violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder by defrauding investors in the WM Funds, which are pooled investment vehicles" in connection with Putman's and Fevola's acceptance of $1.24 million each in kickbacks.  The Funds'offering documents falsely represented to investors that WM's, Putman's and Fevola's compensation from managing the Funds' investments only came from management and other fees, when in fact Putman and Fevola were taking kickbacks in connection with certain of the Funds' investments in Brown and Baetis.

WM and Putman also violated Sections 206(4) of the Advisers Act and Rule 206(4)-8 thereunder by misrepresenting the safety and stability of Gryphon and Watch Stone to WM's investment advisory clients and by placing some clients in unsuitable investments.  As discussed above, WM and Putman caused Gryphon and Watch Stone to invest in risky, illiquid "alternative" investments, even though Gryphon's and Watch Stone's offering documents represented that the funds would primarily invest in conservative fixed-income securities. Additionally, by using conservative, fixed-income investments as performance benchmarks in monthly reports to investors, WM falsely suggested that the Funds' investments were similar to these conservative investments when they were not.  Additionally, the placement of some clients' funds in unsuitable investments also violated Section 206(4).

Additionally, Defendants' failure to disclose the serious disciplinary history of Aaron (the principal of Baetis and Brown) to WM's advisory clients itself constitutes a violation 206(4). See, e.g., SEC v. Householder, 2002 WL 31207292 (N.D. Ill. Oct. 1, 2002) (finding that Section 206(4) of Advisers Act may be violated where in investment adviser fails to disclose an investment manager's disciplinary history).

### C.    Violations of Section 207 of the Advisers Act

Section 207 of the Advisers Act makes it unlawful for any person to willfully make any untrue statement of a material fact or omit to state any material fact required to be stated in a report filed with the Commission.  Section 207 does not require a finding of scienter.  See SEC v. Slocum, Gordon & Co., 2004 U.S. Dist. LEXIS 19273 at *103 (D.R.I., Sept. 28, 2004).  Part II of a Form ADV is deemed to be "filed" for purposes of Section 207 even though it is not required to be physically filed with the Commission.  See Advisers Act Rule 204-1(c).

Under Section 207 of the Advisers Act, WM had a duty to file Forms ADV that were not false or misleading and that did not omit to state material facts.  WM violated Section 207 of the Advisers Act by filing Forms ADV that materially misrepresented that neither WM nor its principals received any third-party compensation, when in fact Putman and Fevola were receiving undisclosed kickbacks in connection with the WM Funds' investments in Brown and Baetis.

### D.    Violations of the Antifraud Provisions of the Securities Act and Exchange Act by WM, Putman, and Fevola

The SEC is also substantially likely to prevail on its claim that WM and Putman violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities. Section 10(b) of the Exchange Act and Rule 10b-5 proscribe fraud in connection with the purchase or sale of securities.  A violation of these antifraud provisions occurs when: (1) there is

a false or misleading statement of material fact; (2) made in the offer or sale, or in connection with the purchase or sale, of securities; and (3) the defendant acted with scienter.  See Basic, Inc. v. Levinson, 485 U.S. 24 (1988).  However, scienter is not a requirement for a violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act.  Aaron v. SEC, 446 U.S. 680, 697 (1980).  Scienter has been defined as a "mental state embracing the intent to deceive, manipulate or defraud."  Ernst & Ernst. v. Hochfelder, et. al., 425 U.S. 185, 193, n. 12 (1976).  Reckless conduct also satisfies the scienter requirement.  Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 704 (7th Cir. January 17, 2008).

Investments in the WM Funds constitute securities in the form of investment contracts. An investment contract exists where the following three prongs are satisfied: (1) a person invests his or her money; (2) in a common enterprise; and (3) is led to expect profits from the efforts of the promoter or a third party.  SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946).  The first prong is met because individuals invested money in the WM Funds.  As to the second prong, the Seventh Circuit has ruled that a common enterprise is satisfied by horizontal commonality.  See Stenger v. R.H. Love Galleries, 741 F.2d 144, 146 (7th Cir. 1984).  Horizontal commonality requires that multiple investors pool their resources and receive profits from that activity.  Id. Here, horizontal commonality is satisfied because the WM Funds are common pools of funds, created by each individual investor's contribution, and those investors then shared in any profits from the funds.  Finally, the third prong of the Howey test is met because it appears the investors' profits were dependent solely upon the efforts of WM and Putman.

