U.S. DISTRICT COURT
EASTERN DISTRICT-WI
GREEN BAY DIV.

'09 NOV -4 A10 56

FILED
JON W. SANFILIPPO
MAIL-REC'D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

SECURITIES AND EXCHANGE COMMISSION

Plaintiff

v.

WEALTH MANAGEMENT, LLC;
JAMES E. PUTMAN;
AND SIMONE FEVOLA,

Defendants, and

WML GRYPHON FUND, LLC;
WML WATCHSTONE PARTNERS, L.P.;
WML PANTERA PARTNERS, L.P.;
WML PALISADE PARTNERS, L.P.;
WML L-3, LLC;
WML QUETZAL PARTNERS, L.P.,

Relief Defendants

CIVIL ACTION NO: 09-CV-506

JUDGE WILLIAM C. GRIESBACH

## DEFENDANT'S FIRST REQUEST TO PLAINTIFF FOR ADMISSIONS

I, James E. Putman, Defendant, pro se, hereby requests that Plaintiff respond within 30 days to this Request by admitting, for purposes of this action only and subject to admissibility at trial the following matters. For purposes of this Request, definitions established by you in your Complaint will be utilized herein by me and may be utilized by you in your responses.

### STATEMENTS

### Contributions to Baetis and Brown

The truth of each of the following statements:

1

1. Based upon the information and documents which you have, Gryphon contributed $3,000,000 to the Baetis Fund on March 1, 2006.

2. Based upon the information and documents which you have, Gryphon made no further contributions to the Baetis Fund after March 1, 2006 for the calendar year 2006, and made no contributions to the Baetis Fund or to the Brown Fund during 2007 or during 2008.

3. Based upon the information and documents which you have, Watch Stone contributed $3,000,000 to the Brown Fund on March 1, 2006.

4. Based upon the information and documents which you have, Watch Stone contributed $1,000,000 to the Brown Fund on March 31, 2006.

5. Based upon the information and documents which you have, Watch Stone made no contributions to the Brown Fund after March 31, 2006 for the calendar year 2006, and made no contributions to the Baetis Fund or to the Brown Fund during 2007 or during 2008.

6. Based upon the information and documents which you have, Palisades Series C contributed $300,000 to the Brown Fund on January 31, 2006.

7. Based upon the information and documents which you have, Palisades contributed $500,000 to the Brown Fund on March 31, 2006.

8. Based upon the information and documents which you have, Palisades contributed $400,000 to the Brown Fund on July 3, 2006.

9. Based upon the information and documents which you have, after the $400,000 contribution made by Palisades to the Brown Fund on July 3, 2006, Palisades made no further contributions to the Brown Fund for the calendar year 2006, and made no contributions to the Baetis Fund or to the Brown Fund during 2007 or during 2008.

10. Based upon the information and documents which you have, neither Pantera, L3, nor Quetzal made any contributions to either Baetis or Brown during 2006, 2007 and 2008.

11. A person who has received a collateral assignment of an interest in a life insurance policy to secure a debt is not a named "beneficiary" of the policy.

**Control of WM and of WM Funds**

12. You have in your possession a copy of the signed original of the Amended and Restated Operating Agreement of the Wealth Management Acquisition Company, LLC dated August 28, 1997 (hereafter referred to as the "WM Operating Agreement").

13. Based upon the information and documents which you have, Wealth Management Acquisition Company, LLC is now known as Wealth Management, LLC.

14. Section 2.1 of Article II of the WM Operating Agreement provides as follows

"2.1) <u>Units</u>. The equity of the Company shall be divided into the following classes:

| Class | Number of Units |
|---|---|
| Class A Units | 600 |
| Class B Units | 400 |
| Class C Units | 100" |

15. Paragraph (c) of Section 7.6 of Article VII of the WM Operating Agreement provides as follows:

> "(c) <u>Voting</u>. Each Member (other than Class C Members unless a vote is mandated under the WLLCL) shall be entitled to one vote per Unit on any matter submitted for Member action. Matters subject to a vote of Members shall be voted upon by such Members voting together as a single class, except as follows: (i) if a separate class vote is mandated under the WLLCL or this Agreement, or (ii) amendments to this Agreement which affect the relative rights and preferences of the class."

