UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

    v.

WEALTH MANAGEMENT LLC;
JAMES PUTMAN; and SIMONE FEVOLA,

        Defendants, and

WML GRYPHON FUND LLC;
WML WATCH STONE PARTNERS, L.P.; WML
PANTERA PARTNERS, L.P.; WML PALISADE
PARTNERS, L.P.; WML L3, LLC; WML
QUETZAL PARTNERS, L.P.; AND
EMPLOYEE SERVICES OF APPLETON, INC.

        Relief Defendants.

Civil Action No: 09-C-506

---

**RECEIVER'S CONSOLIDATED BRIEF IN OPPOSITION TO MOTIONS TO
CLARIFY OR MODIFY FREEZE ORDER**

---

The Court-appointed Receiver, Faye B. Feinstein (the "Receiver"), by her attorneys,

Quarles & Brady LLP, files this consolidated response in opposition to the motions brought by

the Joanne Miller Trust, Riek & Associates, David Janssen and Fox Valley Plastic Surgery,

(collectively, the "Securities Holders"), to clarify or modify the Court's Order Freezing Assets

dated May 20, 2009, and extended by order dated May 26, 2009 (collectively, the "Freeze

Order"). The Securities Holders' motions must be denied 1) because the Freeze Order prohibits

distribution of the assets in question, which belong almost exclusively to the Wealth

Management investors, and 2) because the notes in question are illegally issued securities that

should be re-characterized as equity in an action for declaratory judgment against Wood, Hat &

Silver, L.L.C., Joseph Aaron and the Securities Holders to be filed separately by the Receiver.

# I.    FACTS

## A.    Putman and Fevola Allegedly Engage in a Kickback Scheme, Which Results in the Appointment of a Receiver Charged with Protecting the WM Funds.

James Putman and Simone Fevola, individually named as defendants in this action, allegedly engaged in a kickback scheme through which each accepted at least $1.24 million in undisclosed payments derived from certain investments made by Wealth Management, L.L.C. and the various related funds named as relief defendants (collectively the "WM Funds"). (Docket Entry 1, SEC Complaint, ¶ 4).  Additionally, Putman and Fevola allegedly breached their fiduciary duties and engaged in fraud by misrepresenting the safety and stability of certain of the WM Funds, and by placing investments that were unsuitable for some clients.  (*Id.*, ¶ 5). As a result of these alleged activities, the SEC brought an action against Putman and Fevola, and secured the appointment of the Receiver.  (Docket Entry 8, *Order Appointing Receiver*).  When the Court appointed the Receiver, it also entered an Order Freezing Assets that was later extended.  (Docket Entries 9 and 15, *Order Freezing Assets* and *Order Extending Asset Freeze*, respectively).

Pursuant to the Order Appointing Receiver, the Receiver was given access to the books and records of the WM Funds, and charged with taking whatever action necessary to preserve, take control, and prevent the dissipation, concealment or disposition of any assets belonging to the WM Funds.  (Docket Entry 8).

## B.    The Receiver Has Determined that the WM Funds are Invested in the Brown Investment Fund, L.P.

On September 4, 2009, after the Receiver's investigation was well underway, she filed a Report informing the Court that six of the WM Funds were invested in a total of twenty-two (22) alternative investments, or "Sub-Funds".  (Docket Entry 60-2, *Second Report of Receiver*, p. 3). Additionally, she reported that two of the WM Funds, Watch Stone and Palisade were invested

in a privately offered Sub-Fund, the Brown Investment Fund, L.P. (the "Brown Fund"), that reinvested WM Fund money in life insurance premium financing vehicles. (*Id.*, pp. 19, 21; *see also* Exhibit A, *Second Amended and Restated Agreement of Limited Partnership for the Brown Fund dated September 2006*). **Specifically, Watch Stone and Palisade invested a combined total of $16.2 million in the Brown Fund, which accounts for 95.27% of the investments in that fund**. (Docket Entry 60-2, *Second Report of Receiver*, p. 19).The Receiver further reported that the Brown Fund is a limited partnership formed in Delaware, with its principal office in Sonoma, California, and with Wood, Hat & Silver, L.L.C. ("WH&S") serving as its General Partner. (*Id.*, p. 27).

