# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN
# GREEN BAY DIVISION

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

  v.                                             Civil Action No: 09-C-506

WEALTH MANAGEMENT, LLC,
JAMES PUTMAN, and SIMONE FEVOLA,

      Defendants, and

WML GRYPHON FUND, LLC;
WML WATCH STONE PARTNERS, L.P.; WML
PANTERA PARTNERS, L.P.; WML PALISADE
PARTNERS, L.P.; WML L3, LLC;
WML QUETZAL PARTNERS, L.P., and
EMPLOYEE SERVICES OF APPLETON, INC.,

      Relief Defendants.

## DECISION AND ORDER

On July 13, 2010 the Receiver for Wealth Management LLC ("WM"), various investment funds created by WM ("the Relief Defendants"), and Employee Services of Appleton moved this Court for an order authorizing the Receiver to use WM assets encumbered by the security interest of Community First Credit Union ("CFCU") to pay $22,211.20 in wage claims to twelve former WM employees. The Receiver also moves for an order requiring CFCU to disgorge and return to the Receiver $8,223.22, which CFCU seized from an account maintained by WM at CFCU. The Receiver seeks return of all or that part of the $8,223.22 needed to pay such claims. For the reasons set forth below, the Receiver's motions will be granted in part and denied in part.

## BACKGROUND

On May 20, 2009, the SEC filed the complaint in the above-captioned enforcement action against WM, James Putman and Simone Fevola, alleging securities laws violations. On the same date, this Court appointed a Receiver (Dkt. 8) and issued its *Order Freezing Assets* of WM and the Relief Defendants. (Dkt. 9 ). By orders entered on November 20 and November 30, 2009 (Dkt. Nos. 161 and 167, respectively), the Court approved the Receiver's Second Amended Plan of Allocation of the Assets of WM and the Relief Defendants ("the Plan"). (Dkt. 163.) The Plan creates seven receiver estates: one containing the assets of WM and one for the assets of each of the six WM Funds or the Relief Defendants. The Plan also provides for a deadline for the submission of all creditor claims against the Receiver estates.

Eight claims were submitted to the Receiver by former WM employees for unpaid wages or the equivalent. In fact, the claims consist of unpaid employer matching contributions to employee retirement plans (401k claims) and the dollar value of available paid-time-off ("PTO") not used prior to termination of employment. The total value of the eight claims submitted is $17,490.85. The Receiver states in her motion for payment of these claims that she has reviewed the submitted proofs of claims and WM's records and is satisfied they are prima facie valid. (Receiver's Motion ¶ 13.) From her review of WM's records, the Receiver has also concluded that four additional former WM employees who failed to file claims within the time allowed under the Plan would also have claims totaling $4,720.35. The Receiver seeks leave to pay these claims as well because she believes "it is inequitable to disallow valid Employee Claims that are reflected in WM's records solely because the former employee did not submit a proof of claim to the Receiver." (Receiver's Motion ¶ 13, n.1.) The total amount of all wage claims the Receiver requests authorization to pay is thus $22,211.20. (Receiver's Motion ¶¶ 13, 14.)

The Receiver proposed to pay these Wage claims out of the following WM assets: (1) cash of $1,103.85 deposited by WM in a bank account held at CFCU in the name of Employee Services of Appleton, Inc., ("ESA") ; (2) cash of $4,761.50 distributed to WM on account of its investments in several of the WM Funds; (3) cash of $12,000 received as proceeds of the sale of used office furniture and equipment from WM's leased office premises; and (4) $8,223.22 that was seized by CFCU from WM's checking account in violation of the Freeze Order. These assets total $26,088.57. With the exception of the WM distribution, the Receiver acknowledges that all of the available WM assets are subject to security interests held by CFCU. No other WM assets are available to satisfy the wage claims, however, and it is the Receiver's position that the Wage claims are entitled to priority over CFCU's liens under Wisconsin law.

