UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

_____

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

  v.

WEALTH MANAGEMENT LLC;
JAMES PUTMAN; and SIMONE FEVOLA,

    Defendants, and

WML GRYPHON FUND LLC;
WML WATCH STONE PARTNERS, L.P.; WML
PANTERA PARTNERS, L.P.; WML PALISADE
PARTNERS, L.P.; WML L3, LLC; and WML
QUETZAL PARTNERS, L.P.,

    Relief Defendants.
_____

Civil Action No: 09-C-506

Judge William C. Griesbach

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF
UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR
<u>SUMMARY JUDGMENT AGAINST DEFENDANT JAMES PUTMAN</u>**

Eric M. Phillips
U.S. SEC
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff United States
Securities and Exchange Commission*

# UNDISPUTED MATERIAL FACTS

Pursuant to Civil Local Rule 56, Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission") hereby submits this Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment as to Defendant James Putman ("Putman), and accompanying memorandum of law.[1]

## I. Parties, Jurisdiction and Venue

1. Plaintiff SEC is an independent federal agency charged with administering and enforcing the federal securities laws, including, among others, the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a *et seq.*, the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*, and the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-1 *et seq.*, and the rules and regulations promulgated thereunder. (Complaint, ¶ 16 Docket #1, Answer to Complaint filed by James Putman, Docket #70)

2. Wealth Management, LLC ("WM") was an Appleton, Wisconsin SEC-registered investment adviser that, prior to being placed in receivership in May 2009, provided financial planning and investment advisory services to clients in Wisconsin and throughout the United States. (Ex. 8, Putman 4/20/06 WM Business Plan; Ex. 2, WM Form ADV; Ex. 1, 4/20/11 Deposition of James Putman, at 31)

3. WM executed an Investment Management Agreement with each client that provided, among other things, that the client appointed WM to manage the client's investment portfolio and take all necessary steps to effect transactions for the client's account. (Ex. 3, 6-28-06 Discretionary Investment Management Agreement Between WM and client) (portions redacted)

---

[1] References to the form "Ex." are to exhibits electronically filed herewith and included in the Appendix provided to the Clerk of the Court in hard copy form.

4.      Putman, age 59 and a resident of Menasha, Wisconsin, formed WM in 1985. (Ex. 1, 4/20/11 Deposition of James Putman, at 14; Ex. 2, WM Form ADV)  Putman was WM's President from 1985 until 2005 (Ex. 1, 4/20/11 Deposition of James Putman, at 14-16), and its CEO and Chairman of the Board from 1997 through May 2009. (*Id.* at 16-17)

5.      This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§78u(d) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Putman, directly or indirectly, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  Some of these transactions, acts, practices and courses of business occurred in the Eastern District of Wisconsin, where Putman transacted business during the relevant period.  Putman is a resident of this district, and WM's offices were also located within this district during the relevant period. (Complaint, ¶ 18, Docket #1, Answer to Complaint of James Putman, Docket #70)

## II.     Putman's and WM's Supposed "Fee-Only" Relationship with Clients

6.      In 2002, Putman hired Simone Fevola, and Fevola became WM's President in 2005.  (Ex. 1, 4/20/11 Deposition of James Putman, at 17-18)  Fevola reported to Putman from 2002 through 2008.  (*Id.* at 18)

7.      Among Putman's duties at WM was to serve as a financial planning consultant to WM's clients.  (*Id.* at 31)   In most cases, the financial planning consultant was the main interface between WM and the client.  (*Id.*)  Putman knew everything about his clients' financial situation, including what the clients were looking for in terms of making investments.  (*Id.* at 32)

2

8.      Most of Putman's clients were nearing or in retirement. (*Id.* at 34) Accordingly, the clients were focused on stability of principal and minimizing losses (*id.* at 32) and were looking for conservative investments. (*Id.* at 33-34) When Putman and other financing planning consultants met with clients, WM's standard practice was to document everything that was said at the meeting in meeting notes that WM kept in its files and sent to clients. (*Id.* at198-99; Ex. 4, Notes of Meetings Between WM and Clients) (portions redacted)

