UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

  v.                                                           Case No. 9-C-506

WEALTH MANAGEMENT, LLC,
JAMES PUTMAN, and
SIMONE FEVOLA,

       Defendants, and

WML GRYPHON FUND, LLC,
WML WATCH STONE PARTNERS, L.P.;
WML PANTERA PARTNERS, L.P.,
WML PALISADE PARTNERS, L.P.,
WML L3, LLC,
WML QUETZAL PARTNERS, L.P., and
EMPLOYEE SERVICES OF APPLETON, INC.,

       Relief Defendants.

## DECISION AND ORDER

The Securities and Exchange Commission brought this enforcement action against Wealth Management LLC, Wealth Management's founder James Putman, and Wealth Management's former president and chief investment officer Simone Fevola, alleging that the defendants violated the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*; the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*; Rule 10b-5, 17 C.F.R. § 240.10b-5; and the Investment Advisor Act of 1940, 15 U.S.C. § 80b-1, *et seq.* Presently before the court is Lincoln National Life Insurance Company's motion to intervene pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure. For the reasons stated below, the motion will be denied.

**BACKGROUND**

The original action in this case commenced over ten years ago, on May 20, 2009, when the SEC filed this action against Wealth Management, James Putnam, Simone Fevola, and six "relief defendant" funds. On that same date, this court appointed Ms. Faye Feinstein as the Receiver of Wealth Management, the various Wealth Management funds, and Employee Services of Appleton, Inc. *See* Order Appointing Receiver, Dkt. No. 8. Ms. Feinstein, in the course of her Receivership, has retained Quarles & Brady LLP as her counsel in this action, and both regularly apply to the court for approval of compensation for their services.

In carrying out her duties as Receiver, Ms. Feinstein engaged in negotiations with the law firm of Melnick & Melnick, S.C. to act as special litigation counsel in the action and to "(a) investigate the potential liability of numerous entities, including, insurance companies . . . for the losses sustained by investors in the Brown and Baetis funds; and (b) consider the pursuit of such claims." Receiver's Br. in Opp., Dkt. No. 477, at 7. Following negotiations, the court authorized the Receiver to execute an engagement letter and retain Melnick & Melnick, S.C. *See* Order, Dkt. No. 352. Following investigation by Melnick, the firm informed Ms. Feinstein that it was prepared to pursue litigation in Wisconsin state court, and in December 2012, Ms. Feinstein authorized four of the Wealth Management funds to file suit against various defendants in Outagamie County. One of those defendants was Lincoln. Lincoln's Br., Dkt. No. 471, at 4.

Prior to and during the course of the Outagamie County litigation, both Ms. Feinstein and Quarles had represented Lincoln in various matters. Lincoln, through its affiants, asserts that Quarles represented Lincoln in thirteen matters from 2001 until 2009, and that Ms. Feinstein was specifically retained in actions relating to bankruptcy, foreclosures, and building code violations in

2010, 2011, 2013, 2014, and 2015. Lincoln maintains that Ms. Feinstein should have identified the potential conflict of interest with her Receivership as early as 2010, but failed to recognize it then, and further failed to disclose the conflict in 2014 when she was retained in litigation with the City of Chicago that was unrelated to the litigation in this action. *Id.* Quarles, on the other hand, maintains that Lincoln should have known of a potential conflict as early as 2013, when Ms. Feinstein informed Mary Jo Potter, associate general counsel for Lincoln, that Ms. Feinstein was acting as a Receiver, although Ms. Potter says she is certain that Ms. Feinstein did not indicate that the Receivership was involved in litigation directly adverse to Lincoln. Potter Aff., Dkt. No. 474-2, ¶¶ 9–11.