WM and Putman violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in connection with Putman's and Fevola's undisclosed acceptance of $1.24 million each in kickbacks.  Accepting kickbacks derived from investments in securities and concealing those kickbacks constitutes a violation of Section 17(a) of the

Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, among other provisions. Tandem, 2001 WL 1488218 (S.D.N.Y., Nov. 21, 2001).

Additionally, WM and Putman violated these antifraud provisions by making misrepresentations concerning the safety and stability of Gryphon and Watch Stone.[8] WM and Putman created the funds and were responsible for their contents. WM was a party to the subscription agreements, and Putman was the signatory to many of these subscription agreements, which make clear that investors should have reviewed the Confidential Offering Memoranda before signing.

Information about the safety and stability of Gryphon and Watch Stone would be viewed by a reasonable investor as significantly altering the total mix of information available, and therefore is material. See Hanley v. SEC, 415 F.2d 589 (2d Cir. 1969) (failure to disclose the speculative nature of securities recommended or negative financial information about the issuers violated the antifraud provisions); SEC v. Manus, [1981 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶98,307 at ¶91,923-24 (S.D.N.Y. Oct. 7, 1981) (representation that investment involved no risk would "undoubtedly" be material to an investment decision).

The SEC is also substantially likely to prevail in its aiding and abetting claim against Putman for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Section 20(e) of the Exchange Act imposes aiding and abetting liability for any person who knowingly provides substantial assistance to another person in violation of any Exchange Act provision. The Seventh Circuit has held that one is liable for aiding and abetting where: (1) there is a primary violation, (2) the aider and abettor generally was aware or knew that his or her actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and

---

[8] We are not recommending action against Pantera, Palisade, and Quetzal based on misrepresentations about the safety and stability of those Funds because their offering documents did not make claims that they would primarily make conservative fixed-income investments.

abettor substantially assisted the primary violation. <u>Monetta Financial Services, Inc. v. SEC</u>, 390 F.3d 952, 956 (7th Cir. 2004). The SEC easily satisfies this test as against Putman. His conduct in connection with the undisclosed kickback scheme was knowing, and his participation, as recipient of more than $1 million in kickbacks, was substantial. <u>See</u>, <u>e.g.</u>, <u>SEC v. Washington County Utility District</u>, 676 F.2d 218, 224-225 (6th Cir. 1982) (finding defendant's failure to disclose "kickback" rendered him liable under Rule 10b-5 as an aider and abetter)

### E. <u>Risk of Repetition</u>

In determining whether there is a likelihood of future violations, courts consider the totality of circumstances. <u>SEC v. Holschuh</u>, 694 F.2d 130, 144 (7th Cir. 1982). Relevant factors include (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation and his degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability;[9] and (5) the sincerity of his assurances against future violations. <u>Id</u>. The SEC need not prove all of these factors point to a likelihood of a future violation in order to obtain an injunction. <u>SEC v. Church Extension of Church of God, Inc.</u>, 429 F. Supp. 2d 1045 (S.D. Ind. 2005). In weighing these factors, "the court may properly view a culpable defendant's continued protestations of innocence as an indication that injunctive relief is advisable." <u>SEC v. Jakubowski</u>, 1997 WL 598108, at *1 (N.D. Ill. 1997) (quoting <u>SEC v. Lorin</u>, 76 F.3d 458, 461 (2d Cir. 1996) (citations omitted)). In <u>Jakubowski</u>, the court also noted that "the existence of past violations may give rise to an inference that there will

---

[9]    This factor is limited by <u>SEC v. First City Financial Corp.</u>, 890 F.2d 1215, 1229 (D.C. Cir. 1989), in which the court of appeals said that "'lack of remorse' is relevant only where the defendants have previously violated court orders, <u>see</u> <u>SEC v. Koenig</u>, 469 F.2d 198, 202 (2<sup>d</sup> Cir. 1972), or otherwise indicate that they do not feel bound by the law, <u>see</u> <u>SEC v. Savoy Industries</u>, 587 F.2d 1149, 1168 (D.C. Cir. 1978)."

be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction.  SEC v. Jakubowski, 1997 WL 598108, at *1.

Under this test, a temporary restraining order is warranted against WM and Putman engaged in blatant securities law violations, including in connection with Putman's and Fevola's acceptance of  $1.24 million apiece of undisclosed kickbacks derived from the WM Funds' investments in Baetis and Brown.  Their conduct was repeated and egregious, and they acted with a high degree of scienter.  Even as they were engaged in their kickback scheme, over a 15-month period, they raised an additional $20 million from approximately 100 clients to plow into these unsafe investments, so that they could continue receiving kickbacks.  WM still controls the WM Funds, and with it the vast majority of WM's advisory clients' assets.  Putman, remarkably, still controls WM.  Notwithstanding their continuing failure to provide accurate information to WM Fund investors concerning such matters as risk, stability, liquidity, suitability and valuation, WM and Putman continued to accept payments into the WM Funds as recently as mid-2008. (Exs. 36-41, Summary of Purchases)  Given their prior conduct, there can be no reasonable assurance, so long as WM and Putman remain in the current roles, that no future violations will occur.