16. Paragraph (a) of Section 7.6 of Article VII of the WM Operating Agreement provides as follows:

"(a) <u>Manner of Acting</u>. Except as otherwise provided in this Agreement, the consent of the Members to any act or failure to act may be given by Majority Consent at a meeting in which a quorum of such Members participate in person or by telephone or other electronic means. Members holding sufficient Units to give Majority Consent to the action taken at any meeting shall constitute a quorum of the Members at such meeting. Alternatively, the Members may act by unanimous written consent without the need for a meeting."

17. Paragraph (a) of Section 7.2 of the WM Operating Agreement provides as follows:

"(a) <u>Number, Tenure and Qualifications of Managers</u>. The number of Managers of the Company shall, except as provided below, be five (5). The Board of Managers shall be elected by certain of the Members as follows:

(i) The holders of Class A Units shall be entitled to appoint two Managers;

(ii) The holders of Class B Units shall be entitled to appoint two Managers; provided, however, that if 200 or fewer Class B Units are outstanding at any time, the holders of Class B Units shall be entitled to appoint one Manager and, unless otherwise directed by the holders of the Class B Units, the last appointed Class B Manager shall be deemed to have resigned; and

(iii) One Manager shall be appointed by a majority of the Board of Managers appointed in 7.2(a)(i) and (ii);

<u>provided, however</u>, that until the closing of the Private Placement, James Putman shall be the sole Manager. Upon closing of the Private Placement, the initial Board of Managers shall be the number of and persons set forth on Exhibit E. With respect to the Class B Managers identified on Exhibit E, the Company will seek the ratification of the appointment of such persons by the Class B Members within 60 days from the date of closing of the Private Placement and, thereafter, the Class A Managers and Class B Managers will promptly appoint the fifth Manager. The Members entitled to appoint a Manager (or the Board of Managers with respect to a Manager appointed pursuant to (iii), above, acting by a vote of a majority in number of all of the Managers (excluding the Manager who is the subject of the vote)) may remove such person at any time by written notice to the Board of Managers. The appointment of a replacement Manager shall follow the procedure set forth above. If a Board of Managers seat is vacant, by withdrawal of a Manager under Section 7.2(b) or otherwise, the Board of Managers shall for all purposes under this Agreement be deemed to consist of only such number of Managers as has been appointed until a Manager has been appointed under this Section 7.2. Members of the Board of Managers need not be Members of the Company."

4

18. Based upon the information and documents which you have, the following were the members of the Board of Managers: James E. Putman, Simone Fevola, Ronald Monica, DDS, Charles Bergmann, Jr., and Robert Coglianese for the years 2003 through 2008.

19. Based upon the information and documents which you have, James E. Putman and Charles Bergmann, Jr. served as the Class A Managers on the Board of Managers for the years 2003 through 2008.

20. Based upon the information and documents which you have, Simone Fevola (until his resignation in 2008) and Ronald Monica, DDS served as the Class B Managers on the Board of Managers for the years 2003 through 2008.

21. Based upon the information and documents which you have, Robert Coglianese served as the Board Member elected by the other four members of the Board of Managers. (namely the two Class A Managers and the two Class B Managers) for the years 2003 through 2008.

22. Based upon the information and documents which you have, WM and myself had not entered into any employment agreement for the years 2003 through 2008.

23. Section 7.3 of the WM Operating Agreement, provides as follows:

> "7.3 <u>Actions by Board of Managers</u>. Any actions of the Board of Managers shall be taken in the manner set forth below.
>
>     (a) <u>Quorum; Manner of Acting</u>. The consent of the Managers to any act or failure to act may be given at a meeting in which a majority in number of the Managers participate in person or by telephone or other electronic means. Consent to any act or failure to act shall be deemed given at a meeting of the Board of Managers if approved by the affirmative vote of a majority of all the Managers. Alternatively, the Managers may act by unanimous written consent without the need for a meeting.
>
>     (b) <u>Meetings</u>. Meetings of the Board of Managers may be called by the Chairman, the President of the Company or by any two Managers. Meetings not held by

electronic means shall be held at the principal place of business of the Company or at such other place as may be designated by a majority in number of the Managers.