The Brown Fund accepted monies from Watch Stone and Palisade and invested those monies in the loans of initial premiums to elderly insureds who assigned their life insurance policies to the Brown Fund. (*See Id.* (incorporating by reference the Receiver's report on the Baetis Investment Fund, L.P.)). The insureds executed non-recourse notes in which they promised to repay the borrowed premium payments plus interest (usually 9%) from the proceeds of the sale of the assigned insurance policy following the two-year period of contestability. (*Id.*) The insurers acknowledged on the policy assignment that the insureds had assigned the policy to the Brown Fund and that the Brown Fund Partnership was the owner of the benefits of that policy. (*Id.*) The insureds ranged in age from 73 to 85, and the face value of the policies in the Brown Fund Partnership's portfolio start at $1,000,000 with a maximum up to $15,000,000. (*Id.*)

The Brown Fund intended to sell all of these policies immediately following the two-year period of contestability, before most of the required premiums were due. (*Id.*) After a time, however, the fund was unable to sell policies, or to sell them for more than the amount of the monies loaned to the insureds to pay the initial premiums on the policy. (*Id.*) After the two-year

Case 1:09-cv-00506-WCG    Filed 03/29/10    Page 3 of 21    Document 233

period of contestability expired, and additional premiums became due, the Brown Fund had to pay the premiums, or let the policies lapse. (Aaron Dep., 242:17-23)[1].

### C. The Receiver Has Determined that WH&S, the WM Funds and Riek Acted in Concert.

Joseph Aaron ("Aaron") is the managing member of WH&S. (Aaron Dep., 23:7-12). Prior to 2002, Aaron met the individually named defendants, Putman and Fevola, through Tom Riek ("Riek"). (Riek Dep., 37:17-24)[2]. Riek is one of the Securities Holders who has brought a motion before this Court to clarify or modify the Freeze Order. (Docket Entry 187, *Motion of Riek & Associates to Clarify or Modify Freeze Order*). Riek is also a former employee of Wealth Management, L.L.C., where he managed assets of approximately $150 million for roughly 100 clients (Riek Dep., 16:13-20), and a former employee of WH&S. (*Id.*, 37:5-6).

Between 2002 and 2005, Aaron gave half a dozen investment presentations to Putman and Fevola. (Aaron Dep., 43:11-17). Through the course of these dealings, the relationship between Aaron, Putman and Fevola eventually grew so close that in calendar year 2005, WH&S gave the WM Funds authority to approve all investments made by the Brown Fund. (Aaron Dep., 37:5-20). Furthermore, by at least 2005, and perhaps earlier, **all** the money in the Brown Fund was invested in loans to trusts for the purchase of life insurance policies, and the **WM Funds** were the principal investor. (Aaron Dep., 36:10-15; 40:10-17).

The relationship between Aaron, Putman and Fevola was also close enough that Aaron began participating in discussions at the Quadrimus Executive Committee Meetings. (*See* Exhibit D, 12/6/06 email from Riek). Quadrimus was created by Putman, Fevola and Riek to receive commission payments from the alleged kickback scheme. (Transcript of James E. Putman Investigative Testimony, 70:5-25, 71:1-6)[3]. Although there is no evidence that Aaron

---

[1] All excerpts referenced from the deposition of Joseph Aaron are attached hereto as Exhibit B.
[2] All excerpts referenced from the deposition of Tom Riek are attached hereto as Exhibit C.
[3] All excerpts referenced from the SEC's interview of James Putman are attached hereto as Exhibit E.

received kickbacks through Quadrimus, documents show that Aaron appeared at Quadrimus meetings on more than one occasion, and according to Quadrimus documents, provided information at those meetings. (*See* Exhibits D and Exhibit F, 12/14/06 email from Riek). Documents also show that the Quadrimus members discussed "cash flow issues" relating to the Brown Fund, which shows that information about the Brown Fund was passing freely between Aaron, Riek, Putman and Fevola. (*See* Exhibit G, 4/4/07 email from Riek; *see also* Exhibit H, 2/27/07 email from Riek). Aaron also openly admits that as of 2007, he, Putman and Fevola were discussing cash flow concerns relating to the Brown Fund. (Aaron Dep., 75:5-13).

> ### D. <u>The Receiver Has Monitored, Supervised and Controlled the Recovery of Assets and the Expenditure of Monies in the Brown Fund.</u>

After determining that Watch Stone and Palisade had collectively invested $16.2 million into the Brown Fund, accounting for 95.27% of the investments in that fund, and that WH&S gave the WM Funds authority to approve all investments made by the Brown Fund, the Receiver began monitoring the Brown Fund, and supervising and controlling the expenditures of certain money in the Brown Fund. (*See* Exhibit I, Affidavit of Michael Schaalman, Esq.). Indeed, the Receiver has received monthly bank statements for the Brown Fund, and has reviewed the recommendations of Brown Fund consultants and the managing member to reach a consensus about the payment of additional premiums. (*Id.*) The Receiver also recommended replacing one consultant with a more cost effective employee of that consultant in order to reduce expenses. (*Id.*) Through these activities, the Receiver, in consultation with the Brown Fund's managing member and consultants, has exercised control over the recovery of assets and the payment of expenditures. (*Id.*)

**E. The Receiver Determined that Aaron, as Managing Member of WH&S, Issued a Series of Illegal Securities (the Notes).**

On September 1, 2007, a few months after the Brown Fund's "cash flow issues" were discussed in Quadrimus Executive Committee Meetings, and during the time frame within which Aaron admits he was discussing cash flow issues with Putman and Fevola, Aaron used his authority as the managing member of WH&S, the General Partner of the Brown Fund, to accept $300,000 from the JoAnne Miller Trust. (*See* Exhibit J, *Miller Trust Promissory Note*). Aaron had issued notes out of several of WH&S's funds from time to time prior to this. (Riek Dep. 84: 8-11).