CFCU's security interest in the WM assets arises out of a May 8, 2008 Promissory Note executed by WM in the amount of $700,000 and Security Agreement under which WM gave CFCU a blanket security interest in WM's "inventory", "accounts and other rights to payment", "general intangibles", and "equipment" (including furniture). There is no dispute as to the validity of CFCU's claim and its security interest in the WM assets. There is also no dispute, however, that CFCU violated this Court's Freeze Order when it seized $8,223.22 from WM's checking account between June 9 and September 1, 2009, pursuant to its Security Agreement with WM. Based on her claim that the Wage claims are prior to CFCU's security interests, the Receiver now requests that CFCU be ordered to return the funds it wrongfully seized for WM's account and that she be authorized to pay the claims using WM assets.

## LEGAL STANDARDS

Wisconsin's Wage Claim Act was created as a protection for the situation where an employer shuts down or relocates his business, sells, liquidates, or otherwise disposes of his

3

business. *In re Napco Graphic Arts, Inc.*, 83 B.R. 558, (Bankr. E.D. Wis.1988) (citing legislative history). As early as 1862, the Wisconsin Supreme Court, in an action determining the priority of loggers' wage liens in relation to a prior security interest in the logs, commented that "it was the intention of the [wage lien] statute to give such workmen an absolute lien . . . as against everybody," and that "[t]heir claim is a sacred lien." *Id.* citing *Paine v. Woodworth,* 15 Wis. 298, 327, 332-33 (1862).

In Wisconsin, wage claim liens are superpriority liens that have priority over pre-existing liens, except those explicitly excluded by statute. *Pfister v. Milwaukee Economic Development Corp.,* 576 N.W.2d 554, 563 (Wis. Ct. App.1998). The Wage Claim Act provides that an employee's wage claim lien shall take precedence over "all other" debts, judgments, decrees, liens or mortgages against employer. Wis. Stat. 109.09(2). There are narrow limitations on superpriority liens stemming from the Wage Claim Act. One limitation is relevant here: if a commercial lending institution has a lien in place, employees who file under Wage Claim Act can only recover up to $3,000 of wages for the six month period proceeding the date on which the employee files his or her claim. Wis. Stat. § 109.09(2)(c)2.

**ANALYSIS**

**I. Wage Claims**

The Receiver relies on the Wage Claim Act in asking this Court to allow her to pay a total of $22,211.20 to twelve different employees. The Receiver seeks to pay this amount out of assets of the WM receivership estate. CFCU, as a financial institution with a security interest in WM assets, opposes the Receiver's request. CFCU's opposition is based on two arguments; first, that the employees were not employed by WM and second, that the Receiver has not established that the employees' claims are entitled to priority under the Wage Claim Act.

### A) Status of Employees

CFCU first argues that the claimants were employees of ESA and not WM. The definition of an employer under the Wage Claim Act is broad:

> "employer" means any person engaged in any activity, enterprise or business employing one or more persons within the state, including the state and its political subdivisions and charitable, nonprofit or tax-exempt organizations and institutions.

§ 109.01(2). The relationship between WM and ESA plainly shows that the 12 employees worked for WM, even though their paychecks happened to be cut by ESA. ESA was established for the sole purpose of managing the payroll and benefits of WM. Because ESA conducted no business and had no assets, the employees ostensibly spent their time working on WM-related matters. This notion is confirmed by the Receiver's review of the employees' claims. She determined that the claimants were, in fact, "employees" of WM within the meaning of the Wage Act. (Dkt. 295 at 5.)

This Court approved the Receiver's Proposed Plan for the Allocation of WM Assets. (Dkt. 62.) The approved plan stated that ESA was "created solely to manage payroll and benefits for WM employees, conducted no business of its own, and had no assets." (Dkt. 126, at 19, n.2.) CFCU was provided notice and an opportunity to object to the Receiver's Proposed Plan for the Allocation of WM Assets before this Court approved it. (Dkt. 161.) CFCU did not object to the proposed plan or to the language related to ESA. The Receiver also has strong evidence that CFCU was aware that ESA regularly paid employees only after WM transferred funds to the ESA account. (Dkt. 295, Ex. B.) WM made a $17,601.96 "payroll deposit" to an ESA account at CFCU on May 27, 2009 allowing ESA to cut payroll checks on May 28 and 29, 2009. To hold that WM is not subject to the Wage Claim Act by virtue of ESA's role as a payroll and benefits management entity would effectively allow organizations to sidestep enforcement of the Wage Claim Act by setting up shell

5

payroll entities. For all of the above stated reasons this Court holds that the claimants are appropriately treated as employees of WM under the Wage Claim Act.