9.      Putman marketed WM as a "fee only" financial planning firm, meaning that WM purportedly only received compensation from fees for managing clients' investments and for financial planning, not from commissions. (Ex. 5, Putman's Answers to Request to Admit, #10) Putman told clients that WM would charge 1% of the client's assets under management for WM's services. (Ex. 6, 3/12/09 Testimony of James Putman at 139-40) Fee-only financial planning was a central part of WM's business plan. (Ex. 1, 4/20/11 Deposition of James Putman at 27) Putman marketed himself as an advocate for fee-only financial planning, and formerly served as President of the National Association of Personal Financial Advisors ("NAPFA"), an organization dedicated to fee-only financial planning. (Ex. 5, Putman's Answers to Requests to Admits, # 10, #11) Putman repeatedly told clients that all of WM's investment recommendations were "made with no commission bias, which allows us to make objective decisions that are in your best interests." (Ex. 1, 4/20/11 Deposition of James Putman at 25; Ex. 7, 7/9/04 Letter from James Putman to Client)

10.     Putman wrote that fee-only compensation was a "unique characteristic" of WM, adding that "we do not receive compensation from third party product or service providers. We are loyal to those that pay us – our clients! This allows us to operate without a commission or product conflict of interest." (Ex. 8, Putman 4/20/06 WM Business Plan)

3

**III.     Putman Forms the WM Funds**

11.     Prior to approximately 2003, WM and Putman invested client assets in traditional investments, such as diversified stock and bond funds.  (Ex. 1, 4/20/11 Deposition of James Putman, 34-35; Ex. 9, 4/26/11 Deposition of Lori Coonen at 29)

12.     In approximately 2003, however, Putman created new investment vehicles so that WM clients could invest in alternative, non-traditional investments.  (Ex. 1, 4/20/11 Deposition of James Putman, at 34-35)  Over the next couple of years, Putman created six alternative investment funds for WM clients: Gryphon, WatchStone, WML Pantera Partners, L.P., WML Palisade Partners, L.P., WML Quetzal Partners, L.P., and WML L3 LLC (collectively, the "WM Funds").  (*Id.* at 34)  Gryphon and WatchStone were the largest of the WM Funds.  (*Id.*)

13.     Shortly after creating the WM Funds, Putman began advising his clients to put most of their investable assets into alternative investments through the WM Funds.  (*Id.*; Ex. 9, 4/26/11 Deposition of Lori Coonen at 45-46)

14.     Before advising clients to invest in Gryphon and WatchStone, Putman told clients that these investments would serve as a substitute for traditional fixed-income investments such as diversified bond funds (Ex. 4, Notes of Meetings Between WM and Clients: 5/28/03 Meeting Notes Between WM and Client (portions redacted); 10/9/03 Meeting Notes between WM and John and Teresa Bobinski; 10/10/03 Meeting Notes Between WM and Client (portions redacted); 10/22/03 Meeting Notes Between WM and Client) (portions redacted),  appropriate for investors at or near retirement age and looking for conservative investments.  (Ex. 10, Declaration of David and Jean Lawrence, ¶ 7; Ex. 46, Declaration of Jacalyn Schubbe, ¶ 7; Ex. 44, Declaration of John and Teresa Bobinski, ¶ 7)  Putman told clients that the goals of Gryphon and WatchStone were to preserve investors' principal, outperform the 10-year Treasury note and/or

4

the Merrill Lynch U.S. Master Bond Index, and produce a consistent 8% annual rate of return. (Ex. 4, Notes of Meetings Between WM and Clients: 10/3/03 Meeting Notes Between WM and Client (portions redacted); 10/8/03 Meeting Notes Between WM and John and Teresa Bobinski; 01/28/04 Meeting Notes Between WM and Client (portions redacted); 9/17/04 Meeting Notes Between WM and Client (portions redacted); 11/3/04 Meeting Notes Between WM and Client (portions redacted); 11/19/04 Meeting Notes Between WM and Client (portions redacted); 11/15/04 Meeting Notes Between WM and David and Jean Lawrence)  WM provided monthly investor reports to clients listing the investments in the WM Funds and purporting to show consistent monthly returns from those investments.  (Ex. 11, Gryphon and WatchStone Monthly Investor Reports; Ex. 12, 3/30/11 Deposition of Chad Morley at 35-36)