Regardless, it was not until July 2018 that Lincoln acted, when the City of Chicago filed another complaint against Lincoln. The attorney handling that complaint, Jeffrey Davis, is also representing Lincoln in the Outagamie County litigation. Upon investigation, Mr. Davis discovered that Ms. Feinstein, who was Lincoln's counsel in the City of Chicago litigation, was also directing the lawsuit against Lincoln in the Outagamie County litigation in her capacity as a Receiver. Lincoln's Br., Dkt. No. 471, at 4. Upon discovery of this potential conflict, Lincoln notified Ms. Feinstein, who denied any conflict and referred Lincoln to Don Schott, Quarles' general counsel. *Id.* In October 2018, Mr. Davis sent Mr. Schott a letter, demanding that Ms. Feinstein resign as receiver, that Quarles disgorge all fees paid by Lincoln to Quarles since 2009, and that Quarles waive all pending invoices. During a November 2018 phone call, Mr. Schott informed Lincoln that he had refused Lincoln's demands and denied that a conflict existed. *Id.* Following the refusal, Lincoln attempted to work directly with the SEC to resolve the conflict, but ultimately filed this

motion to intervene for the purpose of disqualifying Ms. Feinstein as Receiver of Wealth Management, and to disqualify Quarles as counsel to the Receiver.

**ANALYSIS**

Under Federal Rule of Civil Procedure 24(a)(2), a party must be allowed to intervene in an action if it "claims an interest relating to the property or transaction that is the subject of the motion, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." A party has a right to intervene when (1) the motion to intervene is timely filed; (2) the proposed intervenors possess an interest related to the subject matter of the action; (3) disposition of the action threatens to impair that interest; and (4) the named parties inadequately represent that interest. *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 657–59 (7th Cir. 2013). The party seeking to intervene has the burden to show that all four criteria are met. *Reid L. v. Ill. State Bd. of Educ.*, 289 F.3d 1009, 1017 (7th Cir. 2002). Failure to satisfy any one factor mandates denial of the petition. *United States v. City of Chicago*, 908 F.2d 197, 199 (7th Cir. 1990). "In evaluating the motion to intervene, the district court must accept as true the non-conclusory allegations of the motion." *Lake Investors Dev. Grp., Inc. v. Egidi Dev. Grp.*, 715 F.2d 1256, 1258 (7th Cir. 1983).

Taking the issue of timeliness first, the court concludes that Lincoln's motion to intervene was not timely. The Supreme Court mandates that "the court where the action is pending must first be satisfied as to timeliness." *N.A.A.C.P. v. New York*, 413 U.S. 345, 365 (1973). Timeliness is not "limited to chronological considerations but is to be determined from all the circumstances." *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 388 (7th Cir. 2019) (quoting *City of Bloomington v. Westinghouse Elec. Corp.*, 824 F.3d 531, 534 (7th Cir. 1987)). When considering

4

whether a motion to intervene is timely, the court considers four factors: "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; and (4) any other unusual circumstances." *Id.* (quoting *Sokaogon Chippewa Cmty.v. Babitt*, 214 F.3d 941, 949 (7th Cir. 2000)). The test for timeliness is "essentially one of reasonableness" and potential intervenors need to be "reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly." *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) (citations omitted). Whether a motion to intervene is timely is "committed to the sound discretion of the district court." *Shea v. Angulo*, 19 F.3d 343, 349 (7th Cir. 1994) (quoting *City of Chicago*, 908 F.2d at 199).

The policy behind the timeliness requirement is to "prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." *United States v. South Bend Cmty. Sch. Corp.*, 710 F.2d 394, 396 (7th Cir. 1983). Furthermore, "[t]he timeliness requirement forces interested non-parties to seek to intervene promptly so as not to upset the progress made toward resolving a dispute." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 797 (7th Cir. 2013). Other circuits have recognized that the timeliness requirement is a "guard against prejudicing the original parties by failure to apply sooner." *Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 865 (5th Cir. 2019) (citations omitted). Here, while Lincoln may not be derailing a lawsuit within sight of the terminal, Lincoln's tardiness in filing this motion is greatly upsetting the progress that was made in settling the original dispute, and is also upsetting the progress being made in the Outagamie County litigation. Lincoln's "failure to apply sooner" is prejudicing the original parties, and thus, as noted by the Fifth Circuit, the timeliness requirement must act as a guard against such prejudice.