## II.      The Immediate Appointment of a Receiver is Necessary and Appropriate

Section 27 of the Exchange Act confers general equity powers upon the Court in a Commission action brought pursuant to these provisions.  SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2nd Cir. 1972); SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1307 (2nd Cir. 1971).  Once the equity jurisdiction of the district court has been properly invoked, the full panoply of equitable remedies is available to the Court to effectuate the statutory purpose, including the ordering of non-injunctive relief in a variety of forms.  See J.I. Case Co. v. Borak, 377 U.S. 426, 433 (1964); SEC v. Materia, 745 F.2d 197, 200 (2nd Cir. 1984).  Courts regularly

appoint receivers to manage corporate assets when there has been fraud and mismanagement and a receiver is necessary to identify, marshal, preserve, and protect the assets.  See e.g., SEC v. Keller Corp., 323 F.2d 397, 403 (7th Cir. 1963); SEC v. Koenig, 469 F.2d 198, 202 (2nd Cir. 1972); SEC v. Bowler, 427 F.2d 190, 198 (4th Cir. 1970).

Here, a receiver should be appointed to identify, marshal, preserve and protect the clients' assets being held by WM, including the assets held in the WM Funds.  A receiver, not WM or Putman, should be appointed to manage these clients' assets, and to assist the Court in obtaining a better understanding of Defendants' assets, operations, books and records.  A receiver also can determine the most efficient and fairest way in which to provide relief to the WM Funds' investors while still protecting and servicing WM's advisory clients whose assets are held in segregated investment accounts.  This Court should exercise its equitable powers by appointing a receiver in this matter to ensure that the WM and Putman do not cause further harm to their clients.

Immediate relief is particularly important in this case because Defendants' misconduct is continuing to produce adverse and inequitable results for investors.  The SEC is concerned that WM and Putman will distribute the limited remaining assets of the WM Funds to a few investors who submitted redemption requests prior to September 30, 2008 and leave the remaining investors with little or no recovery, unless a TRO is obtained and a receiver is appointed.  WM has informed the SEC that it intends to reimburse those investors first, supposedly pursuant to language of the Funds' operating agreements.

The Funds' governing documents are vague as to how this situation should be handled; however, even if these documents provide a mechanism that gave a general preference in liquidation to investors who submit redemption requests prior to the liquidation announcement, it would be wholly inequitable to distribute remaining assets in WM's proposed manner.  It is

important to appoint a receiver with <u>equitable</u> powers to handle the distribution of whatever funds remain because, among other things:

- WM intends to honor redemption requests based on possibly inflated valuations of those investors' investments, causing a disproportionate allocation of remaining funds to those who made requests prior to September 30, 2008;

- Many investors were defrauded into investing in these WM Funds due to misrepresentations regarding the nature and risk of the WM Funds;

- Some investors likely did not make redemption requests because they were receiving statements that likely overstated the value of their investments; and

- In early 2008, WM sent a letter to all investors stating that it would limit redemptions to 2% per quarter, which likely was interpreted by some investors to mean that they were not allowed to make redemption requests in excess of 2%.

The SEC further seeks the appointment of a receiver because Putman remains in control of WM and the WM Funds and is overseeing the liquidation of the WM Funds. His past conduct demonstrates that he cannot be trusted to effectively and equitably liquidate the WM Funds, especially since he has personal investments in some of the Funds. (Ex. 62, Account Statements for Putman and His Family)

## III. <u>An Temporary Asset Freeze Against WM and the WM Funds Is Appropriate</u>

Pursuant to their general equity powers, courts may order ancillary relief to effectuate the purposes of the federal securities laws and to ensure that wrongdoers do not profit from their unlawful conduct. <u>See</u>, <u>e.g.</u>, <u>SEC v. Unifund Sal</u>, 910 F.2d 1028, 1041 (2d Cir. 1990); <u>see</u> <u>also</u>, <u>SEC v. Wencke</u>, 622 F.2d 1363, 1369 (9th Cir. 1980); <u>SEC v. Manor Nursing Centers, Inc.</u>, 458 F.2d 1082, 1103-04 (2d Cir. 1972); <u>SEC v. General Refractories</u>, 400 F. Supp. 1248, 1260 (D.D.C. 1975). To obtain an asset freeze, the Commission must establish only that it is likely to succeed on the merits. <u>SEC v. Cavanaugh</u>, 155 F.3d at 132. Moreover, where there are concerns that defendants might dissipate assets, a court need only find some basis for inferring a violation

of the federal securities laws in order to impose an asset freeze. See e.g. SEC v. Infinity Group Co., 212 F.3d 180, 197 (3rd Cir. 2000).