(c) <u>Voting</u>. Each Manager shall be entitled to one vote. Any Manager abstaining from voting on a given matter shall be deemed to have voted in the same manner as the majority, if any, of the Managers not abstaining from voting on that issue.

(d) <u>Notice</u>. No matter shall be voted upon at a meeting of the Board of Managers unless at least forty-eight (48) hours notice of such matter is given or such notice is waived by any Manager not receiving it. A Manager shall be deemed to have waived notice of any matter acted upon at any meeting the Manager attends or in which the Manager participates unless at the beginning of the meeting or promptly upon commencement of participation therein the Manager objects to the consideration of such matter because of lack of proper notice. No prior notice shall be required for any action taken by unanimous written consent of the Managers."

24. Based upon the provisions of Section 7.3 of the WM Operating Agreement as set forth above, I could have been outvoted at any time on any matter to be voted on by the Board of Managers during the years of 2003 through 2008.

25. Section 10.8 of Article 10 of the WM Operating Agreement provides as follows:

"10.8 <u>Amendments to Operating Agreement</u>. Except as otherwise provided in this Agreement, any amendment to this Agreement shall be valid if in writing and approved by Majority Consent, provided, however, that any amendments to this Agreement which affect the relative rights and preferences of the Class B Units shall be approved by a Majority Consent of the Class B Members voting separately."

26. Section 10.8 of Article 10 of the WM Operating Agreement as set forth above effectively prevented me (even if I owned all of the Class A Units which represented 60% of all of the voting Units of WM) from amending the provisions of Section 7.3 of the WM Operating Agreement in any way which would affect the voting rights of the Class B Members.

27. The following provisions of the WM Operating Agreement describe the authority and powers of the Board of Managers:

A. To appoint a new registered agent and change the registered office. (Section

1.2 (b)

    B. To authorize WM to conduct any lawful business permitted under the WLLCL. (Section 1.3)

    C. To establish the "Capital Contribution" for the re-issuance of Class A Units which were acquired or redeemed by WM. (Section 2.2)

    D. To establish the "Capital Contribution" for the re-issuance of Class B Units which were acquired or redeemed by WM and to establish the "Capital Contribution" for Class B Units which were not sold in the Private Placement. (Section 2.3)

    E. To approve the issuance of Class C Units. (Section 2.4)

    F. To establish the "Capital Contribution" for the re-issuance of Class C Units which were acquired or redeemed by WM. (Section 2.4)

    G. To approve "Tax Distributions." (Section 4.1 (a))

    H. To keep, or cause to be kept, proper and complete records and books of account in which shall be entered all transactions and other matters relative to Company business as may be reasonably required. (Section 6.1)

    I. To determine the fiscal year of WM. (Section 6.3)

    J. To designate such officers or other duly appointed individuals who would have the authority to make withdrawals from any checking and savings accounts as designated by the President or from "Permitted Investments." (Section 6.5)

    K. To provide prior consent to the Tax Matters Partner before the Tax Matters Partner could "..extend or agree to a proposed adjustment by the Internal Revenue Service to the Company's items." (Section 6.6)

L. To have the "... right to disapprove of any or all items contained in ..." the Annual Budget which the President is required to submit to the Board of Managers. (Section 6.7)

M. To approve any revised Annual Budget. (Section 6.7)

N. To exercise "...all of the rights, powers and obligations of the managers of a limited liability company, the management of which has been delegated to its managers under the WLLCL, subject to the other provisions of...." the WM Operating Agreement. (Section 7.1 (a))