Aaron was introduced to Miller through their mutual friend, Riek. (Aaron Dep., 65:11-13). Miller was looking for investment vehicles that were **secure and with a good return rate**. (Miller Dep., 13:1-7[4]; Riek Dep., 77:14-24, 86:20-21). The same day the Miller investment was made, the Brown Fund also received a $300,000 investment from Riek's company, Riek & Associates, LLC. (*See* Exhibit L, *Riek & Associates Promissory Note*). Riek invested $300,000 with the Brown Fund at that time in order to reassure Miller that it was **a good investment with an above-market rate of return**. (Riek Dep., 76:8-10, 86:12-16).

A little less than a year later, on June 1, 2008, the Brown Fund received $125,000 from David Janssen, and $58,000 from the Fox Valley Plastic Surgery 401(k) Plan. (*See* Exhibit M, *Janssen Promissory Note*, and Exhibit N, *Fox Valley Promissory Note*). Janssen was a longtime investor with WH&S, who had previously invested not only in the Brown Fund but also in a sister fund, the Baetis Investment Fund, L.P. (Janssen Dep., 25:20-21)[5]. Fox Valley Plastic Surgery is owned by and employs Dr. Janssen. (Janssen Dep., 27:9-10). Janssen readily admits

---

[4] All excerpts referenced from the deposition of JoAnne Miller are attached hereto as Exhibit K.
[5] All excerpts referenced from the deposition of David Janssen, M.D., are attached hereto as Exhibit O.

Case 1:09-cv-00506-WCG   Filed 03/29/10   Page 6 of 21   Document 233

that he perceived the note as an **investment** and that he was interested in that investment because it was not as dynamic as an equity investment but **offered a good rate of return**. (Janssen Dep. 51:12-14, 55:9-14, 68:8-10). On December 1, 2008, a few months after receiving funds from Janssen, the Brown Fund received $1,000,000 from the WH&S 401(k) Profit Sharing Plan & Trust. (Exhibit P, *WH&S Promissory Note*).

All of these investments were used to remedy "cash flow concerns." Specifically, Aaron used proceeds from the Miller, Riek, Janssen, Fox Valley, and WH&S investments for the same purpose that he used proceeds from the WM Funds' investments -- namely, to resolve the Brown Fund's cash flow issues **by paying insurance premiums**. (Aaron Dep., 60:20-24, 61:1-22; 64:4-24, 65:1-5; 88:2-8). Aaron made no attempt to go to commercial lenders to resolve the Brown Fund's cash flow issues; he testified that in 2007, at least, he didn't need to go to commercial lenders because Riek had come forward with $600,000 from himself and Miller. (*Id.*, 72:16-24, 72:1-2). Aaron also testified that if Riek had not come forward, he would have gone to the WM Funds for additional investments. (*Id.*, 72:3-7).

Aaron did not negotiate with the Securities Holders over the return rates on their investments. (Miller Dep., 28:25, 29:1; Riek Dep., 94:2-4; Janssen Dep., 68:11-14). Set at 12%, the return for each of the investments was significantly higher than the interest on other investment instruments, such as CDs or money market accounts, which at that time were set between 3 and 5%. (*See* Exhibit Q, Declaration of A. Cimpl-Wiemer, Esq.). WH&S presented absolutely no documentation to Miller, Riek or Janssen in conjunction with these investments, other than the notes, nor was any diligence done by the investors. (Aaron Dep., 60:6-19; Miller Dep., 25:16-21, 31:7-12; Riek Dep., 90:4-6; Janssen Dep., 56:4-7).

Aaron concedes that under the Limited Partnership Agreement for the Brown Fund (Exhibit A), other than the limited partner interests such as those sold to the WM Fund investors,

**Aaron had no authority to issue other securities** for sale to the public. (Aaron Dep., 58:4-8).

Based upon the foregoing facts, and for reasons set forth in the Argument section below, the

Receiver is filing an action for declaratory judgment against WH&S, Joseph Aaron, the Brown

Fund, the WH&S Plan and the Securities Holders requesting an Order re-characterizing the notes

as equity, and equitably subordinating any claims of the WH&S Plan and the Securities Holders.

A copy of the Complaint is attached as Exhibit R.

     **F.**    **WH&S Improperly Subordinated the WM Investors' Interests.**

     Aaron admits that any Brown Fund profits from the sale of policies in the fourth quarter

of 2007 included premiums that were due to be returned to the WM Fund investors. (Aaron

Dep., 91:15-22). But no distributions were made by the Brown Fund to the WM Fund investors

during the fourth quarter of 2007. (Aaron Dep., 90:17-20).