### B) Priority of Employee Claims

The fact that CFCU has a perfected security interest in WM's assets does not mean it has priority over the employees' wage claims. Under the Wage Claim Act, up to $3,000 of an employee's claim for wages earned within the six-month period prior to the date on which the employee either files a claim with the Wisconsin Department of Workforce Development ("DWD") or brings suit against the employer can take precedence over a lien of a commercial lending institution. Wis. Stat. 109(2)(c)(2). CFCU argues, however, that the Receiver has failed to prove that the wages of the affected employees were earned within six months preceding the employees' filing of an action or wage claim. (Dkt. 290 at 4.) In her motion, the Receiver included a chart showing the amount each employee is allegedly entitled to under the Wage Claim Act. (Dkt. 288 at 6.) The wages apparently stem from unused vacation time and unpaid 401(k) matching contributions. This Court is convinced that the Receiver has diligently reviewed the WM and ESA records and appropriately determined that the wages were earned within six months of her assumed filing date.

CFCU challenges the Receiver's assumed filing date, however. To repeat, the Wage Claim Act gives priority to claims for unpaid wages earned by an employee within the six months preceding the *date on which the employee files the wage claim* with the Wisconsin Department of Workforce Development ("DWD") or files an action against the employer. Wis. Stat. 109.09(2)(c)2. CFCU contends that the Receiver has arbitrarily chosen the six months prior to her appointment as the relevant time period for wage claims.

The period chosen by the Receiver is not arbitrary. The relevant period, according to the Receiver, is the six-month period ending on May 20, 2009, the date of the Receiver's appointment. Because this Court's Freeze Order barred ancillary litigation against WM, the Receiver argues it would be improper to deny claims because the employees did not file claims with the DWD or commence an action against WM themselves after the entry of this Court's Freeze Order since doing so could be seen as a violation of the Court's order. The Court agrees. It is enough that the employees filed their claims with the Receiver in accordance with the Plan approved by the Court.

The Receiver also seeks authorization to pay claims for employees who did not filed claims against the WM estate. This request will be denied. The Plan sets a clear bar date by which all creditors were required to submit their claims in order for payment to be considered. The Receiver offers no reason why Wage claimants should be excused from this requirement. Accordingly, only claimants who filed claims within the time allowed under the Plan are entitled to payment.

Finally, CFCU is also ordered to return to the estate the $8,223.22 that it wrongfully removed from WM's checking account in violation of the Court's Freeze Order. Although I previously rejected the Receiver's suggestion that CFCU be sanctioned for its conduct, I am now satisfied that, notwithstanding its security interest in WM's accounts, its violation of the Court's order cannot stand. Given the priority of wage claims such as those at issue here and perhaps other claims as well, CFCU's removal of the funds was not simply premature; it was wrong. Whatever priority CFCU may have in WM assets, if disputed by the Receiver, must ultimately be determined by the Court as part of its role in supervising the liquidation of the estate. CFCU was not entitled to self-help measures. Accordingly, CFCU is directed to return to the Receiver the funds taken from WM's account in violation of the Freeze Order.

**CONCLUSION**

Accordingly, and for the reasons set forth above, the Receiver's motion is granted in part and denied in part. The Receiver is authorized to pay out of WM assets the wage claims of those former WM employees who filed their claims within the time allowed under the Plan. No payment is authorized as to any other wage claim. In addition, CFCU is directed to return the funds taken from WM's account after the issuance of the Freeze Order on May 20, 2009.

**SO ORDERED** this ___15th___ day of September, 2010

    s/ William C. Griesbach
William C. Griesbach
United States District Judge