15. Gryphon's and WatchStone's written offering documents were consistent with Putman's representations that Gryphon and WatchStone were conservative investments similar to diversified bond funds.  Gryphon's offering documents stated in pertinent part that Gryphon's investment objective was "to achieve a high level of income consistent with the preservation of capital" and that Gryphon would "generally invest its assets in a portfolio of individual debt securities with varying maturities, including corporate debt obligations, as well as certain hedge funds which have an investment objective similar to the Fund's investment objective," and that Gryphon would mostly invest in investment grade debt securities.  (Ex. 13, Gryphon Confidential Offering Memorandum, at 1)  Likewise, WatchStone's offering documents stated in pertinent part that WatchStone's investment objective was to achieve a high level of income consistent with the preservation of capital and WatchStone would invest substantially all of its assets through third-party managers and through direct investments in "a varied portfolio of individual debt securities, as well as other financial instruments," and that WatchStone would

5

mostly invest in investment grade debt securities. (Ex. 14, WatchStone Confidential Offering Memorandum, at 1, 7)

16. Putman assured clients that Gryphon and WatchStone would be well diversified (Ex. 4, Notes of Meetings Between WM and Clients: 5/28/03 Meeting Notes Between WM and Client (portions redacted); Ex. 17, 3/29/11 Deposition of Donald Swain at 38; Ex. 46, Declaration of Jacalyn Schubbe, ¶¶ 7,8) and liquid investments. (Ex. 4, Notes of Meetings Between WM and Clients: 12/18/03 Meeting Notes between WM and Peter and Jacalyn Schubbe; 11/19/04 Meeting Notes Between WM and Client (portions redacted)) Putman also assured clients that he created the WM Funds solely to benefit clients, not WM. (Ex. 4, Notes of Meetings Between WM and Clients: 12/18/03 Meeting Notes Between WM and Peter and Jacalyn Schubbe)

### III. Contrary to Putman's Representations to Clients, He Concentrates Most of Gryphon's and WatchStone's Assets in Two Risky Strategies

17. Contrary to Putman's representations to clients that Gryphon and WatchStone would invest in a diversified portfolio of conservative, fixed-income investments similar to a diversified bond fund, Gryphon and WatchStone instead concentrated their investments in a few risky strategies. Shortly after being formed, Gryphon dabbled in strategies such as convertible bond arbitrage and municipal bond futures. (Ex. 15, 2004 Gryphon Description; Ex. 16, Gryphon Chronology as of 5/1/04) In approximately 2004, Gryphon and WatchStone began making investments in real estate investment funds managed by MKA Capital Group Advisors, LLC, ("MKA") of Newport Beach, California ("MKA Funds"), and in life insurance premium financing investments coordinated by Wood Hat & Silver, LLC ("WHS") of Sonoma, California. (Ex. 16, Gryphon Chronology as of 5/1/04) By 2005, Gryphon and WatchStone increasingly began concentrating their investments in MKA Funds and life insurance premium financing. (Ex. 5, Putman Answers to Request to Admit, #27, #32; Ex. 11, Gryphon and WatchStone

6

Monthly Investor Reports) Putman and Fevola made these investment decisions. (Ex. 17, 3-29-11 Deposition of Donald Swain at 41; Ex. 18, 3/17/09 Testimony of Simone Fevola at 26; Ex. 19, 7/22/10 Deposition of Thomas Riek at 63, Ex. 20, Quadrimus Meeting Minutes) Other investments in Gryphon and WatchStone included investments in natural gas royalty interests and distressed credit card debt. (Ex. 11, Gryphon and WatchStone Monthly Investment Reports)