5

Beginning with the length of time Lincoln knew or should have known of its interest in the case, the court notes that it "determine[s] timeliness from the time the potential intervenors learn that their interest might be impaired." *Reich*, 64 F.3d at 321. Lincoln was first sued in Outagamie County in 2012, but argues that it was unaware that Ms. Feinstein and Quarles would not adequately protect Lincoln's interest in its privileged information until November 2018, when Quarles denied that a conflict existed and refused Lincoln's demands. Lincoln's Br., Dkt. No. 471, at 6. Despite Lincoln's contention, the record reveals that Lincoln should have known of Ms. Feinstein's potential conflict as early as 2013. In 2013, the defendant insurance companies in the Outagamie County litigation filed a motion to dismiss, to which Stephanie L. Melnick filed an affidavit in opposition. In the third paragraph of that affidavit, Ms. Melnick indicates that she attached to the affidavit, as Exhibit 1, the order from this court appointing Ms. Feinstein as Receiver for Wealth Management and its relevant funds. *See* Melnick Decl. Ex. C, ¶ 3 & Ex. 1, Dkt. No. 478-3. While Lincoln characterizes this exhibit as "buried," the court does not do the same. Had Lincoln been "reasonably diligent," an act as simple as reading a document that had been filed in a case to which Lincoln was a party, Lincoln would have realized then and there, that Ms. Feinstein may have a potential conflict, and it could have taken steps to alleviate the problem starting nearly six years ago. A six-year delay in filing a motion to intervene is categorically untimely.

But even if the court were to conclude that the exhibit was "buried" and that Lincoln did not know and could not have known that it had an interest in the case, then the court can look to Lincoln's own in-house attorneys, who recall Ms. Feinstein raising her position as a Receiver with them. In either 2013 or 2015, Ms. Feinstein raised her position as a Receiver with Mary Jo Potter, Associate General Counsel for Lincoln. Ms. Potter recalled Ms. Feinstein mentioning the

Receivership and she also recalled Ms. Feinstein assuring her that the Receivership would not pose a conflict to Lincoln. Potter Aff., Dkt. No. 474-2, ¶¶ 9–10. Ms. Potter further noted that she did not understand why Ms. Feinstein had raised the issue of the Receivership, and that she was never provided with a case number or a notice of conflict in writing. But Ms. Potter wasn't the only one who was told of the Receivership. Eric Deskins, an attorney for Lincoln, had a discussion with Ms. Feinstein in 2014 in which Ms. Feinstein mentioned her Receivership. Again, Mr. Deskins says he was not given a case number, and that he had not understood why Ms. Feinstein raised the issue. Deskins Aff., Dkt. No. 474, ¶¶ 6–7. Lincoln indicates that even after these conversations took place, Lincoln did not know and could not have known of its interest in the case. It seems clear that Ms. Feinstein's statements regarding the Receivership and her belief that it would not pose a conflict with Lincoln would be worth questioning and investigating, and it would not seem reasonably diligent to let such a comment pass without further inquiry. Based on these conversations, it is possible that Lincoln should have known of the potential conflict as early as 2013 or 2015, depending on the year in which Ms. Feinstein discussed the matter with Ms. Potter. Yet again, we face a lengthy delay either way, and whether it is a six year delay or a four year delay, neither would be considered timely.