The SEC is seeking to freeze all of WM's and WM Funds' corporate assets and any assets, including custodial assets, held in bank and brokerage accounts in any of their names until such time as a receiver can be placed in control of WM and the WM Funds' assets. Given that the SEC's proposed receiver, and the investment adviser she intends to use, is ready to step in almost immediately and take over the operations, any asset freeze will be extremely short in duration, and, in any event will not likely affect any advisory clients' holdings, since: (1) WM claims that it is not currently making any redemptions to any WM Fund investors at this time; and (2) the SEC is not seeking to freeze any client assets held by WM in segregated accounts. See e.g., SEC v. Black, 163 F.3d 188, 196-98 (3rd Cir. 1998)(freeze was properly lifted as to segregated accounts and/or accounts that were not within defendants' control).

Hence, the asset freeze that the SEC seeks in this case is of limited duration, limited scope, and not likely to affect WM's advisory clients' access to their segregated investment accounts. It will, however, protect clients from the possibility that, during the transition of control to the Receiver, WM or Putman might be seek to cause WM and WM Funds assets to be dissipated.

## VI.    Other Ancillary Relief, Including an Accounting and Limited Expedited Discovery is Appropriate

To determine accurately the scope of a fraud and a defendant's ability to disgorge illicit proceeds, courts frequently require defendants to provide an accounting of all monies or property obtained as a result of any fraudulent activity, as well as their current financial resources or assets. See, e.g., SEC v. International Swiss Inv. Corp., 895 F.2d 1272, 1276 (9th Cir. 1990). An accounting is necessary to determine the current nature, location and use of WM's and the WM Funds' clients' assets, including the; the extent of the fraud perpetrated on and losses

suffered by all of WM's and the WM Funds' clients; the ill-gotten gains that WM, Putman and Fevola may have obtained; and the proposed defendants' ability to repay them.

The Court should also order expedited discovery. In appropriate circumstances, expedited discovery is authorized under Rules 26(d), 30(a), 33(b) and 34(b) of the Federal Rules of Civil of Procedure. Such an order is necessary for the SEC to take meaningful discovery in anticipation of a hearing on an application for a preliminary injunction. See F.R.C.P. 65(b).

Finally, the SEC is also seeking an order prohibiting the destruction or alteration of WM's and the WM Funds' books and records. Such an order is necessary to identify the location of the remaining assets or accounts being held by WM and the WM Funds, and to preserve other possible evidence.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant its motion and enter the proposed orders submitted in connection with this motion.

Dated: May 20, 2009

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

/s/ Steven J. Levine
By: One of its Attorneys

Steven J. Levine
Eric M. Phillips
Tracy W. Lo
Jeffrey A. Shank
**UNITED STATES SECURITIES**
**AND EXCHANGE COMMISSION**
175 W. Jackson Blvd.
Suite 900
Chicago, Illinois 60604
(312) 353-7390

## CERTIFICATE OF SERVICE

I, Steven J. Levine, hereby certify that on Tuesday, May 19, 2009, at approximately 8:00 p.m., I sent a courtesy copy of Plaintiff's Memorandum of Law in Support of Plaintiff's Emergency Motion for a Temporary Restraining Order, Asset Freeze, Order Appointing Receiver, and Other Ancillary Relief by electronic mail to the following parties listed below:

Jeff Blumberg, Esq. of Drinker Biddle & Reath LLP (Jeffrey.Blumberg@dbr.com)
Daniel Flaherty, Esq. of Godfrey & Kahn, S.C. (dflaherty@gklaw.com)
Counsel for Wealth Management LLC

Steven Scholes of McDermott Will & Emery (sscholes@mwe.com)
Counsel for James Putman

Steven Senderowitz of Winston & Strawn LLP (ssenderowitz@winston.com)
Counsel for Simone Fevola


s/ Steven J. Levine
Steven J. Levine
One of the Attorneys for Plaintiff
Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, IL  60604-2615

Phone:  (312) 353-7390
Facsimile:  (312) 353-7398
Email: levines@sec.gov