O. To exercise "....the right, power and authority to act and transact business on behalf of the Company..." (Section 7.1 (b))

P. To direct the officers of WM with respect to "....the right, power and authority to act and transact business on behalf of the Company..." (Section 7.1 (b))

Q. To appoint the officers of WM (other than the office of Chairman and President unless I otherwise agreed). (Section 7.4 (a))

R. To appoint assistant officers of WM. (Section 7.4 (a))

S. To authorize specific authority for the officers of WM. (Section 7.4 (a))

T. To authorize an officer to appoint one or more other officers of WM. (Section 7.4 (a)).

U. To determine the term of the appointment of the officers (other than with respect to the office of chairman and president unless I otherwise agree). (Section 7.4 (b))

V. To remove an officer appointed by the Board of Managers. (Section 7.4 (b))

W. To assign duties to the chairman of the board. (Section 7.4 (c).

X. To authorize the president of WM to sign contracts, leases, deeds, mortgages, or other documents. (Section 7.4 (d)).

Y. To assign duties to the president. (Section 7.4 (d)).

Z. To assign duties to any vice president of WM. (Section 7.4 (e)).

AA. To assign duties to the secretary of WM. (Section 7.4 (f)).

BB. To assign duties to the chief financial officer and treasurer of WM. (Section 7.4 (g)).

CC. To assign duties to assistant secretaries and assistant treasurers of WM. (Section 7.4 (h)).

DD. To approve the dissolution of WM. (Section 8.1)

EE. To approve the exercise of a "call option." (Section 9.4 (a))

FF. To approve annual compensation to me of more than $100,000. (Section 10.12)

28. Pursuant to the WM Operating Agreement, the Board of Managers of WM had substantial authority regarding the business affairs of WM.

29. Pursuant to the WM Operating Agreement, the Board of Managers of WM had substantial responsibility regarding the business affairs of WM.

30. Pursuant to the WM Operating Agreement, the Board of Managers of WM was not an advisory type of board which type of board would normally have no authority or powers and would only advise.

31. As of January 29, 2009, the Board of Managers consisted of myself, Skip Bergmann, Ron Monica and Bob Coglianese.

32. Pursuant to the WM Operating Agreement, the position of chairman of the board of WM was to preside at all meetings of members of WM and of the Board of Managers and to advise and counsel with the president. (Section 7.4 (c))

33. Pursuant to the WM Operating Agreement, the president of WM was the designated principal executive officer and, subject to the overall control of the Board of Managers, had the authority and responsibility for the general supervision and control all of the business and affairs of the Company and its officers. (Section 7.4 (d))

34. Pursuant to the WM Operating Agreement, the position of chief executive officer of WM is not specifically mentioned nor authorized.

35. The election of a person to the position of chief executive officer would require the approval of the Board of Managers.

36. Other than the statement to you by Mr. Charles Bergmann as reported in the Declaration of Willie R. Davis dated May 19, 2009, and other than a statement on the WM website, you have no other information as to whether the Board of Managers of WM was merely an advisory board.

37. Based upon the provisions of the WM Operating Agreement, I did not have exclusive authority to control the business affairs of WM for "all times relevant" with respect to the allegations which you have made against me in your complaint.

38. Based upon the provisions of the WM Operating Agreement, I possessed neither the power nor the ability to control the specific transactions or activities of WM and/or the WM

10

Funds for "all times relevant" with respect to the allegations which you have made against me in your complaint.

39. Other than as may be provided in the WM Operating Agreement, minutes of the Board of Managers, or any written agreement of which I am a party, you have no written documentation which gave to me for "all times relevant" the power or the ability to control the specific transactions or activities of WM and/or of the WM Funds with respect to the allegations which you have made against me in your complaint.

40. If I did not have the power or the ability to control WM, then I would not have had the power or the ability to control the WM Funds.

41. If for "all times relevant" I did not have the power or the ability to control WM, then your allegation in the first sentence of Paragraph 76 of your complaint that I did have such power or ability would be false.