     Aaron also admits that he made early distributions on Miller's investment. (Aaron Dep.,

78:19-24, 79:1-8). He did not disclose to the WM investors that those payments were made.

(*Id*., 78:20-23).

**II.**    **ARGUMENT**

     The Court must deny the Securities Holders' motions because there is no reason at this

time to clarify or modify the Freeze Order. The Freeze Order is clear on its face, and it

safeguards the WM Funds' investments, whose interests the Receiver is charged with protecting,

from being improperly subordinated to the interests of individuals and entities that acted in

concert with Putman and Fevola. Put simply, the Freeze Order needs no clarification.

     Furthermore, the Freeze Order should not be modified. Evidence shows that the notes at

issue are securities that were issued in violation of the Brown Fund partnership agreement. It

would, therefore, be inequitable for the Securities Holders (as well as the WH&S Plan) to be paid

ahead of the WM Funds' investors. Moreover, as of January 31, 2010, the Brown Fund

contained only $1,529,546.60. If the Securities Holders' motion to modify the Freeze Order is

granted, this handful of claimants, as well as the WH&S Plan, will siphon away more than $1,780,000, leaving nothing in the Brown Fund to be distributed to the remaining Brown Fund investors -- among whom are the WM Funds investors, who are entitled to 95.27% of the Brown Fund's assets, proportional with their investments. Accordingly, the Court should not rule that the Securities Holders are creditors who should be paid ahead of the WM Fund investors. Rather, the Freeze Order should remain in place pending a determination in the declaratory judgment action filed by the Receiver against WH&S, Aaron, the Brown Fund, the WH&S Plan and the Securities Holders.

**A.** **The Freeze Order Expressly Prohibits Distribution of the Funds In Question, and Does Not Need Clarification.**

The terms of the Freeze Order prevent the Brown Fund from distributing the assets that have been requested by the Securities Holders. Specifically, the Freeze Order prohibits the WM Funds "**and those persons in active concert or participation with them (including without limitation banks or brokerages)**" from withdrawing, transferring, pledging, encumbering, assigning, dissipating, concealing, or otherwise disposing of any WM Funds' corporate, partnership, funds, or other properties. WH&S, the general partner of the Brown Fund, acted in concert with the WM Funds because WH&S is holding assets that belong to the WM Funds -- namely, a 95.27% interest in the Brown Fund. Moreover, **the Receiver has exercised control over the Brown Fund within the context of this receivership**, including consulting with the managing member and consultants to reach consensus as to whether additional premiums should be paid, and otherwise reviewing all decisions as to the use of assets. The Freeze Order, therefore, plainly prohibits the Brown Fund from disposing of the assets in question.

Additionally, evidence shows that WH&S, through its managing partner, Aaron, worked closely with Putman and Fevola in the management of the Brown Fund. For example, Aaron gave Putman and Fevola authority to approve all investments made by the Brown Fund. Under

the 2006 Brown Fund Limited Partnership Offering Memorandum, Wealth Management LLC

became an advisor to the Brown Fund, and selected the investment securities which the Grown

Fund would purchase for the benefit of the WM Funds' investors. It was Aaron, Putman and

Fevola, acting through Wealth Management LLC, who decided that **all** the money in the Brown

Fund would be invested in loans to trusts for the purchase of life insurance policies. Because

Wood, Hat & Silver acted in concert with Wealth Management LLC, Watch Stone and Palisade,

the Freeze Order specifically prohibits distribution of any of the monies in the Brown Fund.

Accordingly, clarification of the Freeze Order is not needed, and the Securities Holders' motions

must be denied.

**B.**     <u>The Freeze Order Preserves the Status Quo and Should Not Be Modified</u>
<u>Because the Notes are Securities Issued In Breach of the Limited Partnership</u>
<u>Agreement.</u>

The purpose of the Freeze Order is to preserve the *status quo* and to protect the Court's

ability to approve **equitable** relief in this receivership. That purpose will be defeated if the Court

allows the Securities Holders to be paid before the WM Funds' investors. First, as the Securities

Holders concede, the majority of the assets in the Brown Fund belong to the Wealth

Management investors. Indeed, the $16.2 million that was invested by the WM Funds represents

95.27% of the investments in the Brown Fund. As such, those assets should remain frozen while

the Brown Fund is still in liquidation, and while the Receiver's declaratory action against

WH&S, Aaron and the Securities Holders is pending. Second, and more importantly, the notes

at issue are securities that were sold in violation of the Brown Fund LP Partnership Agreement

and, therefore, are not valid. Because the notes are invalid, the Securities Holders have no

priority over other investors in the Brown Fund.[6] Because the WM Funds invested $16.2 million

---

[6] The JoAnne Miller Trust has asserted that in e-mail correspondence the Receiver "conceded" that the Securities
Holders needed only to show that the Notes were carried on the Brown Fund's books as loans in order to have their
interests placed ahead of everyone else. (Miller Br., p. 2). The Receiver intended no such concession. In her
fiduciary role, the Receiver was charged with determining whether the Notes represent interests that should prime

QB\136328.00005\10012141.7

in the Brown Fund and hold a 95.27% interest that will never be fully (or even mostly) recovered, even if the notes are deemed valid, the Securities Holders' claims should be subordinated and paid along with the interests of the WM Funds' investors' interests. Accordingly, modifying the Freeze Order so that the notes may be paid would disrupt the *status quo* and hinder the Court's ability to award equitable relief, contrary to the very purpose of the Freeze Order.