18. The MKA Funds were funds that loaned money, principally to real estate developers, many of which were located in California and the southwestern United States. (Ex. 21, Declaration of James Keane, ¶ 2) The offering materials for these Funds informed prospective investors that investments in the MKA Funds were "speculative." (*Id.* at ¶¶ 4, 6; Ex. 22, Keane Declaration Exs. 1, 2, Private Placement Memoranda for MKA Opportunity Fund and MKA Qualified Fund at 2) WHS first introduced MKA to Putman and Fevola (Ex. 19, 7/22/10 Deposition of Thomas Riek at 18-19), and WM first invested in the MKA Funds through WHS' Baetis Fund (3/30/11 Deposition of Chad Morley at 25; 7/28/10 Deposition of Joseph Aaron at 30-33). Despite publicly stating that Putman personally performed extensive due diligence on the WM Funds' investments (Ex. 24, 03/06 Article About James Putman and WM at 7-9), Putman testified that Fevola did all of the due diligence on MKA. (Ex. 43, 2-25-11 Deposition of James Putman at 44-45) During 2005 through 2008, WatchStone invested as much as 47% of its assets in the MKA Funds (Ex. 11, Gryphon and WatchStone Monthly Investment Reports, 7/1/06 WatchStone Investment Report), and Gryphon invested as much as 25% of its assets in the MKA Funds during this same period. (*Id.*, 7/1/06 Gryphon Investment Report)

19. Life insurance premium financing investments by Gryphon and WatchStone involved loans to irrevocable life insurance trusts for the purpose of paying insurance premiums targeted for the first two years of the policy's existence. (Ex. 6, 3/12/09 Testimony of James Putman at 22; Ex. 23, 7/28/10 Deposition of Joseph Aaron at 41-42) An irrevocable life

7

insurance trust is a trust whose main asset is a life insurance policy. (Ex. 6, 3/12/09 Testimony of James Putman at 46; Ex. 23, 7/28/10 Deposition of Joseph Aaron at 40) Its beneficiaries are the insured, the insurance agent that puts the trust together, known as the "aggregator," and the lender. (Ex. 6, 3/12/09 Testimony of James Putman at 46; Ex. 23, 7/28/10 Deposition of Joseph Aaron at 41) The insureds typically are elderly -- 76 years old or older. (Ex. 23, 7/28/10 Deposition of Joseph Aaron at 40) The premise of the investment was that after funding the premiums for the life insurance policy after two years, the policy would be sold into the secondary market at a profit. (*Id.* at 41-46) Putman understood that the risk of these investments would be that there would be no buyers for the policies after two years. (Ex. 6, 3/12/09 Testimony of James Putman at 51-52)

20. The WM Funds made investments in life insurance premium financing through the WHS funds The Baetis Fund, L.P. ("Baetis") and/or The Brown Investment Fund, L.P. ("Brown"). (*Id.* at 44-45) The WM Funds were the only investors in Baetis beginning in 2005 (Ex. 23, 7/28/10 Deposition of Joseph Aaron at 28), and they were the majority investors in Brown. (*Id.* at 33-34)

21. Brown and Baetis, in turn, invested in life insurance premium financing through various aggregators, who found insureds and introduced possible life insurance policies to WHS. (*Id.* at 41) These aggregators included Rangetree Strategies, UTC (run by a former WHS employee, Beau Gayner), Meridian Capital, Jeff Keller, PRG (run by Byron Frisch), and others. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 15, 41, 62-63, 108-109; Ex. 23, 7/28/10 Deposition of Joseph Aaron at 35-36, 128-29, 153)

22. Baetis and Brown were managed by Joseph Aaron (Ex. 6, 3/12/09 Testimony of James Putman at 45), who owned WHS. (Ex. 23, 7/28/10 Deposition of Joseph Aaron at 10, 14-15) From approximately 2002 through 2004, WHS also employed Thomas Riek, who previously

8

had worked with Putman at WM. (*Id.* at 17; Ex. 19, 7/22/10 Deposition of Thomas Riek at 14-15) After Riek left WHS in 2004, he worked as a "finder," introducing clients such as WM to money managers such as WHS. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 17-18) At some point during the course of Putman's investments through Aaron, Putman learned that Aaron had a disciplinary history with the SEC, which concerned Putman. (Ex. 6, 3/12/09 Testimony of James Putman at 97-98)