But even if the court assumes that Lincoln did not know or could not have known as early as 2015 that its interests were implicated, then Lincoln certainly knew or should have known in July 2018, when Mr. Davis, allegedly for the first time, discovered the potential conflict. If we start the "timeliness clock" in July of 2018, then Lincoln still waited eight months to file its motion to intervene. In this circuit, a time frame of eight months, and sometimes even shorter, has been deemed untimely. *See South Bend Cmty. Sch. Corp.*, 710 F.2d at 396 (stating that filing the motion

7

four and a half months from the point of knowledge was untimely); *Atl. Mut. Ins. Co. v. Nw. Airlines, Inc.*, 24 F.3d 958, 961 (7th Cir. 1994) (noting that filing more than three months after the decision was not "timely by any standard"); *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14-C-1748, 2018 WL 5884519 (N.D. Ill. 2018) (stating that filing the motion at a minimum of three months after having known or should have known was untimely). Lincoln's defense of this time frame is that it spent the time between July and November working with Quarles, Ms. Feinstein, and the SEC to attempt to resolve the problem directly. However, even if the court accepts this as true and accepts that the negotiations broke down in November 2018, it still took Lincoln another five months to file the motion. If the discussions on resolving the problem stalled in November, why was the motion not filed then? Lincoln's answer to this question is that it spent the time researching and drafting the motion, and that its thorough research justifies the length of time it took to file the motion.

In support of its contention, Lincoln cites *Board of Managers v. Wabash Loftominium*, 876 N.E.2d 65 (Ill. App. Ct. 2007). But that case is distinguishable from the instant case. First, and most obvious, this court is not required to follow a state court's decision applying a state rule. Second, the motion in that case "came early in the proceedings rather than as an after thought," whereas this motion has come over six years after the case was administratively closed by the court. *Id.* at 77. While the court does not characterize this motion as an "afterthought," this motion appears over ten years after the initial litigation began, seven years after suit was filed against Lincoln in Outagamie County, six years since the closing of this case, and eight months following Lincoln's alleged first moment of knowledge. In addition, the party in *Wabash* had far more to review in terms of documents, needing to survey 865 pages of invoices which ultimately revealed

8

263 billing invoices and at least 60 instances of representation. *Id.* at 70. In this case, Lincoln has made no showing that its research was significant or time-intensive. Lincoln, in fact, has discovered less than a third of the engagements that were discovered in *Wabash*, and likely had less paperwork to sort through. Even so, the court would not find reviewing invoices a sufficient reason to justify an eight month delay in filing a motion to intervene. Therefore, the court need not, and will not, follow the Illinois Court of Appeals' stance on the issue.

The second factor, the prejudice caused to the original parties, also weighs in favor of the motion being untimely. The Seventh Circuit has noted that this factor is the "most important consideration in deciding whether a motion for intervention is untimely." *Lopez-Aguilar*, 924 F.3d at 389 (citation omitted). The prejudice caused to the original parties by this motion would be substantial. For over ten years, Ms. Feinstein has acted as Receiver for Wealth Management and she has diligently performed her duties in that capacity. If this motion were granted, Lincoln would be derailing a lawsuit and its corresponding Receivership. Ms. Feinstein has accumulated a great deal of knowledge and experience during her Receivership, and she is in the best position to oversee the resolution of it. If this motion were granted, the court would need to appoint a new Receiver, who would then be required to learn all of the inner workings of Wealth Management, its funds, and its investors. The new Receiver would also need to become acquainted with the Outagamie County litigation, which would likely lead to more delays in that litigation. For example, on October 24, 2018, Lincoln informed Melnick that Lincoln would not produce any witnesses in response to Melnick's Notice of Deposition, pending resolution of Lincoln's dispute with Ms. Feinstein. Receiver's Br. in Opp., Dkt. No. 477, at 20. One week later, the deadline to complete mediation was delayed three months, and on March 11, 2019, that deadline was delayed two more months,