42. Based upon the provisions of the WM Operating Agreement, your inference in the first and second sentences of Paragraph 76 of your complaint that the Board of Managers of WM was only an advisory board would be false.

43. Based upon the provisions of the WM Operating Agreement, since Defendant Fevola was elected president of WM in September of 2002, then as of that date and for the "all times relevant" I no longer held the powers of the president and did not have the authority and responsibility for the "general supervision and control all of the business and affairs of the Company and its officers."

44. Based upon information which you have, I did not during "all times relevant" own any of the Class B Units.

45. Based upon information which you have, a total of 1,025 Units of WM were issued and outstanding as of December 1, 2007.

46. If I could not control WM because of the manner in which the Board of Managers of WM was structured, then I would not be deemed to be an "investment adviser" for purposes of the Investment Advisers Act as referred to in your Complaint.

47. If I am not an investment adviser for purposes of the Investment Advisers Act as referred to in your Complaint, then your allegations that I violated Section 206 of the Investment Advisers Act are false.

### In the Matter of John J. Kenny and Nicholson/Kenny Capital Management, Inc., SEC Rel. No.338234, 2003 WL 23353325 (May 14, 2003) - (Hereafter referred to as the Kenny Ruling)

48. The first sentence of the summary of your Kenny Ruling states:

> "Associated person of a broker-dealer and of a registered investment adviser who also *controlled* the investment adviser violated antifraud provisions of the federal securities laws by misrepresenting material facts to two individual investors and aiding and abetting scheme to defraud two insurance companies." (Italics added.)

49. According to the Kenny Ruling, Mr. Kenny and his wife, during the relevant times, owned a holding company which owned Nicholson/Kenny Capital Management, Inc. which was the registered investment adviser.

50. According to the Kenny Ruling, Mr. Kenny conceded that he did control Nicholson/Kenny Capital Management, Inc., the registered investment adviser.

51. According to footnote #54 of your Kenny Ruling, you state:

> "....courts have found that an associated person is liable under Section 206 where the investment adviser is an alter ego of the associated person or is *controlled* by the associated person. See, e.g., SEC v. Berger, 2001 U.S. Dist. LEXIS 18448, at *28 (S.D.N.Y. Nov. 13, 2001) (finding associated person liable under §§ 206(1)

12

and (2) based on control of investment adviser)..." (Italics added.)

52. Since you were and still are fully aware of the structure of the Board of Managers and its authority pursuant to the Operating Agreement, Footnote 7 of your Memorandum of Law, as submitted with your Complaint, in which you described your Kenny Ruling, as a basis for you charging me with direct violations of Sections 206 (1) and (2), represented at best a misinterpretation by you of your Kenny Ruling or at worst an intentional attempt to mislead the Court.

53. Based upon applicable case law and the provisions of the Investment Advisers Act, a person who is a "person associated with an investment advisor" but who does not control the investment adviser cannot be charged with violations under Sections 206 of the Investment Advisers Act.

54. Faye Feinstein, the receiver, after extensive investigation into the affairs of WM, has concluded that no "ponzi" scheme existed during the "all times relevant."

55. The three members of Quadrimus, LLC on August 20, 2006, per the Operating Agreement of Quadrimus, LLC were Thomas R. Riek, Amalgamated Consolidated Enterprises, Inc. and Simone O. Fevola.

56. Based upon information and documents which you have, I was never a member of Quadrimus.

57. Based upon information and documents which you have, I never owned a controlling voting interest in Amalgamated Consolidated Enterprises, Inc.

58. Based upon information and documents which you have, distributions from Quadrimus were made to Amalgamated Consolidated Enterprises, Inc. and not to me.

59. The K-1 for 2006 for $265,000 was issued to Amalgamated Consolidated Enterprises, Inc.

60. The K-1 for 2007 for $975,000 was issued to Amalgamated Consolidated Enterprises, Inc.

Dated: November 3, 2009

*/s/ James E. Putman*
James E. Putman
311 Cleveland, Menasha, WI 54952
920-722-0137