### 1. The Notes Are Securities.

Promissory notes such as the ones at issue in this case are **presumed** to be securities. *Reves v. Ernst & Young*, 494 U.S. 56, 67 (1990). That presumption may be overcome if, under a four factor test, the notes are deemed to resemble one of the instruments that the U.S. Supreme Court has determined are **not** securities under the Acts. *Id.* at 65. The notes at issue in this case fail to overcome the presumption that they are securities because, under the four factor test, they do **not** strongly resemble any of the enumerated instruments. Furthermore, these "notes" were never treated as loans; if they had been, the "lenders" would have done due diligence as to the alleged collateral. Accordingly, the Securities Holders' investments are securities.

#### a. Promissory Notes are Presumed to be Securities Unless They Satisfy the Majority of Factors in a Four Part Test.

Promissory notes are securities as defined by the Securities Act of 1933[7] and the Securities Exchange Act of 1934[8] if they do not strongly resemble any of the enumerated instruments[9] that the United States Supreme Court has determined are **not** securities under Acts.

---

the interests of the WM Funds' investors and creditors. Through discovery in the context of the pending Noteholder motions, and for reasons fully set forth below, the Receiver has determined that the Notes are **securities** and, therefore, that the Securities Holders' interests should not prime the interests of the WM Funds' investors and creditors.

[7] *See* 15 U.S.C. §77b(1)("'security' means any note").

[8] *See* 15 USC § 78c(a)(10)("'security' means any note").

[9] The enumerated list includes the following instruments: 1) A note delivered in consumer financing; 2) A note secured by a mortgage on a home; 3)A short-term note secured by a lien on a small business or some of its assets; 4) A note that simply formalizes an open-account debt incurred in the ordinary course of business; 5) A note evidencing a character loan to a bank customer; 6) A short-term note secured by an assignment of accounts

QB\136328.00005\10012141.7

11

*Reves* 494 U.S. at 67. Courts consider four factors when determining whether a note strongly

resembles one of the enumerated instruments and, therefore, is not a security. *Id.* at 66. It is

important to note, however, that all four factors do not need to be satisfied. *Id.* at 66.

First, courts look at the motivations of a reasonable buyer and seller. *Id.* Generally, if

the seller offers the note to finance substantial investments (as opposed to advance some

commercial purpose), then the note is more like a security. *Id.* Also, if the buyer is purchasing

the note to make a profit, the note is more like a security. *Id.*

Second, courts consider the note's plan of distribution. *Id.* at 67. If there is "common

trading for speculation or investment," then the note is more like a security. *Id.*

Third, courts consider the reasonable expectations that the investing public has regarding

the note. *Id.* Specifically, if the instrument is a security in substance, though not in form, and

the public perceives it as such, it is more like a security. *Id.*

Finally, courts consider whether there is another regulatory scheme (other than the Acts)

that would significantly reduce the risk of the note. *Id.*

> **b.  Courts Have Applied the Four Part Test and Determined that Promissory Notes Similar to the Notes At Issue Here are Securities.**
>
> (i)  *Reves v. Ernst & Young*, 494 U.S. 56, 67 (1990)

The United State Supreme Court, in *Reves*, held that notes sold by a farmers' co-op were

securities under the Acts. The buyers' and sellers' motivations demonstrated that the notes at

issue were more like securities. The notes at issue, which were uninsured, were payable on

demand. *Id.* at 58. The notes were sold to the general public at a variable interest rate that was

adjusted on a monthly basis to keep it higher than the interest rates of local banks. *Id.* at 58-59.

The co-op sold the notes to raise capital for its business operations, and the buyers acquired the

---

receivable; 7) A note that simply formalizes an open-account debt incurred in the ordinary course of business; 8) A note evidencing a loan by a commercial bank for current operations. *Reves v. Ernst & Young*, 494 U.S. 56, 65

notes to make a profit. *Id.* at 67. The Court found that the prospect of higher interest rates than those available at a bank informed the buyer's motivation to seek profit. *Id.* Thus, the Court found that under the first factor, the notes were more like securities. *Id.*

Regarding the second factor, the Court held that the co-op's notes were more like securities because the notes' plan of distribution was broad. *Id.* at 68. The Court found that the notes "were offered and sold to a broad segment of the public," including the co-op's 23,000 members. *Id.* This was enough to satisfy the requirement that there be common trading in an instrument, and a finding that the note was more like a security. *Id.*

Under the third factor, the Court found that the public reasonably perceived the co-op's notes as a security. *Id.* The Court noted that "the fundamental essence of a 'security' [is] its character as an 'investment.'" *Id.* The co-op advertised these notes, and characterized the notes as an "investment program." *Id.* at 59. The Court found that under this factor, the notes were more like securities because the advertisement demonstrated that the instrument could be reasonably perceived by the public as a security. *Id.* at 68.