23. Because life insurance premium financing investments involved paying premiums on life insurance policies for two years and then attempting to sell the policies into a secondary market, these investments did not produce any actual return to Baetis or Brown until the end of two years, which Putman understood. (Ex. 1, 4/20/11 Deposition of James Putman at 205-06)

24. Nevertheless, during the two year period in which Brown and Baetis were funding premiums without receiving any returns, Brown and Baetis reported consistent monthly returns on these investments to WM, based on the expectation that the policies would be sold at a profit at the end of two years, which Putman understood. (*Id.*) WM reported these consistent returns to clients in WM's monthly investment reports on each of the WM Funds. (*Id.* at 205-07; Ex. 11, Gryphon and WatchStone Monthly Investor Reports)

25. Generally, Putman did not explain to clients that the consistent monthly returns that WM was reporting from life insurance premium financing investments were based on assumptions, not real returns. (Ex. 1, 4/20/11 Deposition of James Putman at 207-08)

26. Aaron and Riek first introduced life insurance premium financing to WM and Putman in approximately 2004. (7/28/10 Deposition of Joseph Aaron at 34-35; Ex. 19, 7/22/10 Deposition of Thomas Riek at 21; Ex. 25, 01/01/04 email from Riek to Putman and Fevola) In early 2004, Putman and Fevola engaged in due diligence on this type of investment. (Ex. 26, 01/19/04 email Riek to Putman and Fevola) At this point, life insurance premium financing had

9

only been in existence as a type of investment one to two years. (Ex. 23, 7/28/10 Deposition of Joseph Aaron at 35-38) Thus, life insurance premium financing was a new type of investment, a fact that Aaron told Putman. (*Id.* at 39)

27.  When Riek first talked to Putman about life insurance premium financing, he told Putman that it was a high risk investment. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 42) Riek testified: "There was no track record on the sale of policies at the end of the two years, making it a high-risk venture." (*Id.* at 42-43) The written offering documents for Baetis and Brown also described these investments as "speculative" (Ex. 27, Confidential Offering Memoranda for Brown Fund at 3; Ex. 28, Confidential Offering Memorandum for Baetis Fund, at 2) and involving "significant risks." (Ex. 28, Confidential Offering Memorandum for Baetis Fund at 5; Ex. 23, 7/28/10 Deposition of Joseph Aaron at 83-93)

28.  Over the next several years, Putman and Fevola continued to direct a substantial portion of the WM Funds' investments into life insurance premium financing. (Aaron Dep. 50-53) As Putman stated in a December 2005 email to Riek, copying Aaron and Fevola, in response to Riek's suggestion that Baetis and Brown would be investing more money with an aggregator: "As with the other managers, Simone and I want to approve anything that is invested in Baetis." (Ex. 29, 12/9/05 email Putman to Riek, cc: Fevola, Aaron) Putman and Fevola directed Baetis and Brown to shift their investment strategy into life insurance premium financing, to the exclusion of other possible strategies (Ex. 23, 7/28/10 Deposition of Joseph Aaron at 64-67), and they directed Brown and Baetis to make specific life insurance premium financing investments. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 61-63)

29.  In 2007, Fevola made a number of disparaging comments to Putman about Aaron and Riek. For example, in January 2007, Fevola wrote to Putman that Aaron was "either a liar or an idiot or both." (Ex. 31, 01/11/07 email Fevola to Putman) In July 2007, Fevola wrote to

10

Putman that Fevola had seen "a real ugly side" of Riek and that Fevola was "not happy." (Ex. 32, 07/24/07 email Fevola to Putman) In August 2007, Fevola wrote to Putman that Fevola "was having real doubts about being in business with two people who I don't trust and have little confidence in," referring to Aaron and Riek. (Ex. 1, 4/20/11 Deposition of James Putman at 86-87; Ex. 33, 08/18/07 emails between Fevola and Putman) Fevola added: "I have cut people out of my business life for a lot less than these two clowns have done." (*Id.*) Putman responded: "There are ways to defend ourselves from most bad possibilities. I have been thinking about this, too." (*Id.*) Despite these concerns, Putman and Fevola continued to make investments through Aaron. (Ex. 1, 4/20/11 Deposition of James Putman at 185)