9

while the dispositive motion deadline was delayed for four months. *Id.* at 21. More recently, a co-defendant in the Outagamie County case moved to stay all deadlines and proceedings until this Receivership issue is resolved and Lincoln joined that motion. *Id.* Although the court denied the request for the general stay in proceedings, it did stay the court-ordered mediation and the Receiver's deposition, pending a status conference scheduled for September. *Id.* The delay that this motion has already caused, if only in part, to the Outagamie County litigation would only compound in its effect. The appointment of a new receiver would not only result in more delays and complications in this litigation, but it would further the delay and harm to the Outagamie County litigation. Furthermore, the investors in Wealth Management would suffer yet another delay in their quest for justice and repayment. The instant case has already seen ten years of ongoing work, and the Outagamie County litigation has seen nearly seven years. Regardless of who is responsible for what portion of the delay, any further delays would be prejudicial to the original parties to this case, especially the investors of Wealth Management. Granting this motion would delay the resolution of the Receivership, delay this litigation and the Outagamie County litigation, and harm the investors in Wealth Management.

The third factor, prejudice to the intervenor if the motion is denied, also weighs in favor of the motion being untimely. Lincoln alleges that Ms. Feinstein has acquired "privileged and proprietary information regarding Lincoln's policies and procedures for the distribution of life insurance proceeds" and has insight into Lincoln's "litigation and settlement practices." Lincoln's Br., Dkt. No. 471, at 2. Despite these claims, Lincoln has made no allegation that Ms. Feinstein has disclosed or will disclose the information that she allegedly has. Lincoln's main concern is that Ms. Feinstein will use this information in the Outagamie County litigation of which Lincoln is a

defendant. Addressing the most salient point first, Ms. Feinstein is not directly litigating the Outgamie County litigation. As noted previously, Ms. Feinstein engaged, and the court approved, Melnick & Melnick S.C. as special litigation counsel, and they are the attorneys actively handling the Outagamie County litigation. While Ms. Feinstein may have approved and directed that Melnick file suit against Lincoln and its co-defendants, Ms. Feinstein is not the attorney handling the case. But even so, the information that would allegedly be used against Lincoln by Ms. Feinstein in the Outagamie County litigation is not so strong as to warrant intervention. On a more substantive track, Lincoln alleges that its "policies and procedures" are known to Ms. Feinstein. Even if this is true, it is unlikely that such information will decide the Outagamie County litigation or prejudice Lincoln in any serious manner. The litigation in Outagamie County will undoubtedly hinge on far more important considerations. Lincoln further alleges that Ms. Feinstein has "insight" into Lincoln's litigation and settlement practices, an allegation so general that it can hardly be said that the information will prejudice Lincoln. If Ms. Feinstein has "insight" into such practices, she will only have knowledge of such practices in terms of what cases she has worked on. It is highly unlikely that Lincoln would pursue the same course of litigation in a building-code violation case with the City of Chicago, as it would with an ongoing life-insurance case in Outagamie County, Wisconsin. The prejudice to Lincoln if this motion is denied will be, at most, minimal, and far less than the prejudice caused to the original parties.

 Lastly, Lincoln asserts that, should Ms. Feinstein be allowed to continue as Receiver, the integrity of this litigation and the Outagamie County litigation will be impaired. But the court sees no such reason to conclude the same. Ms. Feinstein is a neutral Receiver in the matter, and she is taking no active role in the litigation against Lincoln in Outagamie County. She simply directed

11

Melnick & Melnick S.C. to pursue the claims that they had investigated. In fact, on this point, Lincoln seems to be asserting that, by allowing Ms. Feinstein to continue as receiver, Ms. Feinstein may actually help Lincoln, to the detriment of the Wealth Management investors. The court finds it hard to believe that Lincoln would intervene for the purpose of protecting the interests of the parties filing suit against it. As there are no unusual circumstances in this case, the court need not address the fourth factor. In sum, Lincoln's motion to intervene is untimely and is denied.

## CONCLUSION

For the reasons above, Lincoln's motion to intervene (Dkt. No. 470) is **DENIED**. Lincoln's motion to disqualify (Dkt. No. 472) is **DENIED as moot**.

**SO ORDERED** this   8th   day of July, 2019.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