Finally under the fourth factor, the Court found that "the notes would escape federal regulation entirely if the [Securities] Acts were held not to apply." *Id.* at 69. The Court focused on whether there was another federal act, like federal banking laws or the Employee Retirement Income Security Act of 1974, that the notes would fall under. *Id.* But the Court found that no other federal act would apply, and so nothing would reduce the risk inherent in the uninsured and uncollateralized notes. *Id.* Thus, the Court found under this factor that the notes were more like securities.

(ii)　　*State v. McGuire*, 2007 WI App 139, 302, Wis. 2d 668, 735
　　　　　　　　　　　　　N.W. 2d 555

Wisconsin courts have also applied the *Reves* test and found that notes similar to the ones

at issue here are securities under analogous Wisconsin securities laws.  For example, in

*McGuire*, the Wisconsin Court of Appeals found that a promissory note issued by a man

interested in financing a NASCAR venture through his girlfriend was a security.  Under the first

factor, the court held that the girlfriend's primary motivation was to profit because she gave the

money to her boyfriend as "it seemed like a good investment which would yield a handsome

profit."  *Id.* at ¶ 18.  The court also found it significant that the note's ten percent interest rate

was much higher than bank rates. *Id.*  Furthermore, the court found that the boyfriend's

motivation was to raise money for the NASCAR venture. *Id.*  Thus, the note seemed more like a

security. *Id.*

Regarding the second factor, the court found that the evidence did not satisfy the

requirement of a common trading in an instrument, and so the note was not like a security. *Id.* at

¶ 19.  The defendant offered the note only to his girlfriend. *Id.*  Unlike the notes in *Reves,* the

note was not advertised or made available to the public. *Id.*  While the court found that the note

had too narrow of a plan of distribution, and was not, in that regard, more like a security under

the second factor, it should be noted that this finding **did not** prevent the court from holding that

the note was more like a security overall. *Id.* at ¶ 23.

The court noted that the third factor is an objective one:  "[W]ould a reasonable investor

have considered the transaction to be an investment?" *Id.* at ¶ 20.  The court found that a

"reasonable investor would have considered the transaction **with its higher-than-commercial**

**interest rate** to be an investment." *Id.* (emphasis added).  Indeed, the court found it significant

that the note issuer convinced his girlfriend that the NASCAR venture "had a promising future,"

Case 1:09-cv-00506-WCG　Filed 03/29/10　Page 14 of 21　Document 233

and that the note offered her a return that was much higher than a bank's return. *Id.* Thus, the court found that under this factor, the note was more like a security. *Id.*

Finally, under the fourth factor, the court held that there were no other applicable regulatory schemes, and so the note is more like a security. *Id.* The note issuer tried to argue that the note fell under the purview of Wisconsin's Deceptive Trade Practices Act ("DTPA"). *Id.* at ¶ 21. He argued that the DTPA applied because his girlfriend complained that he failed to disclose two key pieces of information: First, that he was bankrupt and could not incur debt, and second, that he had a felony conviction for theft by conversion. *Id.* at ¶¶ 21, 23. The court noted that Wisconsin's DTPA covers only affirmative assertions and not failure to disclose, so the DTPA does not apply. *Id.* at ¶ 21. The court also found that there was no other regulatory statute that applied, and so the note should be considered more like a security under the fourth factor. *Id.* at ¶ 22.

(iii)    *Boo'ze v. State*, 2004 WL 691903, (Del. Supr.)

Delaware courts have also applied the *Reves* test and held that notes similar to the notes at issue here fall under the analogous Delaware securities act's definition. In *Boo'ze*, William Boo'ze convinced Jean Cordell to invest $40,000 in a parcel of land that Boo'ze claimed would be sold in three months for a large profit. *Id.* at *2. Boo'ze gave Cordell a promissory note where he promised to pay Cordell back with 8.25% interest. *Id.* He also secured the note with his company's stock, which he claimed was worth $40,000; in fact, his company's assets were less than $40,000. *Id.* Applying the *Reves* test, the court found that under the first factor, "Cordell clearly entered into the transaction with the expectation of profit." *Id.* Thus, the note was more like a security. *Id.*

Under the second factor, the court held that the note had "common trading for speculation or investment." *Id.* Even though the note was offered solely to Cordell, the note "recited that it

was transferable to any third party." *Id.* The court found that this "would include a broad

spectrum of individuals", and so the note had a broad plan of distribution, like the notes in *Reves*.