30. From 2005 through 2008, a significant portion of Gryphon's and WatchStone's assets were invested in life insurance premium financing. (Ex. 5, Putman Answers to Requests to Admit, #27) During 2005 through 2008, WatchStone invested as much as 52% of its assets in life insurance premium financing (Ex. 11, Gryphon and WatchStone Monthly Investor Reports, 12/1/08 WatchStone Investor Report), and Gryphon invested as much as 70% of its assets in life insurance premium financing during this same period. (Ex. 11, Gryphon and WatchStone Monthly Investor Reports, 12/1/08 Investor Report)

31. The SEC's expert, Harold Evensky, states that the WM Funds' investments in life insurance premium financing investments were unsuitable for WM's clients and lacked appropriate diversification. (Ex. 34, Declaration of Harold Evensky, ¶ 8) Mr. Evensky further states that Putman's recommendation for WM's clients to invest the majority of their assets in the WM Funds was inconsistent with industry standards and an extreme departure from the standard of care applicable to investment advisers and financial planners. (*Id.*)

IV. **Putman Accepts Undisclosed Commissions Derived From the WM Funds' Investments In Life Insurance Premium Financing Arrangements**

11

32. When Riek introduced WM to life insurance premium financing investments in approximately 2004, Riek, as a finder, began receiving finder's fees from the aggregators that put together the investments, as Putman knew. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 107; Ex. 35, 2/16/07-2/17/07 email from Gayner to Riek, forwarded from Riek to Putman) When Brown or Baetis, using money invested by the WM Funds, would make an investment in a life insurance policy, the insurance company that issued the policy would pay the insurance agent a commission, and then the insurance agent would give a portion of that commission to the aggregator. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 45-46) Typically, an insurance agent received a commission in the range of 80 to 140 percent of the first year's premium on the policy, and then the insurance agent paid a portion of that commission to the aggregator. (7/28/10 Deposition of Joseph Aaron at 99-100) The aggregator then paid a portion of that amount to Riek as a finder's fee for introducing WM as an investor in the policy. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 111-14)[2]

33. In 2005, Riek offered Putman the opportunity to share in the finder's fees Riek was receiving from the WM Funds' investments in life insurance premium financing. (*Id. at* 46) At that time, Putman declined Riek's offer, telling Riek that he did not want to accept a portion of the finder's fees because he would have to disclose this compensation to his clients and to NAPFA, where he was President. (*Id. at* 46-47) Putman told Riek that accepting a portion of the finder's fees would not be allowed for a fee-only financial planner such as Putman. (*Id. at* 47)

34. However, after initially declining Riek's offer to share in these finder's fees, Putman suddenly reversed course and decided to accept them. (*Id. at* 52) In April 2006, Riek, Putman and Fevola started discussing forming an entity that would serve as a vehicle for Riek,

---

[2] Riek also received a finder's fee from MKA for introducing the WM Funds as an investor in the MKA Funds. (*Id. at* 101)

12

Putman, and Fevola to share in a portion of the finder's fees generated by the WM Funds' investments in life insurance premium financing. (*Id. at* 50) At this time, Riek, Putman and Fevola discussed that if Putman and Fevola accepted these finder's fees, Putman and Fevola would have to disclose this to WM's clients. (*Id. at* 50-53; Ex. 30, Summary of Thomas Riek Calendar Entries 2004-2007, 4/17/06 meeting summary)

35. In August 2006, Riek, Putman, and Fevola formed Quadrimus LLC ("Quadrimus") as the entity through which they would share in the finder's fees derived from the WM Funds' investments in life insurance premium financing. (*Id. at* 55) When they were forming Quadrimus, Fevola remarked to Putman and Riek that the name of the entity would sound good on the monthly investor newsletters that WM sent to clients invested in the WM Funds. (Ex. 47, 8/22/06 email from Fevola to Putman and Riek) Before and after Quadrimus was formed, Riek questioned Putman about whether Putman and Fevola had disclosed to WM clients that they would be receiving a share of the finder's fees derived from the WM Funds' life premium financing investments, and Putman assured Riek that they had done so. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 50-58)