*Id.* Thus the court found that the note here was more like a security under the second factor. *Id.*

Regarding the third factor, the court focused on the fact that the note would offer the

holder a substantial return. *Id.* The court found it significant that Cordell would not have made

the business loan unless she was expecting a high return because her financial means indicated

that "she was not otherwise disposed, or in a position, to make a business loan" to Boo'ze. *Id.*

The court found that there was a reasonable expectation that the public would consider the note a

security because of the high return associated with the transaction. *Id.* Thus, the court found that

the note was a security under the third factor. *Id.*

Finally, under the fourth factor, the court found that no other regulatory scheme applied.

*Id.* Boo'ze tried to argue that the Delaware Criminal Code is an alternative regulatory scheme,

and so there would be no need to apply the Securities Act. *Id.* However, the court determined

that the Criminal Code was not "designed to regulate the distribution of promissory notes," and

not similar to the "regulatory, risk-reductions schemes" that the *Reves* court had in mind, such as

ERISA. *Id.* Accordingly, the court held that the Criminal Code was not a risk-reducing

alternative, and the note was more like a security. *Id.*

   **c.**  **The Securities Holders' Investments Do Not Overcome the Presumption That They Are Securities.**

Like the notes in *Reves*, *McGuire*, and *Boo'ze*, the investments here are securities under

the four-factor test. Testimony from Joanne Miller, Tom Riek, and David Janssen demonstrates

that these parties were motivated primarily by the prospect of making a profit. Miller's

motivation was to invest her money in a low-risk vehicle that would still generate substantial

returns -- enough for her to remain a stay-at-home mother after the death of her husband, the sole

Case 1:09-cv-00506-WCG Filed 03/29/10 Page 16 of 21 Document 233

income provider. Further, Miller, like Cordell in *Boo'ze*, was not in a financial position to be making a business loan as opposed to a profit-producing investment.

Riek, acting as Miller's advisor, testified that he made his investment in the Brown Fund to persuade Miller that this was a wise and profitable investment. He testified that he thought a note in the Brown Fund would be good for Miller (and, therefore, good for him, too) because it was a "low-risk" vehicle with a much better rate of return than a CD.

Janssen plainly admitted that he perceived the note as an **investment**, and the primary reason he chose that investment was that it offered a much higher rate of return than a CD and was not as dynamic as an equity investment.

Joe Aaron's testimony also shows that, based on motivation, the investments are securities. Specifically, he admits that his purpose in the Securities Holders' investments was not to build-up WH&S's business, but rather to resolve the Brown Fund's cash flow problems by financing substantial investments. Furthermore, Aaron admits that he made it clear to Riek and Janssen, at least, that he was offering the investments so he could use the funds to finance the life insurance premiums. In other words, he was **not** using the funds to advance a commercial purpose (like buying a new office building or hiring staff); instead, he was using the money the same way he was using the equity investors' money. In short, the buyers' and seller's motivations here demonstrate that the Securities Holders' investments are more like securities.

The Securities Holders' investments' plan of distribution is also broad enough to consider them securities. There were five "notes" for the Brown Fund issued to three people or entities. Periodically, Aaron issued other "notes" for several other WH&S funds. Thus, there was not an isolated transaction in this case, like there was in *McGuire*. Moreover, the investments at issue here provide that they are assignable to a third party with written consent of WH&S, which is

similar to the transfer clause in *Boo'ze*. (See Exhibits J, L, M, N pp. 13). Thus, the investments'
plan of distribution demonstrates the notes are more like securities.

As to the third factor, a reasonable investor would perceive the Securities Holders'
investments as securities. The rate of return on these investments was 12%, which is more than
double what a CD would have offered at that time. The courts in *Reves*, *McGuire*, and *Boo'ze*
found that the rates on the notes in question were higher than bank rates. Those courts also
determined that these high rates indicated to a reasonable investor that the transaction was an
investment. Under the standard set forth in those case, the rates of return here signify to a
reasonable investor that the "notes" are really investments.

Another fact that would lead a reasonable investor to perceive the Security Holders'
investments as securities is that Joe Aaron was using the money from these investments in the
exact same way as he was using the money from the equity investments. Put another way, the
Securities Holders' investments and the WM Funds' investments are different in form, but
identical in substance. Thus, the Securities Holders' investments, like the WM Funds'
investments, are securities.

Finally, as to the fourth factor, if the Securities Act and the Securities Exchange Act do
not apply to these investments, there are no other regulations that would lower the risk associated
with them. The Securities Holders may have a basis for bringing actions against WH&S and
Aaron for breach of contract, negligence, intentional misrepresentation, and/or breach of
fiduciary duty, but they otherwise have no regulatory protection in relation to the "notes."
Accordingly, the Securities Holders' investments are more like securities under the fourth factor
set forth in *Reves*.