36. In September 2006, Riek notified Putman and Fevola that Quadrimus would be receiving its first share of commissions generated by the WM Funds' investments in life insurance premium financing, to which Putman responded: "Great news!", then adding: "Let's hope this leads to more good things!!" Even though Quadrimus only was in business in 2006 for receive payments for four months of that year, Riek, Putman, and Fevola each received $265,000 from Quadrimus in 2006. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 71-72; Ex. 36, 12-13-06 Quadrimus Info Meeting Notes)

37. In 2007, the money from Quadrimus to Putman kept coming in. In April 2007, Riek forwarded Putman a message from one of the life insurance premium financing

13

aggregators, who told Riek that he had a full pipeline of life insurance policies that the WM Funds could invest in. (Ex. 37, 04/17/07 email from Keller to Riek, forwarded by Riek to Putman) Putman responded: "Yes, yes, yes. I like full pipelines!" (*Id.*) A full pipeline from the aggregators meant more money for Putman and Quadrimus. (Ex. 1, 4/20/11 Deposition of James Putman at 111)

38. In 2007, Putman received $975,000 through Quadrimus, representing his share of finder's fees from the WM Funds' investments' in life insurance premium financing. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 73) Combined with Putman's 2006 income from Quadrimus, Putman received a total of $1,240,000 in commissions through Quadrimus. (Ex. 5, Putman Answers to Requests to Admit, # 14) This amount dwarfed the amount of salary, bonus, and other compensation Putman received from WM during this same period. (Ex. 6, 3/12/09 Testimony of James Putman at 119-21)[3]

39. At some point, at Aaron's request, life insurance aggregators began paying a portion of their commissions to Brown and Baetis, in addition to Quadrimus. (7/28/10 Deposition of Joseph Aaron 101-03, 122-24) Putman and Fevola were involved in these discussions, and they decided with Aaron that a portion of the commissions should be directed to Brown and Baetis and a portion should be directed to Quadrimus. (Ex. 19, 7/22/10 Deposition of Thomas Riek at 75-77)

40. For example, in a June 2007 email from Riek to Beau Gayner ("Gayner"), an aggregator, which Riek then forwarded to Putman, Riek told Gayner that Putman and Fevola had approved accepting 25% of the aggregator's share of insurance commissions derived from the WM Funds' life insurance premium investments, with 15% going to Quadrimus and 10% going to Brown. (Ex. 38, 06/29/07 email Riek to Gayner, forwarded by Riek to Putman)

---

[3] Prejudgment interest on this amount equals $290,129. (Ex. 45, Declaration of Luz Aguilar)

41. Putman expressed his opinion to Fevola and Riek about which investments Brown and Baetis should make based, in part, on how much money a particular investment would generate for Quadrimus. (Ex. 1, 4/20/11 Deposition of James Putman at 110) For example, in an April 2007 email, Putman, upset that an aggregator, Gayner, had not paid Quadrimus sufficiently and in a timely manner, told Fevola that Brown and Baetis should invest in life insurance premium financing investments by a different aggregator, Kevin Yurkes, stating: "I am not comfortable giving [Gayner] any more money at this time. I thought we get 20% from Kevin Yurkes? Who gives us 15%? If you think these cases are of high quality and Beau comes up with 20% I would agree to funding these but only if you are comfortable. Yurkes is giving us a good deal with no bad JuJu. If we get the same dough from Kevin, why do we want to 'help' Beau out when he really hasn't helped us from the start." (Ex. 1, 4/20/11 Deposition of James Putman at 104-08; Ex. 48, 04/23/07 email Putman to Fevola)