Because the investments at issue here satisfy all four of the *Reves* factors, they do not
overcome the presumption that they are securities. The Securities Holders' motivations were to

profit from these investments. Aaron's motivation was to finance substantial investments. There was a wide-enough plan of distribution, and the much higher interest rates that Aaron offered signify to a reasonable investor that these are, in fact, investments. Finally, there is no other regulatory protection that applies to these investments aside from the Securities Act and the Securities Exchange Act. Accordingly, the "notes" are securities.

### 2. Aaron Violated the Partnership Agreement By Selling the "Notes", and the "Notes" Are Illegal Securities.

Aaron concedes that under the Limited Partnership Agreement for the Brown Fund ("the Partnership Agreement"), **Aaron had no authority to issue other securities** for sale to the public besides the limited partner interests such as those that he sold to the WM Fund investors. For reasons set forth above, the investments at issue are securities. Accordingly, Aaron violated the Partnership Agreement by selling the "notes."

Furthermore, the securities are illegal. First, as noted above, Aaron had no authority to sell them under the Partnership Agreement. Second, the securities were not registered. Third, at least two of the securities, namely the Riek & Associates investment and the investment made by the WH&S Plan, were issued based on insider information. Fourth, one of the securities (the JoAnne Miller investment) was issued to an investor who, admittedly, was not accredited and, therefore, did not qualify for the investment. Finally, the securities were issued without the provision of any offering memoranda or prospectuses. Accordingly, the Securities Holders' investments are illegal securities that should be rescinded in the context of the Receiver's action for declaratory judgment, to be filed separately.

### 3. Modifying the Freeze Order to Allow Payment to the Securities Holders Would Be Inequitable and Disturb the Status Quo.

In light of the fact that the investments at issue are illegal securities, it would be fundamentally unfair if the interests of the WM Funds' investors were subordinated to the interests of the Securities Holders through modification of the Freeze Order. Indeed, if the

Freeze Order is modified so that the "notes" should be paid, the Receiver may be forced to sue the Securities Holders[10] for damages, in addition to the declaratory judgment action being filed separately.

Furthermore, testimony shows that the interests of the WM Funds' investors were already subordinated by Aaron through, among other things, payment on the Miller investment. Without any authority under the Miller promissory note, Aaron made payments **before** they were due. Furthermore, he did so without informing the WM Fund investors that such payments were being made, let alone why the funds had been obtained in the first place (namely, to resolve the Brown Fund's cash flow issues). During the same time frame, the WM Fund investors were not receiving premiums to which they would have been entitled had they known to redeem their investments because the Brown Fund was experiencing cash flow difficulties. Given those circumstances, it would be particularly inequitable for the Securities Holders' interests to be paid ahead of the interests of the WM Funds' investors through modification of the Freeze Order.

Finally, the Freeze Order should not be modified because the Brown Fund has not yet been fully liquidated, and altering the Freeze Order will disturb the *status quo*. Due to the nature of the Brown Fund's insurance premium investments, the Receiver has not yet demanded transfer of the Brown Fund's assets into the WM Funds (as she was entitled to do). Instead, it has made sense to maximize the Brown Fund's potential returns by continuing to allow the Brown Fund to use the assets to fund premiums as they become due. While the Brown Fund is in liquidation mode, its assets should remain subject to the Freeze Order, frozen in order to preserve the *status quo*.

---

[10] The Receiver is already considering a suit against Tom Rick, on a theory of unjust enrichment, for disgorgement of payment he received from WH&S on a Note to the Baetis Investment Fund.

QB\136328.00005\10012141.7

20

## III.   CONCLUSION

For the foregoing reasons, the Securities Holders' motions to clarify the Freeze Order should be denied. The Freeze Order is clear on its face, and prohibits distribution of the assets in question because Aaron acted in concert with Putman and Fevola in relation to the Brown Fund, and because the Receiver currently controls the Brown Funds' assets in the context of the receivership. Accordingly, there is no need to clarify the Freeze Order in relation to the Securities Holders' investments, and their motions in that regard should be denied.

Likewise, the Securities Holders' motions to modify should be denied. The investments at issue are illegal securities, and the Receiver is filing an action against Wood, Hat & Silver, the Brown Fund, Joseph Aaron, the WH&S Plan and the Securities Holders for a declaratory judgment re-characterizing the notes as equities, and for equitable subordination. It would, therefore, be premature for the Court to modify the Freeze Order and allow the Securities Holders to be paid first. The Securities Holders' motion to modify the Freeze Order should, therefore, be denied.

Dated this 29th day of March, 2010.

MICHAEL H. SCHAALMAN
JANE E. APPLEBY
ALLISON E. CIMPL-WIEMER

s/ Jane E. Appleby
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202-4497
414.277.5000
Email: jane.appleby@quarles.com
Attorneys for Court Appointed Receiver, Faye
Feinstein, Esq.