42. In another email, in May 2007, Putman, still upset about Gayner's slow payments to Quadrimus wrote to Riek, stating: "Let's hope Beau is motivated to send [Quadrimus] some dough. He should feel obligated from the business we sent his way," referring to the investments that the WM Funds had made through Brown and Baetis. (Ex. 1, 4/20/11 Deposition of James Putman at 112-13; Ex. 39, 05/30//07 email Putman to Riek) In July 2007, at a Quadrimus Board Meeting, Putman, Fevola, and Riek voted not to have the WM Funds make any further investments in life insurance premium financing investments with Gayner as the aggregator because Gayner had "stiffed" Quadrimus out of commissions that Gayner owed. (Ex. 1, 4/20/11 Deposition of James Putman at 124-125; Ex. 40, Minutes of 07/03/07 Quadrimus Meeting)

43. Putman did not disclose his receipt of commissions through Quadrimus until May 2008. (Ex. 5, Putman Answers to Requests to Admit, # 4) When the WM Board of Managers discovered Putman's receipt of these commissions, they ousted him from WM. (Ex. 9, 4/26/11

15

Deposition of Lori Coonen at 60-61) Putman's receipt of commissions was misconduct that constituted a direct conflict with his representations that he was a fee-only investment adviser (*id.* at 63-64; Ex. 12, 3/30/11 Deposition of Chad Morley Morley at 57-58) and the representations in WM's Form ADV, which represented that WM did not accept commissions as part of its compensation for giving advisory services and that no person related to WM received any economic benefit in connection with giving advice to clients. (Ex. 2, WM Form ADV at Item 5, pp.7-8 of 32, Part II, Item 13, p. 6; Ex. 9, 4/26/11 Deposition of Lori Coonen at 64-69)

44. The SEC's expert, Harold Evensky, states that Putman's acceptance of undisclosed, significant payments by various entities associated with investments made by the WM Funds was inconsistent with industry standards and an extreme departure from the applicable standard of care for investment advisers and financial planners. (Ex. 34, Declaration of Harold Evensky, ¶ 5)

## V.     The WM Funds Collapse, Causing Devastating Losses

45. By late 2007, the WM Funds' investments with MKA and in life insurance premium financing investments began to unravel. In late 2007, Putman and Fevola met with the principals of MKA. After the meeting, WM concluded that MKA's real estate projects were "dead in the water," with no hope for a turnaround for a year or more. (Ex. 41, 11-08-07 MKA Due Diligence Update) After reading a negative report issued by MKA, Putman wrote in an internal WM November 2007 email that it "[d]oesn't look good for MKA and our funds for 2007-2008." (Ex. 49, 11/5//07 email Putman to WM staff) By January 2008, Putman was telling other WM employees to prepare for 50% losses on the WM Funds investments with MKA. (Ex. 42, 01/24/09 email Putman to Fevola, cc: Coonen, Fuss)

46. In 2007, MKA suspended redemptions from its funds. (Ex. 21, Declaration of James Keane at ¶ 11) Despite this grim news, WM continued to report to investors that the WM

16

Funds' investments had significant value. (Ex. 11, Gryphon and WatchStone Monthly Investor Reports, 2008 Investor Reports).

47.     Likewise, by November 2008, Putman knew that the WM Funds' life insurance premium financing investments were lapsing (Ex. 43, 2-25-11 Deposition of James Putman at 153), but WM continued to ascribe significant value to those investments in its monthly investment reports to clients. (Ex. 11, Gryphon and WatchStone Monthly Investor Reports, 12/1/08 Investor Reports; Ex. 43, 2-25-11 Deposition of James Putman at 153-59)

48.     In early 2008, WM began to limit redemptions from the WM Funds. (Ex. 12, 3/30/11 Deposition of Chad Morley at 35-36) In May 2009, the SEC filed this emergency action against Putman, Fevola, and WM, and the Court appointed a receiver over WM and the WM Funds. (Docket #1, #8) The collapse of the WM Funds and Putman's breach of trust has caused devastating losses and pain to WM's clients. (Ex. 10, Declaration of David and Jean Lawrence, ¶ 11; Ex. 44, Declaration of John and Teresa Bobinski, ¶ 11)

Respectfully submitted,

/s/ Eric M. Phillips
Eric M. Phillips (IL Bar No. 6237871)
Attorney for Plaintiff
U.S. Securities and Exchange Commission
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Phone: (312) 353-7390

Dated: September 9, 2011